COOLEY LLP
SIMONA AGNOLUCCI (246943)
(sagnolucci@cooley.com)
EDUARDO SANTACANA (281668)
(esantacana@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California  94111-4004
Telephone:    +1 415 693 2000
Facsimile:    +1 415 693 2222

COOLEY LLP
NATALIE PEELISH (*Appearance Pro Hac Vice*)
(npeelish@cooley.com)
1700 Seventh Avenue, Suite 1900
Seattle, Washington  98101-1355
Telephone:    +1 206 452 8700
Facsimile:    +1 206 452 8800

Attorneys for Defendant
LINKEDIN CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICHOLAS FARRELL, individually and on behalf of all other persons similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Related Cases:<br>No. 3:26-cv-02953-VC<br>No. 3:26-cv-02968-VC<br><br>**DECLARATION OF TYLER SEYMOUR IN SUPPORT OF DEFENDANT LINKEDIN CORPORATION'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**<br><br>Date:        September 3, 2026<br>Time:        10:00 a.m.<br>Location:    17th Floor, Courtroom 3<br>Judge:       Honorable Vincent Chhabria<br><br>Date Action Filed: April 6, 2026 |
| JEFF GANAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | |

I, **TYLER SEYMOUR**, declare as follows:

1. I am the Principal Trust and Safety Investigator at LinkedIn Corporation ("LinkedIn"). I have served in this role since April 1, 2024 and have been employed at LinkedIn since January 13, 2020. In my role, I have direct supervisory responsibility for and personal knowledge of LinkedIn's technical systems, including the anti-abuse and bot detection systems described in the complaint filed in the above-captioned matter. I make this declaration based on my personal knowledge and on my review of LinkedIn's technical systems, architecture, and documentation. If called as a witness, I could and would testify competently to the matters stated herein.

2. I submit this declaration to provide the Court with accurate technical context regarding: (a) the nature and function of browser extensions and the publicly accessible information they expose by design; (b) the nature and purpose of LinkedIn's browser extension-detection systems; (c) the nature and purpose of LinkedIn's device fingerprinting systems; (d) the technical relationship between those systems.

A. **Automated scraping costs LinkedIn and its members.**

3. LinkedIn operates a social networking platform for professionals around the world.

4. LinkedIn faces a substantial, ongoing threat from automated scraping and bot activity. Automated bots and scraping tools impose real costs: they harvest member data for unauthorized redistribution, generate artificial engagement signals that degrade platform quality, and execute automated connection requests and messages that can constitute spam. Even seemingly harmless extensions can be designed to scrape the website a user visits and extract information from it, thereby consuming server capacity and degrading service for legitimate members.

5. LinkedIn prohibits the use of browser extensions and third-party software that scrape, automate, or modify LinkedIn's services, as stated in LinkedIn's Prohibited Software and Extensions policy and User Agreement.[1]

---

[1] *Prohibited Software and Extensions*, LinkedIn Help, https://www.linkedin.com/help/linkedin/answer/a1341387/prohibited-software-and-extensions (last visited June 30,

6. A Chrome browser extension is a software component that modifies or extends browser functionality. Extensions are distributed through the Chrome Web Store and are identified by a unique publicly registered extension ID—a 32-character string that is identical for every member who installs a given extension from the Chrome Web Store. These IDs are publicly listed on the Chrome Web Store alongside the extension's name, developer, description, and permissions.[2]

7. Browser extensions are commonly used in automation stacks. Scrapers, CAPTCHA solvers, and workflow automation tools frequently rely on extensions to simplify or scale abuse. Even when an extension is not actively used on a given site, its presence can still reveal information about the environment. Detecting browser extensions therefore provides valuable context when it comes to fraud and bot detection.

8. These risks are not merely hypothetical. For example, last fall, LinkedIn identified traffic patterns at 100x the volume of a normal user among a small subset of members, seriously degrading site performance and causing a site outage event. Investigating the links between the traffic patterns, LinkedIn confirmed that nearly all of them were detected as having a particular Chrome extension installed. LinkedIn then conducted follow up analysis of the extension to confirm it was capable of causing the observed traffic spike. All of this evidence provided sufficient confirmation of the responsible party, allowing LinkedIn to take action against the extension developer and mitigate the on-platform harm as soon as possible.

**B. LinkedIn protects its platform and members via browser extension detection.**

9. To combat the threat of automated scraping and bot activity, LinkedIn deploys multi-layered anti-abuse systems, including browser extension-detection systems.

---

2026); *see also User Agreement* § 8.2(2), LinkedIn (effective Nov. 3, 2025), https://www.linkedin.com/legal/user-agreement (last visited June 30, 2026) (prohibiting "us[ing] software, devices, scripts, robots or any other means or processes (such as crawlers, browser plugins and add-ons or any other technology) to scrape or copy the Services, including profiles and other data from the Services").

[2] *Manifest - Web Accessible Resources*, Chrome for Developers, https://developer.chrome.com/docs/extensions/reference/manifest/web-accessible-resources (last visited June 30, 2026).

10. The primary purpose of LinkedIn's browser extension-detection systems is to identify whether a visitor to LinkedIn's platform is operating a browser extension that could be associated with scraping, automation, or other prohibited activity in order to ensure the security and integrity of the LinkedIn platform.

11. LinkedIn's browser extension-detection system works as follows: LinkedIn maintains a list of extension IDs for extensions that are known or believed to operate on or interact with the LinkedIn website. When a member loads a LinkedIn page in a Chromium-based browser (including Google Chrome), LinkedIn's JavaScript checks whether a web-accessible resource associated with any listed extension can be retrieved. If such a resource is found, it is a signal—not a conclusion—that the browser environment may include a prohibited tool.

12. Web-accessible resources ("web_accessible_resources") are files inside a browser extension that can be accessed by web pages or other extensions; they are part of Chrome's browser extension architecture. Extension developers typically use this feature to expose images or other assets that they want to be loaded in web pages, but any asset included in an extension's bundle can be made web accessible.

13. When an extension developer declares a resource as web-accessible, they choose to expose that resource to the web.

14. Accordingly, when a website detects whether a member has a particular extension installed—by checking for the presence of a web-accessible resource—it is simply observing information that the extension developer has, by architectural choice, made publicly accessible to any website the member visits.

15. LinkedIn also operates a passive DOM-based detection system called Spectroscopy. Spectroscopy detects extensions based on the observable traces that extensions leave behind in a page operation as part of their normal operation. In other words, these are extensions that modify the appearance or operation of the LinkedIn website in some

way, and are detected because they interact with LinkedIn's DOM. DOM-based extension detection does not rely on extension IDs.

**C. Browser extension detection data is not used to generate revenue, nor is it shared with third parties.**

16. Browser extension detection results are used by LinkedIn to engage in the security purposes disclosed in its Privacy Policy, which include investigating fraud, illegal activity, and violations of the User Agreement, and to provide customer support with respect to service issues.[3]

17. LinkedIn has not, and does not, link browser extension detection results to member identities in order to use that information for any revenue-generating, marketing, or advertising purpose.

18. I am not aware of any "profiles," "dossiers," or other collections of information about LinkedIn members containing browser extension detection results. Further, I have investigated the allegation that such collections of information exist at LinkedIn and have found no such evidence. I can say with confidence that LinkedIn does not engage in this practice.

19. Browser tracking events are stored for up to two years. They are not used by LinkedIn for any purpose other than the anti-abuse purposes and customer support services disclosed in LinkedIn's Privacy Policy. For example, if a customer complains about webpage performance, a customer support representative may seek to determine whether the member has browser extensions installed that could degrade webpage performance, and inform the member about those results so they can take action to improve their experience on the platform.

---

[3] *Privacy Policy* § 2.7, LinkedIn (effective Nov. 3, 2025), https://www.linkedin.com/legal/privacy-policy (last visited June 30, 2026) ("We use data (which can include your communications) to investigate, respond to and resolve complaints and for Service issues (e.g., bugs)"); *id.* at § 2.9 ("We and our Affiliates, including Microsoft, may use your data (including your communications) for security purposes or to prevent or investigate possible fraud or other violations of the law, our User Agreement and/or attempts to harm our Members, Visitors, company, Affiliates, or others.").

20. Finally, LinkedIn does not share its browser extension detection results with any third party, including HUMAN Security ("HUMAN"). Based on my investigation, the only data LinkedIn transmits to any third-party in connection with LinkedIn's anti-abuse systems relates to the device fingerprinting system and, as described below, that data does not include browser extension detection results.

**D. LinkedIn's anti-fraud platform features collection ("AFPC") system does not include results from its browser extension detection system.**

21. Separate from its browser extension-detection systems, LinkedIn operates a device fingerprinting system referred to internally as the Anti-Fraud Platform Features Collection ("AFPC") system.

22. For the purpose of bot detection and fraud prevention, the AFPC system collects standard browser and device signals that any website may collect and that the browser passively exposes as part of normal operation. These include, as a representative sample: graphics processing unit (GPU) characteristics derived from canvas and WebGL rendering; CPU core count and device memory; screen resolution and color depth; browser type, version, and operating system; time zone and language settings; font rendering characteristics; network and IP address information; and behavioral signals.[4] These signals do not include extension detection results.

23. LinkedIn engages third-party anti-fraud vendors—including HUMAN, formerly known as PerimeterX—to assist in processing these fingerprinting signals and making bot determinations. LinkedIn provides these vendors with access to device fingerprinting signals for this purpose. It does not include browser extension detection results. The data collected by these vendors is processed for the sole purpose of distinguishing automated bot traffic from genuine human members on LinkedIn's behalf.

---

[4] *Privacy Policy* § 1.5, LinkedIn (effective Nov. 3, 2025), https://www.linkedin.com/legal/privacy-policy (last visited June 30, 2026) ("We also get information about your network and device (e.g., IP address, proxy server, operating system, web browser and add-ons, device identifier and features, cookie IDs and/or ISP, or your mobile carrier).")

24. I understand that Exhibit A attached to this Declaration is a true and correct copy of the October 31, 2023 LinkedIn Data Processing Agreement with HUMAN Security, Inc. ("DPA"). According to the DPA, HUMAN shall "process Personal Data solely for the purposes described in the [Service] Agreement … and will not use or process the Personal Data for any other purpose." DPA Section 4.1. The DPA prohibits HUMAN from "us[ing] the Personal Data to build or modify a profile about a Data Subject or their household to use in providing services to a third-party, or cleaning or augmenting any Personal Data acquired from another source." *Id.* In a schedule attached to the DPA, HUMAN further certifies that "it does not receive LinkedIn Personal Data as consideration for any services and does not otherwise derive value from the processing or use of LinkedIn Personal Data other than the value derived as a result of [its] direct business relationship with LinkedIn … [HUMAN] certifies that it does not and will not sell LinkedIn Personal Data … and acknowledges that it may not retain, use or disclose LinkedIn Personal Data except as is necessary to provide services to LinkedIn." DPA Schedule C (California Consumer Privacy Act of 2018 Certification). I have no reason to believe HUMAN Security has violated those contractual terms.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed June 30, 2026 in Hollister, CA

_____
Tyler Seymour

7