# Exhibit 9

**Related Cases:**
*Farrell v. LinkedIn Corp.*, No. 3:26-cv-02953-VC
*Ganan v. LinkedIn Corp.*, No. 3:26-cv-02968-VC

Certified Copy

## Regional Court of Munich I

| | |
|---|---|
| Ref. no.:    37 O 104/26 | **Received on:**<br><br>**03/11/2026** |

**[emblem]**

# IN THE NAME OF THE PEOPLE

In the legal dispute

1)  **Teamfluence OÜ**, represented by the Managing Director Jan-Jakob Liebling, [redacted]
    - Claimant -

2)  **Liebling** Jan-Jakob, alias Steven Morell, [redacted]
    - Claimant -

Legal representatives for 1 and 2:
Attorneys at Law **Glade Michel Wirtz**, Partnerschaft von Rechtsanwälten mbB, [redacted]
Ref.: 25-118

against

1)  **LinkedIn Ireland Unlimited Company**, represented by its Managing Directors Keith Dolliver, Benjamin Orndorff, James O'Connor, Henry Chi-Ning Fong, and Sue Duke, Wilton Place, Dublin 2, Ireland
    - Respondent -

2)  **LinkedIn Germany GmbH**, represented by the Managing Directors Keith Dolliver, Benjamin Orndorff, Steven Liang-Chun Chen, and Henry Chi-Ning Fong, August-Everding-Str. 24, 81671 Munich
    - Respondent -

Legal representatives for 1 and 2:

Attorneys at Law **Fieldfisher Partnerschaft von Rechtsanwälten mbB**, Amerigo-Vespucci-Platz 1, 20457 Hamburg, Ref.: SZI/SBK/DE01-052492-00036/136693963 v2

in the matter concerning preliminary injunction

the Munich I Regional Court - 37th Civil Chamber - composed of Dr. Althaus the Honorable Presiding Judge at the Regional Court, the Honorable Judge Schmelcher at the Regional Court, and the Honorable Judge Reichert at the Regional Court, issues, based on the oral hearing held on February 18, 2026, the following

37 O 104/26                                         - Page 2 -

# Final Judgment

1.      The request for a preliminary injunction dated January 22, 2026, is dismissed.

2.      The Claimants in the injunction proceedings shall each bear 50% of the costs of the legal dispute.

3.      The judgment is provisionally enforceable. The Claimants may avert enforcement by the Respondents by posting security in the amount of 110% of the amount enforceable under the judgment, unless the Respondents post security in the amount of 110% of the amount to be enforced prior to enforcement.

as well as the following

# Order

The amount of the dispute is set at €25,000.00.

2

# Facts of the Case

The Claimants have filed a motion for a preliminary injunction challenging what they consider to be an unjustified restriction of their user profiles on the "LinkedIn" platform, as well as measures taken against other members of the platform who use the software distributed by Claimant No. 1.

Claimant No. 1 is a company based in Estonia that specializes in the development and provision of software solutions for social media integrations, particularly in the area of browser plugins for the "LinkedIn" platform. For this purpose, it distributes, in particular, the software "Teamfluence". Claimant No. 1 in the injunction proceedings distributes this internationally, though approximately 30% of its sales are to customers in Germany.

Claimant No. 2 in the injunction proceedings is the sole managing shareholder of Claimant No. 1. He uses the "LinkedIn" platform himself under the stage name "Steven Morell" (see Exhibit GMW-eV1).

Respondent No. 1, an indirect subsidiary of Microsoft Corporation based in Ireland, operates the professional network "LinkedIn" available at the URL "www.linkedin.com" in Europe (see Exhibit GMW-eV2). The program aims at connecting professionals and providing them with a platform for publishing professional profiles and exchanging ideas on work- and career-related topics (see Exhibit AG1).

Respondent No. 2 is a subsidiary of Respondent No. 1, with its registered office in Munich. It provides administrative services and customer service for Respondent No. 1 in connection with the "LinkedIn" platform. This includes, in particular, advising customers and users, as well as providing marketing services primarily in the German market. Moreover, Respondent No. 2 enters into contracts with local service providers (see Exhibits AG2, GMW-eV3, and GMW-eV4).

Claimant No. 1 in the injunction proceedings has been distributing the software "Teamfluence", developed specifically for the "LinkedIn" platform, to commercial customers since about June 2023. Since the beginning of 2024, the software has been available as a browser plug-in that can be downloaded via the "Chrome" browser app store and installed and used there.

The Claimant in the injunction proceedings each have maintained a profile on the "LinkedIn" platform for several years. The use of the platform is based on the user agreement of

37 O 104/26                                    - Page 4 -

Respondent No. 1 (see Exhibit GMW-eV6).

According to Section 8.2. of the user agreement, users must refrain from the following, among other things:

"2. Develop, support, or use software, devices, scripts, bots, or other means or processes (such as crawlers, browser plug-ins and add-ons, or other technologies) to scrape the services or to copy profiles and other data from the services";

"7. Infringe upon LinkedIn's intellectual property rights or other rights, including, but not limited to, (i) copying or distributing our educational videos or other materials; (ii) copying or distributing our technology, unless it is provided under open-source licenses; or (iii) using the word "LinkedIn" or our logos in company names, email addresses, or URLs, except as provided in the trademark guidelines";

"10. Without our express permission, create the impression that you are affiliated with LinkedIn or endorsed by LinkedIn (for example, by presenting yourself as a LinkedIn trainer)";

"11. Rent, lease, lend, trade, sell/resell, or otherwise monetize the services or related data, or access the Services or related data without LinkedIn's consent.";

"13. Use bots or other unauthorized automated methods to access the services, add or download contacts, send or redirect messages, create, comment on, like, share, or re-share posts, or otherwise generate inauthentic engagement".

Pursuant to Section 3.4 of the Terms of Use, Respondent No. 1 is entitled to restrict the use of the "Services" under certain conditions. Specifically, it states the following:

**4**

37 O 104/26                                    - Page 5 -

"LinkedIn reserves the right to restrict your use of the Services, including the number of contacts you have and your ability to connect with other members." LinkedIn reserves the right to restrict, suspend, or close your account if you violate this Agreement or any laws or misuse the services (for example, by violating the Dos and Don'ts or Community Guidelines).

We may also remove any content or other information you post if we believe that it violates our Community Guidelines, our Dos and Don'ts, or this Agreement. Learn more about how we moderate content."

In an email dated December 10, 2025 (see Exhibit GMW-eV7), "LinkedIn Enforcement" requested that the Claimants, among other things, cease offering their "Teamfluence" browser plugin. The reasoning given was that the user was engaging in so-called "scraping" of "LinkedIn" data and "automation of LinkedIn services," which violated the user agreement.

In a letter dated December 22, 2025 (see Exhibit GMW-eV8), the Claimants responded and arguing that the relevant Section 8.2.2 of the user agreement violates Regulation (EU) 2022/1925 of the European Parliament and of the Council of September 14, 2022, on contestable and fair markets in the digital sector and amending Directives (EU) 2019/1937 and (EU) 2020/1828 (Digital Markets Act - DMA), and that, consequently, there was no breach of the User Agreement.

By letter dated January 05, 2026 (see Exhibit GMW-eV9), "LinkedIn Enforcement" stated that additional information and explanations from the Claimants for the preliminary injunction were required for more detailed review. The letter did not specify a deadline for the submitting the information.

On January 15, 2026, the individual and professional profiles of the two Claimants in the injunction proceedings were then blocked on the "LinkedIn" platform - without any further prior notice or hearing. The Claimants in the injunction proceedings were informed of this by email on the same day (see Exhibit GMW-eV10). The suspension was justified on the grounds that the Claimants in the injunction proceedings had not responded to the letter dated January 5, 2026 (see Exhibit GMW-eV9).

In a letter dated January 15, 2026 (see Exhibit GMW-eV11), the Claimants filed an objection to the suspension of their user accounts and demanded the immediate reinstatement of their profiles. This request was not granted.

37 O 104/26                                        - Page 6 -

The Claimants in the injunction proceedings argue that the "Teamfluence" software distributed by Claimant No. 1 enables users to analyze data regarding their own activities on the network. The software is designed specifically for sales teams and other business users, enabling them to systematically track and analyze interactions on the "LinkedIn" platform— such as likes, comments, or profile visits, and to use this data for internal business processes, such as customer management or sales. For this purpose, the data is transmitted backend to a cloud, where the data is structured, consolidated, analyzed, and prepared for further processing in the company's own systems, such as CRM or sales tools. The transfer applies exclusively to data to which the respective user has access through their own "LinkedIn" account and that is displayed to them in the browser (see Exhibit GMW-eV1).

"Scarping" as defined in the User Agreement did not occur. "Teamfluence" is rather a tool that processes only those data points that "LinkedIn" displays to the respective user in their browser anyway and stores in the cache. Thus, only data provided to the user themselves would be collected with technical support; a systematic extraction of third-party data or a circumvention of technical safeguards would not take place.

Therefore, the application neither impairs the functionality of LinkedIn nor does it constitute a data protection violation. Furthermore, it is not the responsibility of the Respondents in the injunction proceedings to penalize any violations of data protection law that occur outside the platform. Therefore, the Respondents in the injunction proceedings had no legitimate interest in controlling which software is installed and used on their users' end devices. Ownership of and control over the software environment used would rest exclusively with the users. A general ban on using browser plugins, such as the "Teamfluence" tool provided by the Claimants, cannot be justified.

Insofar as the Respondents invoke a potential trademark infringement, it should be noted that the use of a registered trademark is permissible to the extent that it is necessary to explain the benefits and functionality of a service. This is inevitably the case with a software tool developed specifically for the "LinkedIn" platform, so that even the use of protected images and figurative marks does not, in this instance, constitute grounds for suspending the Claimants' user accounts.

37 O 104/26                                          - Page 7 -

The suspension of the user accounts of the two Claimants was unjustified. There is no violation of the terms of use. In any case, a distinction must be made between the distribution of the software and the use of the "LinkedIn" accounts. Furthermore, the provision in Section 8.2.2 of the user agreement violates mandatory provisions of the DMA which applies to the Respondents due to their position as a gatekeeper. It follows specifically from Article 6(10) of the DMA and Article 6(12) of the DMA that the Claimants in the injunction proceedings have a right to (real-time) access to the platform operated by the defendants in the injunction proceedings, such that the block must be lifted on that basis alone. The clause in the User Agreement that restricts this right is contrary to this provision; against this background, it is void and therefore cannot be invoked as grounds for a suspension.

In particular, the Respondents in the injunction proceedings have not yet provided commercial users and the third parties authorized by them with any other alternative means of access or interface that meets the legal requirements for effective, high-quality, and permanent real-time access to the data generated on "LinkedIn". In particular, access via the "Pages Data Portability API" is not sufficient. These are subject to significant capacity and speed limitations, meaning that real-time data access is not provided, and they are practically unusable for so-called "business users" anyway. In any event, Claimant No. 1 in the injunction proceedings filed a corresponding request with the Respondents in the injunction proceedings, which was rejected without justification (see Exhibits GMW-eV25 and GMW-eV26), and the user accounts at issue were suspended immediately thereafter. Even "LinkedIn Sales Navigator" - which is a paid service anyway and thus does not meet the requirements of Article 6(10) of the DMA - does not provide the access required by Article 6 of the DMA; rather, this tool merely allows for an advanced search for companies and individuals and the export of this data to Salesforce.

The suspension of the Claimants' user accounts constitutes a targeted measure against the Claimants seeking a preliminary injunction. The background of this is that the Respondents offer a product competing with "Teamfluence" with their own software, "LinkedIn Sales Navigator" (see Exhibit GMW-eV27), and that competition is to be restricted accordingly by the Respondents. In fact that the Respondents specifically targeted the "Teamfluence" software is ultimately evident from the fact that profiles of numerous providers of comparable products remain accessible on the "LinkedIn" platform (see Exhibit GMW-eV1). In any case, this showed be regarded as discrimination within the meaning of antitrust law, in addition to an unreasonable obstruction resulting from the suspension of user accounts without objective grounds or substantiated justification, and without a fair, participatory hearing process.

- Page 8 -

The Respondents held a dominant position in the market for professional social networking services or digital platform services for initiating and maintaining business contacts. This is evident from market figures, which show that the platform had over 1.3 billion registered users worldwide in 2025, including approximately 304 million in the European Economic Area as of early February 2025. In Germany, the "LinkedIn" platform recorded 7.4 million monthly active users in September 2025, and over 70 million companies were registered or listed (see Exhibits GMW-eV23 and GMW-eV24); by contrast, the "XING" platform effectively no longer plays a role in the relevant market. In addition, the platform has been classified as a "very large online platform" within the meaning of Regulation (EU) 2022/2065 of the European Parliament and of the Council of October 19, 2022, on a Single Market for Digital Services and amending Directive 2000/31/EC (Digital Services Act – DSA).

The account suspensions at issue also constituted an interference with the Claimants' right to operate the business they had established and were conducting; therefore, a corresponding claim for injunctive relief also arises by analogy from Section 823(1) of the German Civil Code (BGB) in conjunction with Section 1004 BGB.

Claimant No. 2 in injunction proceedings uses the platform "LinkedIn" as a central tool for managing his professional network and for conducting his entire business communication related to the marketing of the software "Teamfluence" (see Exhibit GMW-eV1). His user account contains all contacts and essential content from nearly two decades of professional work. Approximately 80% of the Claimants' business communication with new and existing customers as well as business partners is conducted via the direct messaging feature of the "LinkedIn" platform. Therefore, the platform serves not only as the central communication channel but also as the key address and network directory of the Claimants in this injunction proceedings. Furthermore, the platform is the only relevant tool for acquiring new customers.

The suspension of the user accounts jeopardizes the economic livelihood of the Claimants. They are cut off from all their business contacts and their entire professional network; in particular, it is no longer possible to acquire new customers. In addition, the Claimants are now identified as "LinkedIn Members" in communications previously conducted between them and their clients, making the suspension apparent to third parties and thus creating a - false - impression that the Claimants have committed a violation, which ultimately leads to a significant loss of reputation (see Exhibits GMW-eV1 and GMW-eV12). Negotiations that were already underway had been suspended, and new inquiries failed to materialize.

Furthermore, the Respondents allegedly contacted customers of Claimant No. 1 or rather users of the "Teamfluence" software after they had detected use of the Claimants' software as a result of unlawful spying on browser settings. Citing Section 8.2.2 of the user

37 O 104/26                                    - Page 9 -

agreement, the users were then threatened with sanctions in order to force them to stop using the "Teamfluence" software. These measures accelerated the loss of trust and deepened the existential threat to the Claimants in the injunction proceedings (see Exhibits GMW-eV1 and GMW-eV13). Some users have already indicated that they wish to terminate their contract regarding use of the "Teamfluence" software out of concern about sanctions imposed by the Respondents (see Exhibits GMW-eV1 and GMW-eV14). These unlawful measures also ultimately constituted infringements against the Claimants, which is why injunctive relief is sought in this respect as well.

During the oral hearing, following a suggestion from the panel, the Claimants expanded their original motion to include an alternative motion.

Finally, the Claimants in the injunction proceeding request:

Respondents No. 1 and No. 2 are hereby prohibited, until a decision is rendered on the merits of the case, under penalty of a fine of up to EUR 250,000 - or, alternatively, imprisonment - to be determined by the court for each instance of noncompliance, or imprisonment for up to six months, to be enforced against their legal representative,

a) maintaining the suspension of the account of Claimant No. 1 on the LinkedIn platform of January 15, 2026, previously accessible at the URL https://linkedin.com/company/myteamfluence/ under the name "My Teamfluence," so that Claimant No. 1 can once again fully use its account, including its company page, in the condition it was in at the time of the suspension, including all functions of the LinkedIn platform, and to refrain from suspending this account again;

9

b) maintaining the suspension of the account of Claimant No. 2 on the LinkedIn platform of January 15, 2026, formerly accessible at the URL https://www.linkedin.com/in/stevenmorell/ under the name of "Steven Morell," so that Claimant No. 2 can once again fully use his account, including his profile, in the condition it was in at the time of the suspension, including all functions of the LinkedIn platform, and to refrain from suspending this account again;

c) to issue warnings or formal notices to LinkedIn members who use the Teamfluence software based on such use, or to otherwise pressure LinkedIn members with the aim of terminating their use of Teamfluence, or to announce or implement adverse measures against LinkedIn members in the event of continued use of Teamfluence, such as, in particular, temporary or permanent account suspensions.

In the alternative, the Claimants in the preliminary injunction request:

Respondents No. 1 and No. 2 are hereby prohibited, until a decision is rendered on the merits of the case, under penalty of a fine of up to EUR 250,000 - or, alternatively, imprisonment - to be determined by the court for each instance of noncompliance, or imprisonment for up to six months, to be enforced against their legal representative,

a) maintaining the suspension of the account of Claimant No. 1 on the LinkedIn platform of January 15, 2026, previously accessible at the URL https://linkedin.com/company/myteamfluence/ under the name "My Teamfluence," so that Claimant No. 1 can once again fully use its account, including its company page, in the condition it was in at the time of the suspension, including all functions of the LinkedIn platform, and to refrain from suspending this account again, provided that Claimant No. 1 does not advertise the "Teamfluence" product;

b) maintaining the suspension of the account of Claimant No. 2 on the LinkedIn platform of January 15, 2026, formerly accessible at the URL https://www.linkedin.com/in/stevenmorell/ under the name of "Steven Morell," so that Claimant No. 2 can once again fully use his account, including his profile, in the condition it was in at the time of the suspension, including all functions of the LinkedIn platform, and to refrain from suspending this account again, provided that Claimant No. 2 does not publish any contents about "Teamfluence";

c)      to issue warnings or formal notices to LinkedIn members who use the Teamfluence software based on such use, or to otherwise pressure LinkedIn members with the aim of terminating their use of Teamfluence, or to announce or implement adverse measures against LinkedIn members in the event of continued use of Teamfluence, such as, in particular, temporary or permanent account suspensions.

The Respondents move

to dismiss the motion for a preliminary injunction.

In their written pleadings, the Respondents further suggested, in the alternative, that the court rule that the Respondents may avert the enforcement of a preliminary injunction - regardless of whether the petitioners provide security - by posting security in the amount of €30,000.00.

The Respondents are of the opinion that the suspension of the Claimants' user accounts was justified, which is there is no claim for an injunction to lift the suspension by reinstating access.

The Respondents first challenge the international and local jurisdiction of the court before which the action was brought. The Regional Court of Munich I has jurisdiction over only small part of the asserted claims, namely only for the alleged claims of Claimant No. 2 against Respondent No. 2, pursuant to Section 32 of the Code of Civil Procedure (ZPO) in conjunction with Section 87 of the Act against German Act Against Restraints of Competition (GWB) and Section 33 of the Ordinance on the Concentration of Jurisdiction in Commercial Matters (Gerichtliche Zuständigkeitsverordnung Justiz, GZVJu). However, with regard to other claims, the court seized lacks jurisdiction. Respondent No. 1 in the injunction proceedings has its registered office in Dublin (Republic of Ireland). In particular, the Munich I Regional Court does not have jurisdiction over the claims brought against the Respondent No. 1 pursuant to Article 7(2) of Regulation (EU) No. 1215/ 2012 of the European Parliament and of the Council of December 12, 2012, on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (Brussels I Regulation). Rather, within the scope of application of Article 7 of the Brussels I Regulation, neither the provision of Section 33 GZVJu nor the provision of Section 87 GWB applies, since competing national rules on local jurisdiction are excluded. Therefore, the Landshut Regional Court has jurisdiction. The (international) jurisdiction of the Munich I Regional Court also does not arise from Article 8(1) of the Brussels I Regulation based on the alleged domicile of Claimant No. 2 in the injunction proceedings in Freising, which has not been sufficiently substantiated. The requirements for the anchor jurisdiction arising from this provision are not met in the present

37 O 104/26                                  - Page 12 -

case; in particular, there is a lack of close connection between the joined claims.

Respondent No. 1 is allegedly the sole operator of the "LinkedIn" platform in the European Economic Area. Neither Claimant No. 1 nor Claimant No. 2 has a contractual relationship with Respondent No. 2. Furthermore, Respondent No. 2 has no authority to issue instructions to Respondent No. 1 or other companies in the Microsoft Group. It does not provide technical support services and is not involved in enforcing the "LinkedIn" User Agreement or sanctioning violations thereof. Furthermore, its employees have no access to the email address "enforcement@linkedin.com" and are neither authorized nor able to issue warnings to users or to suspend users or their accounts; nor could they lift suspensions already been in imposed or prevent impending suspensions (see Exhibit AG2). Accordingly, Respondent No. 2 lacks standing to be sued. By the parallel assertion of unfounded claims against Respondent No. 2 as well, the Claimants in preliminary injunction proceedings attempted to construct, in an abusive manner, the close connection required by Article 8(1) of the Brussels I Regulation. Finally, the court before which the action was brought does not have jurisdiction based on its alleged role as a "gatekeeper," since this does not constitute a basis for attributing jurisdiction under procedural law.

The Respondents argue that the "Teamfluence" product, the Claimants distribute and advertise, is, according to publicly available sources, a product in breach of contract. The tool monitors visits to the "LinkedIn" pages of "Teamfluence" customers, their connections, posts, likes, and comments, and automatically extracts data. It even allows for the monitoring and "scraping" of member data from members' interactions with content that has no connection to "Teamfluence" customers. Furthermore, the Claimants' product description indicates that data unlawfully extracted from the "LinkedIn" platform by the "Teamfluence" software is not only processed in the customers' browsers, but is instead transmitted to the servers of Claimant No. 1, where the data - including personal data processed without a legal basis - is analyzed by artificial intelligence, enriched with additional personal data, such as email addresses and phone numbers, from allegedly more than 20 sources, and then fed back to users. At the same time, copyright limitation provisions, such as Section 44b of the German Copyright Act (UrhG), would be violated. Furthermore, Claimant No. 1 alleges that the data records, which were obtained unlawfully and supplemented with additional personal data, were synchronized with its customers' marketing tools, enabling customers to conduct email advertising campaigns or telemarketing based on the data records that were unlawfully obtained and supplemented by the "Teamfluence" software.

- Page 13 -

Through such an unauthorized extraction of member data, could cause members of Respondent 1 to lose control over their personal data. Browser "scraping" extensions such as the "Teamfluence" tool also violate the privacy of "LinkedIn" members, as they collect their personal data without a sufficient legal basis under Regulation (EU) 2016/679 of the European Parliament and of the Council of April 27, 2016, on the protection of natural persons with regard to the processing of personal data, on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation—GDPR). In any event, the Claimants' plugin tool "Teamfluence" allegedly triggered the technical systems of Respondent 1 for abuse prevention, which analyze atypical patterns in requests to their servers.

This is a clear breach of various provisions of the "LinkedIn" User Agreement and, moreover, constitutes a violation of data protection provisions (see also Exhibits AG5 to AG8). The provisions of Sections 8.2.2 and 8.2.13 of the User Agreements, which had been violated, serve in particular to protect the data and protected content of the members of the "LinkedIn" network and are necessary in this regard, including to prevent automated activities that impair the authenticity of the interactions between users of the platform. At the same time, Respondent 1 complies with its obligations under the DSA through Section 8.2.2 of the user agreement. Because under this, providers would, among other things, be required to implement preventive and independently measures, such as in their general terms and conditions, to avoid systemic risks, including, in particular, the protection of users' personal data against unauthorized access (including the automated extraction of data, such as through "scraping").

Tools such as "Teamfluence" also led to a significant increase in the number of server requests through automation and continuous monitoring of the "LinkedIn" platform, placing a much greater strain on the infrastructure than human users (see Exhibit AG4). So-called "scrapers," which in the view of Respondent No. 1 also include the software "Teamfluence," are responsible for a significant portion of the data traffic accessing servers that provide member profiles and other data. Despite technical countermeasures, such activities led to significant impairments, up to and including service outages, and compelled the Respondents to make substantial investments in additional server capacity (see Exhibit AG4).

- Page 14 -

Furthermore, the Claimants allegedly violated Sections 8.2.7 and 8.2.10 of the User Agreement by using the Respondents' European Union trademarks No. 008411951 and No. 008411928 (see Exhibit AG13) without consent to promote their own services (see Exhibit AG14). Despite a cease-and-desist letter (see Exhibit GMW-eV7), corresponding acts of use were allegedly continued.

According to Section 3.4 of the User Agreement, "LinkedIn" is entitled to remove content and to temporarily or permanently restrict or close accounts in the event of violations of the agreement, laws, or Community Guidelines. Respondent No. 1 exercised these rights in response to the aforementioned violations - in particular, the repeated and serious violations - committed by the Claimants. The account suspensions at issue were carried out following a proper and transparent enforcement process (see Exhibits GMW-eV7 to GMW-eV11 and AG16). In light of this, it cannot be assumed that Respondent No. 1 abused market power which, from the Respondents' perspective, does not exist in any event.

Furthermore, Respondent No. 1 also did not take targeted action solely against the Claimants. Rather, as part of a consistent, globally applied enforcement program, action is taken against products that violate the terms of the agreement (see Exhibits AG10 to AG12). Against this background - contrary to the assertion of the Claimants in the injunction proceedings - there is precisely no discrimination under antitrust law.

Likewise, no targeted action is being taken against mere users of the software "Teamfluence." To the extent that individual users' accounts have been restricted, this is due to atypical request patterns detected by anti-abuse systems, not to knowledge of installed plugins (see Exhibit AG4).

Furthermore, the provisions of the DMA do not give rise to any right of access to the "LinkedIn" platform. Respondent No. 1 implements its obligations under Art. 6(10) DMA by providing two free interfaces, namely the "Member Data Portability API" and the "Pages Data Portability API." The latter serves the continuous data portability for corporate websites. Personal data of members is excluded by default, unless they have expressly given consent. The aforementioned interfaces are publicly documented and accessible (see Exhibit GMW-eV17). Respondent No. 1 maintains that it complies with all obligations under Art. 6(10) DMA by granting commercial users, upon request, the right to free, effective, high-quality, and permanent real-time data access (see Exhibit GMW-eV17).

37 O 104/26                                  - Page 15 -

Even if the performance provided by the interfaces were insufficient for the purposes of individual developers, a request for an increase in capacity could be requested from to Respondent No. 1. Therefore, the Claimants' argument regarding any potential shortcomings in the interfaces does not hold. Ultimately, however, the Claimants had not properly used the interfaces provided by Respondents prior to initiating the preliminary injunction proceedings; in particular, they had not completed the entire application process.

Furthermore, Article 6(12) DMA does not grant a right of access to the "LinkedIn" platform, but merely requires the network operator to publish and apply general access terms and conditions that comply with the so-called FRAND conditions. Respondent no. 1 has fully complied with its corresponding obligation to grant access to commercial users under fair, reasonable, and non-discriminatory general terms and conditions (see Exhibit GMW-eV17).

Furthermore, Respondent No. 1 believes that there are no grounds for a preliminary injunction. The Claimants in the injunction proceedings would still be able to advertise their services through other channels - in particular, through their own website - and generate revenue. Furthermore, Jaxx Technologies Inc., which, according to public information, holds the rights to the software "Teamfluence," continues to have an unrestricted "LinkedIn" profile. Therefore, it has not been credibly demonstrated that there is an existential threat.

Finally, restoring the user accounts at issue and an injunction prohibiting their renewed deletion or suspension, would lead to an impermissible anticipation of the main proceedings.

By order dated January 29, 2026, the Chamber ordered an oral hearing and, at the public hearing on February 18, 2026, heard arguments regarding the motion for a preliminary injunction. For the details of the oral hearing, reference is made to the transcript of the public hearing. Moreover, for the purpose of completing the facts of the case, reference is made to the briefs and exhibits submitted by the Parties.

- Page 16 -

# Reasons for the Decision

The admissible motion for a preliminary injunction is unfounded.


A.

The admissibility of the motion for a preliminary injunction is determined, in particular, by the jurisdiction of the court before which the motion is filed, as well as by the specificity and sufficient detail of the claims to be considered.

The facts establishing local as well as international jurisdiction must have existed at some point between the time the action was filed and the conclusion of the oral hearing (see BGH, Decision of March 1, 2011 - XI ZR 48/10; Roth, in: Stein, ZPO, 24th Ed. 2024, before Section 12, margin no. 58). The principle of *perpetuatio fori* (see Section 261(3) No. 2 ZPO) also applies in the context of international jurisdiction.

I. The international jurisdiction of the Regional Court of Munich I is also established for Respondent No. 1.

With regard to Respondent No. 1, this is governed by the provisions of the Brussels I Regulation, since Respondent No. 1 is a company established under the laws of the Republic of Ireland, has its registered office in Dublin, and thus meets the foreign connection requirement necessary for the application of the Brussels I Regulation.

1.  While it is true that, pursuant to Art. 7(1) of the Brussels I Regulation, there is no place of jurisdiction for claims arising from contracts, since the performance characteristic of the contract that is relevant in this respect is provided in the Republic of Ireland.

2.  With regard to the Claimants in the injunction proceedings, however, there is a venue for the tort claims asserted in each case pursuant to Article 7(2) of the Brussels I Regulation.

    The fact that a contractual relationship exists between Claimant No. 2 and Respondent No. 1 does not preclude this.

    For Art. 7(2) of the Brussels I Regulation is to be interpreted as meaning that it applies to an action seeking an injunction against certain conduct, even within the context of a contractual relationship between the parties, and which is based on the fact that the Respondent is abusing its dominant position in breach of competition law, provided, at any rate, that it is not essential to interpret the contract between the parties (see ECJ, Decision of November 24, 2020 – C-59/19 2021). The same must necessarily applies to general tort law as well as other tort claims (see ECJ, Decision of March 13, 2014 – C-

- Page 17 -

548/12; Stadler/Krüger, in: Musielak/Voit, ZPO, 22nd Ed. 2025, Art. 7 of the Brussel I Regulation, margin no. 3). Although the claim asserted here is related to the contractual relationship between Claimant No. 2 and Respondent No. 1, n that it is based on a potential antitrust injunctive relief claim for restriction arising from an alleged violation of the terms of the contract concluded regarding the user account on the "LinkedIn" platform. However, as the European Court of Justice has clarified (see ECJ, Decision of November 24, 2020 – C-59/19 2021), Claimant No. 2 invoked in his motion a violation of competition law, which generally prohibits the abuse of a dominant position, regardless of the existence of a contract or any other voluntarily entered into obligation. The antitrust abuse claim may arise under the law regardless of whether Respondent No. 1) acted within the scope of its contractual powers when restricting the user account. An interpretation of the contract is therefore not essential for assessing this claim (established case law of the Chamber, inter alia Munich I Regional Court, final judgment of September 3, 2021 – 37 O 9343/21). It is true that the balancing of interests required in each individual case under Section 19(1) and (2)(2) GWB in a contractual relationship between the parties also necessitates consideration of the rights and obligations typical of the contract and the provisions agreed upon between the parties. However, this is irrelevant for the purpose of classifying the asserted claim as a tort claim, especially since interests whose enforcement is legally disapproved of, particularly under antitrust law, must not be taken into account (see BGH, Decision of February 10, 2021 – KZR 66/17).

The place where the damage occurred or was realized within the meaning of Art. 7 No. 2 of the Brussels I Regulation is only the place where the protected legal interest was infringed (see BGH, Decision of December 20, 1963 – I b ZR 104/62; BGH, Decision of September 24, 1986 – VIII ZR 320/85). The focus must be on the location where the "initial damage" occurred (see ECJ, Decision of July 05, 2018—C-27/17). The European Court of Justice has clarified that a person whose rights have been infringed by a website may seek compensation for the full amount of damages suffered before the courts of the country where the content creator is established or before the courts of the country where the injured party has the center of his or her interests (see ECJ, Decision of October 25, 2011 – C-509/09 and C-161/10).

- Page 18 -

A legal entity may also bring an action in the place where the center of its interests is located (see ECJ, Decision of October 17, 2017 – C-194/16). If a legal entity does not primarily carry out its activities in the country where it has its registered office, it may bring an action at the place where the damage occurred (see ECJ, Decision of October 17, 2017 – C-194/16). However, even an English-language website can be specifically targeted at German users based on its content (see BGH, Decision of December 12, 2013 – I ZR 131/12).

Accordingly, in the present case, the place where the alleged tortious acts occurred is Germany. According to the undisputed submission at the hearing, the focus of the customer base of Claimant No. 1's business activities is in Germany.

Claimant No. 2, who is the managing director of Claimant No. 1, has his actual place of residence in Freising, from where he also manages his company's business activities. This was substantiated by presenting Claimant No. 2's identification card and confirmed by Claimant No. 2's personal testimony.

3.  The question of the primary jurisdiction under Article 8(1) of the Brussels I Regulation is therefore irrelevant.

II.   Jurisdiction over the place of performance is based on Article 7(2) of the Brussels I Regulation; subject-matter jurisdiction is based on Sections 87, Sentence 1; 89(1), Sentence 1 GWB, and Section 33(1) No. 1 GZVJu.

Although the Brussels I Regulation generally supersedes national rules on jurisdiction, only to the extent that the Regulation does not also govern territorial jurisdiction (the distinction is made clear by the phrases "courts of the Member State" on the one hand and "court of the place" on the other), may one rely on domestic provisions for determining territorial jurisdiction (see Gebauer/Berner, in: Gebauer/Wiedmann, Europäisches Zivilrecht [European Civil Law], 3rd Ed. 2021, Art. 4 Brussels Ia Regulation, margin no. 6). However, the concentration of jurisdiction under antitrust law does not constitute a deviation from the provisions of the Brussels I Regulation; rather, it governs the court structure in Bavaria and thereby defines the "court of the place" within the meaning of Article 7(2) of the Brussels I Regulation. Jurisdiction established by statutory regulation is a special form of subject-matter jurisdiction. This generally applies to provisions that determine the jurisdiction of a court over the districts of several courts according to substantive-functional criteria.

37 O 104/26                                    - Page 19 -

While the rules on territorial jurisdiction are based on the local connections of the parties involved or the subject matter of the dispute, the option to consolidate cases established by Section 89 GWB is based on the substantive consideration of "ensuring uniform case law" in antitrust matters (see Ollerdißen, in: Wiedemann, Handbuch des Kartellrechts [Handbook of Antitrust Law], 5th Ed. 2026, Section 59, margin no. 45; Higher Regional Court of Koblenz, Decision of June 21, 2007 – 4 SmA 29/07; Schmidt, in: Immenga/Mestmäcker, Wettbewerbsrecht [Competition Law], 7th Ed. 2024, Section 89 GWB, margin no. 1).

III.  The motions of the Claimants for preliminary injunctions are also each sufficiently specific within the meaning of Section 253(2) No. 2 ZPO.

According to the established case law of the Federal Court of Justice, a motion for an injunction under Section 253(2) No. 2 ZPO must not be worded so vaguely that the subject matter and scope of the court's decision-making authority under Section 308(1) ZPO are not clearly delineated, thereby preventing the defendant from mounting a comprehensive defense and ultimately leaving the decision as to what is prohibited to the enforcement court (see BGH, Decision of October 05, 2010 – I ZR 46/09; BGH, Decision of November 04, 2010 – I ZR 118/09). In determining the requirements for the specificity of the motion, the particularities of the applicable substantive law and the circumstances of the individual case must be taken into account, and the statement of facts must also be used as a basis for interpretation. The assessment must include not only the interests in being able to mount a full defense against the complaint, but also the interests of the Claimant (seeking a preliminary injunction), who must not be denied effective legal protection (see BGH, Default Judgment of November 28, 2002 – I ZR 168/00). Accordingly, the motions at issue are sufficiently clear and specific.

B.

However, the motion for issuing a preliminary injunction is unfounded.

The Claimants The Claimants seeking a preliminary injunction were unable to establish a sufficiently credible basis for their claim. With respect to Respondent No. 2, there is already a lack of standing to be sued. However, there is no claim against Respondent No. 1 either.

I.   There is no claim for a preliminary injunction against the Respondent No. 2 in the injunction proceedings. Respondent No. 2 in the injunction proceedings lacks standing to be sued, as the contested actions cannot be attributed to it.

- Page 20 -

Respondent No. 2 is not the operator of the "LinkedIn" platform. According to the User Terms and Conditions Claimants submitted (see Exhibit GMW-eV6), the operator of the "LinkedIn" platform is not Respondent No. 2, but rather Respondent No. 1, who is expressly named in these documents. In view of this, no corresponding platform usage agreement was concluded between the Claimants and Respondent No. 2, so that contractual claims seeking an injunction are ruled out.

This applies equally to corresponding claims under tort law, as Respondent No. 2, having sufficiently substantiated this, did not suspend the Claimants' accounts (see Exhibit AG2).

In particular, in the present case, any unlawful conduct on the part of the parent company is not attributed to Respondent No. 2, as its subsidiary. A subsidiary civil liability for potential claims, provided that an infringement of Article 101(1) TFEU on the part of its parent company has been established, can only be considered if the alleged victim proves that, on the one hand, with regard to the economic, organizational, and legal ties between these two legal entities, and on the other hand, with regard to the existence of a concrete connection between the economic activity of this subsidiary and the subject matter of the infringement, for which the parent company was held liable, this subsidiary formed an economic unit with its parent company (see ECJ, Decision of October 6, 2021 – C-882/19). While the Respondents in the injunction proceedings are indeed connected here accordingly (see Exhibits GMW-eV 3, GMW-eV4, and AG2). However, the Claimants failed to sufficiently demonstrate a concrete connection between the business activities of Respondent No. 2 as a subsidiary of Respondent No. 1 and the subject matter of the violation. Rather, the Respondents credibly demonstrated that Respondent No. 2 was not involved in the suspension procedures Respondent No. 1 carried out (see Exhibit AG2). Thus, Respondent No. 2 has no authority to issue instructions to Respondent No. 1 or other companies in the Microsoft Group. It also does not provide technical support services and is not involved in enforcing the "LinkedIn" User Agreement or penalizing violations thereof. Furthermore, its employees have no access to the email address "enforcement@linkedin.com" and are neither authorized nor able to issue warnings to users or to suspend users or their accounts; nor could they lift suspensions already been in imposed or prevent impending suspensions.

Contrary to the Claimants' arguments, the Respondent No. 2's standing to be sued also does not arise from the Microsoft Group's designation as a "gatekeeper" (see Exhibit GMW-eV5). In the present case, Respondent No. 2 in the injunction proceedings, as the legal entity being sued, is not the direct addressee of the DMA designation decision, but merely a national group subsidiary. In addition, the legal definition of "undertaking" set forth in Art. 2, No. 27 of the DMA corresponds to the definition of "undertaking" developed by the European Court of Justice in its established case law regarding Articles 101 and 102 TFEU (see Lahme/Ruster, in: Podszun, Digital Markets Act, 1st Ed. 2023, Art. 39, margin no. 45). Accordingly, as

- Page 21 -

explained above, in order to establish the economic, organizational, and legal ties between the two respondents on the one hand, and on the other hand to demonstrate the existence of a concrete connection between the economic activity of this subsidiary and the subject matter of the infringement for which the parent company was held liable, this subsidiary would have to form an economic unit with its parent company (see ECJ, Decision of October 06, 2021 – C-882/19; ECJ, Decision of March 14, 2019 – C-724/17). As set out above, the Claimants in the injunction proceedings did not comply with this.

II.    There are also no claims against Respondent No. 1.

1.    No right to an injunctive relief with respect to the motions set forth in items 1) a) and 1) b) arises under Section 33(1) GWB in conjunction with Article 102 of the Treaty on the Functioning of the European Union (TFEU) and Section 19 GWB.

a)    Pursuant to Article 6(3)(a) of Regulation (EC) No. 864/2007 of the European Parliament and of the Council of July 11, 2007, on the law applicable to non-contractual obligations (Rome II Regulation), German law applies to injunctive relief under antitrust law. Since the user account of Claimant No. 1 is primarily directed at the German market and Claimant No. 2 is also domiciled in Germany, it is likely, based on the Claimants' arguments, that the German market will be adversely affected. The contrary agreement in Section 6 of the Terms of Use of the "LinkedIn" platform is invalid pursuant to Art. 6(4) of the Rome II Regulation.

b)    The question of the whether Respondent No. 1 holds a dominant market position can be left open here, since there is in any case no abuse of market power within the meaning of Section 19(1) and (2) GWB or rather Article 102 TFEU. Thus, the suspensions of their user accounts on the "LinkedIn" platform challenged by the Claimants cannot be considered either an unreasonable obstruction or discrimination within the meaning of Section 19(2) No. 1 GWB.

- Page 22 -

A finding that the restriction is unreasonable requires a comprehensive balancing of the individual interests of both parties, taking into account the GWB's objective of promoting free competition (see BGH, Order of September 22, 1981 – KVR 8/80). A company with a dominant market position is limited in its decisions regarding the establishment and termination of business relationships to conduct that is non-discriminatory and based on objective considerations. In the specific case, considering all circumstances, the suspension of the user accounts in question does not constitute an unfair obstruction or discrimination. In particular, the Respondents have demonstrated that the software tool "Teamfluence," through its mode of operation, objectively impairs the Respondents' interests in a manner they are not required to tolerate.

c) Respondent no. 1 has credibly substantiated that the "Teamfluence" software can lead to an overload of its systems.

   aa) Respondent No. 1 argues that the "Teamfluence" software is a technical tool that automatically extracts visits to "LinkedIn" pages of "Teamfluence" customers, their connections, posts, likes, comments, and other data.

   The Respondents refer in this respect to the representation contained in Teamfluence's own promotional material. According to this, "Teamfluence" is a browser plugin that automatically monitors activity on a specific user account in order to store and process certain data, such as visitor data. This is evident from the advertisements submitted (see p. 25 of the brief dated February 09, 2026) and is not disputed by the Claimants seeking a preliminary injunction.

   bb) The Respondents argued and credibly demonstrated that such automated access would place a far greater burden on their own server than access by natural persons would. As a result, system failures have already occurred, and Respondent No. 1 has had to expand its server capacities at its own expense.

- Page 23 -

LinkedIn's systems reportedly detected the "Teamfluence" software based on usage patterns. The Respondents have also substantiated this in an affidavit dated February 06, 2026 (see Exhibit AG4). The Claimants have been unable to rebut this. Their assertion in this regard, that the accesses were comparable in quality and quantity to those of natural persons, lacks substance and contradicts common sense. There is a complete lack of specific information regarding retrieval intervals and the volume of data retrieved by "Teamfluence." The fact that a similar burden could be caused by natural persons if they accessed "LinkedIn" often enough is not sufficient to refute the argument that automated access creates a particular burden.

cc) It is irrelevant in this context whether the actual access to the data takes place on the Respondents' server or on the server of the users of the "Teamfluence" software. The mass automated retrieval of data alone is sufficient to infringe upon the interests of Respondent No. 1. To that extent, it has substantiated through the affidavit it submitted that it has already had to endure service restrictions and even outages caused by these plugins.

dd) To enforce these legitimate interests, Respondent No. 1 has stipulated in Section 8.2.2 of the "LinkedIn" platform's User Agreement that users must refrain from developing, supporting, or using software, devices, scripts, bots, or other means or processes (such as crawlers, browser plugins, add-ons, or other technologies) to "scrape" the services or to copy profiles and other data from the services (see Exhibit GMW-eV6). The "Teamfluence" software violates this.

This clause also does not violate Article 6 of the DMA. Pursuant to Article 6(10) of the DMA, the gatekeeper shall, upon request, grant commercial users and third parties authorized by a commercial user, free of charge, effective, high-quality, and permanent real-time access to aggregated and non-aggregated data, including personal data, provided or generated in connection with the use of the relevant central platform services or services provided in conjunction with or in support of such central platform services by those commercial users and the end users who use the products or services of those commercial users, and enables the use of such data. Accordingly, the regulation requires gatekeepers to provide certain data through a standardized request and provision mechanism in an effective, high-quality, real-time format. However, the standard does not establish any right for third parties to access the system without authorization outside the access channels provided for by law. The prohibition on unauthorized access methods set forth in Section 8.2.2 of the User Agreement does not undermine the statutory right of access, as the prescribed application and provision process

37 O 104/26                                    - Page 24 -

remains unaffected. Respondent 1 provides two interfaces in this case through which the requirement under Art. 6 DMA is in compliance. The "Pages Data Portability API" interface serves to fulfill the right of access under Article 6(10) of the DMA, and, based on sufficient prima facie evidence provided by the first respondent, such access meets the statutory requirements. The Claimants have not substantiated their claim that the Defendants grant free, effective, and permanent access through their interfaces, especially since they did not use the interfaces themselves, having not completed the entire application process, and are therefore unable to make any specific statements, particularly with regard to any potential capacity limitations.

Even if the interface provided did not meet the requirements, this would not constitute a right to self-help for any potential users. Even under Article 10 of the DMA, Respondent No. 1 is not obligated to make such data available through a channel not intended for that purpose. This applies in particular when the uncontrolled use via such an unintended access point, as in this case, is likely to interfere with the platform's smooth operation.

For the reasons stated, the clause also does not raise any antitrust concerns. It is therefore also not ineffective or void within the meaning of Section 134 BGB.

- Page 25 -

d) Furthermore, the data processing carried out by the "Teamfluence" software violates applicable data protection laws. Respondent No. 1 does not have to accept such unlawful processing of data generated on its platform.

   aa) The Respondents have argued, citing "Teamfluence's" own advertising, that this browser plugin enables the monitoring, storage, and processing of member data. Furthermore, the Claimants' product description indicates that data unlawfully extracted from the "LinkedIn" platform by the "Teamfluence" software is not only processed in the customers' browsers, but is instead transmitted to the servers of Claimant No. 1, where the data - including personal data processed without a legal basis - is analyzed by artificial intelligence, enriched with additional personal data, such as email addresses and phone numbers, from allegedly more than 20 sources, and then fed back to users.

   Moreover, Claimant No. 1 advertises that the data sets it collects, which are supplemented with additional personal data, are synchronized with its customers' marketing tools, enabling customers to use the data sets collected and supplemented by the "Teamfluence" software to conduct email marketing campaigns or telemarketing.

   According to the Respondents' undisputed statement, the software also collects data on individuals whom "Teamfluence" customers themselves have not visited, for example by tagging profiles.

   bb) This data storage and data processing is subject to the requirements of the GDPR; in particular, this also applies within the scope of the DMA.

   cc) Personal data on social networks is generally publicly accessible data within the meaning of the GDPR, provided that the relevant data is visible to anyone. Based on the undisputed facts presented here, this is the case, at least for some of the user data in question. The requirement to register does not preclude the classification as publicly accessible data, as this "hurdle" can be overcome by anyone.

37 O 104/26                                    - Page 26 -

In this regard, the lawfulness of the processing is generally governed by Article 6(1)(f) of the GDPR. Accordingly, it is necessary to balance the interests of the data controller against those of the data subjects.

In this context, in addition to the fact that the data is publicly available, one must take into account not only the interests involved in data processing but also the expectations of a reasonable person (see Albers/Veit, in: BeckOK-DatenschutzR, 54th Edition (as of August 01, 2025), Art. 6 GDPR, margin no. 72). Particularly when posting on platforms, participants will not automatically assume that the information in question will be used by others outside the platform for purposes unrelated to the platform. On the other hand, particularly in the case of Respondent No. 1, it must be taken into account that this concerns information from the business or professional sphere, which is generally less sensitive than private information. Furthermore, in a professional context, it can be assumed that those affected generally expect their data to be processed and, in this respect, have different expectations than private individuals (see Dallmann/Busse, ZD 2019, 394, 396).

In weighing the facts of this specific case, it should also be noted that "LinkedIn" itself provides users with settings for exporting data to third parties, specifically in such a way that this must be expressly authorized (see p. 5 of the brief dated February 14, 2026). In addition, settings for visibility outside the platform are made available.

It follows that the use of data from users who have expressly permitted export is also permissible for the "Teamfluence" software without further ado.

Conversely, users who have not enabled this option have a legitimate expectation that their settings will be respected. Under Art. 6(1)(f) GDPR, it follows that data processing contrary to the settings is not permitted.

37 O 104/26                                    - Page 27 -

This is because users who have not authorized the export of information may expect that such information will not be exported. The rights of third parties regarding data processing cannot prevail.

Although "LinkedIn" points out that profile information remains visible and may, under certain circumstances, be managed outside the platform. However, based on the information provided here, users can assume that their activities cannot be collected or processed outside of "LinkedIn." In particular, it is not apparent to the user that information about visits to individual pages could be stored and processed. While the "LinkedIn" user may agree that their contact requests can be viewed by another member. However, it is not apparent to the user that this member permanently stores this information, processes it, supplements it with additional information, and feeds it into other data processing systems.

It is irrelevant whether the information in question is regularly cached in the user's browser. This does not entail consent to permanent storage and data processing. Users without technical knowledge will generally not be able to distinguish between a genuine export and access to the recipient's cache, especially since they themselves will often be unable to read out their own cache. Therefore, the user assumes, based on the design of the settings options, that at the very least their activities are not stored and processed outside the platform. Therefore, this form of data processing is also unlawful for these users under the GDPR.

dd) Furthermore, the Claimants did not present any facts that could have dispelled the suspicion that the "Teamfluence" software operates in a manner that violates other provisions of the GDPR (in particular Article 32 or Article 25(1)). The Claimants argument that "Teamfluence" customers are responsible for complying with data protection regulations on their own indicates, rather, that compliance with data protection regulations depends entirely on unknown third parties who may be located anywhere in the world, without the data subjects having the ability to track the individual steps of data processing.

- Page 28 -

ee)  The Respondent does not have to tolerate such a data protection violation by its "users." It need not be determined whether it is obligated to conduct such monitoring, for example under Article 32 of the DSA. In any case, it is entitled to do so. It is obvious that tolerating data protection violations by other users using software tools like this one is likely to damage the reputation of the respondent's platform and could deter members from continuing to use the platform. The fact that the "Teamfluence" software may collect data from certain users in a lawful manner is irrelevant in this context. The Claimants themselves do not claim that "Teamfluence" is capable of recognizing and taking into account users' different preferences.

Moreover, the considerations mentioned here also apply regardless of whether there has been a violation of the GDPR. In any case, Respondent No. 1 must have the right, in order to ensure compliance with its own contractual obligations, to prevent actions that violate its own data protection policies and the corresponding settings options it offers.

This applies, in any case, to policies and settings that, as in this instance, are appropriate and take into account the expected concerns of the affected users. Given the specific nature of the arrangement, it cannot be assumed that the rules and hiring practices in question are intended solely to restrict unwelcome competitors.

ff)  Nor does Article 6(10) of the DMA indicate otherwise. The standard does not establish any right for third parties to access the system without authorization outside the access channels provided for by law. It does not override the requirements of the GDPR, does not in and of itself justify any and all forms of data processing, and does not prevent gatekeepers from establishing appropriate forms of data protection on their platforms.

- Page 29 -

Even if the interface provided did not meet the requirements, this would not constitute a right to self-help for any potential users. The Respondents have argued without contradiction that using the interface provided would allow the users' privacy settings to be respected. This already shows that Respondent No. 1 has a legitimate interest in ensuring that third-party companies access data solely through the designated interface and not covertly through access channels not intended for this purpose.

e) In addition, the "Teamfluence" software enables automated processes for establishing contact, sending messages, or generating interactions both outside of "LinkedIn" and on the platform itself. The Respondents' arguments on this point are, in turn, based on "Teamfluence's" own description and are not disputed by the Claimants.

aa) This constitutes a violation of Section 8.2.13 of the User Agreement. Accordingly, it is prohibited to use bots or other unauthorized automated methods to access the Services, add or download contacts, send or redirect messages, create, comment on, like, share, or re-share posts, or generate non-authentic engagement in any other way (cf. Exhibit GMW-eV6).

bb) This restriction raises no legal concerns. Respondent No. 1 has a legitimate interest in such a restriction on the use of the platform.

It goes without saying that automated messages are sent within the platform. The key point is that platform interactions are no longer attributable exclusively to individual, authentic user actions, but are technically controlled and occur automatically in terms of both frequency and pattern.. In contrast, users generally expect personal communication. Moreover, automatically generated messages require far less effort than personally written messages and are therefore more likely to be perceived as a nuisance. This legal principle is also expressly enshrined in Section 7(2) UWG.

- Page 30 -

> For these reasons, however, Respondent No. 1 is also not required to tolerate the use of data generated on its platform for automatically generated communications outside the platform, such as via email. Apart from the fact that such emails are prohibited under German law under the conditions set out in Section 7(2) and (3) UWG, Respondent No. 1 has a legitimate interest in ensuring that users are protected from such harassment. Such use of the data available on the platform would also, in principle, be likely to damage the platform's reputation and deter potential users from using the platform.

f) In view of the established violation, it need not to be determined in this case whether the Claimants have also violated further provisions of the "LinkedIn" platform's user agreement, for example, as a result of trademark infringements (see Sections 8.2.7 and 8.2.10) or the use of a pseudonym (see Section 2.1) with regard to Claimant No. 2.

g) Given that the use of the "Teamfluence" software infringed upon their interests, the Respondent No. 1 was also entitled to suspend the user accounts of the Claimants Nos. 1 and 2. The Claimants' argument that a distinction must be made between the use of user accounts and the use of "Teamfluence" cannot be accepted.

Claimant No. 1 markets "Teamfluence" and, as the responsible company, is clearly the intended recipient of any measures aimed at preventing the distribution and use of the software. Claimant No. 2 is the natural person behind "Teamfluence" in his capacity as sole managing shareholder.

According to the Claimants' statements, they conduct their entire business relating to "Teamfluence" through the "LinkedIn" platform. As a result of the blocking, cthey are no longer able to communicate with their customers (see margin no. 45 of the motion dated January 22, 2026)

All business activities would be conducted through these accounts, "in particular customer acquisition, business development, and ongoing communication" (see margin no. 103 of the motion dated January 22, 2026). New customer acquisition is conducted almost exclusively via "LinkedIn" (see margin no. 132 of the motion dated January 22, 2026).

Therefore, this establishes a legal connection between the operation of "Teamfluence" and the Claimants, as well as a functional relationship between the accounts and the non-compliant business model. The breach of duty does not occur in isolation outside the platform, but manifests itself in the use of "LinkedIn" as a distribution and marketing channel for a product that is prohibited under the Terms of Use. The suspension of the accounts in question is therefore an appropriate measure to prevent the unlawful distribution and use of the "Teamfluence" software, which in any case infringes upon the interests of Respondent No. 1.

Accordingly, the distribution or promotion of the tool constitutes support for such software, which is prohibited under the user agreement. Thus, both Claimants Nos. 1 and 2 have violated the user agreements of Respondent No. 1 by distributing or advertising the "Teamfluence" software and thereby at least supporting it.

h)  In light of the Claimants' conduct outlined above, which at the same time constitutes a violation of the user agreement of the "LinkedIn" platform, Respondent No. 1 was entitled to take the measures at issue. The conduct of Respondent No. 1 in suspending the Claimants' user accounts is objectively justified overall and not arbitrary.

The suspension in question is also provided for under Section 3.4 of the Terms of Use and has been agreed upon by the parties. Accordingly, Respondent No. 1 is entitled to restrict the use of the Services, including the number of contacts and the ability to contact other members, or alternatively to restrict, suspend, or close the account, in the event of a violation of the User Agreement or applicable laws, or in the event of misuse of the services (see Exhibit GMW-eV6). Reference is made to the so-called "Dos and Don'ts" (see Section 8 of the User Agreement) as well as the Community Guidelines.

i)  Furthermore, in the present case, there was no need for a prior hearing - or another one - of the Claimants seeking an injunction. However, according to the highest court's jurisprudence, prior notification or a hearing is required in the event of an intended suspension of a user account (see BGH, Decision of July 29, 2021 – III ZR 179/20). However, this – contrary to the view of the Claimants – has occurred. In the

present case, the Claimants were already requested by "LinkedIn Enforcement" in an email dated December 10, 2025 (see Exhibit GMW-eV7), citing a specific reason, to cease, among other things, offering their browser plugin "Teamfluence" and thus ceasing the violation of the User Agreement. At the same time, it was announced that Respondent No. 1 would take further measures to protect the members and the website in the event of non-compliance with its instructions. In a letter dated December 22, 2025 (see Exhibit GMW-eV8), the Claimants responded and argued that the relevant Section 8.2.2 of the User Agreement violates the DMA and that, therefore, no breach of the User Agreement had occurred. By letter dated January 05, 2026 (see Exhibit GMW-eV9), "LinkedIn Enforcement" stated that additional information and explanations from the Claimants for the preliminary injunction were required for more detailed review. After the Claimants initially responded to this, their personal and professional profiles on the "LinkedIn" platform were then blocked on January 15, 2026 - without any further prior notice or hearing. The Claimants in the injunction proceedings were informed of this by email on the same day (see Exhibit GMW-eV10). The suspension was justified on the grounds that the Claimants in the injunction proceedings had not responded to the letter dated January 5, 2026 (see Exhibit GMW-eV9).

Given the communication between the parties in the run-up to the suspensions, the Claimants were aware of the specific nature of the allegation more than a month before the measure was implemented. On the other hand, given the threat of measures contained in the email dated 10 December 2025 (see Exhibit GMW-eV7), they must have been aware of the consequences that would ensue if the status quo were maintained. Ultimately, potential follow-up measures arise directly from the User Agreement accepted by the Claimants seeking injunctive relief. Accordingly, there can be no question of arbitrary conduct on the part of Respondent No. 1 in the injunction proceedings.

Furthermore, the Claimants had the opportunity, as a result of the restrictive measures, to lodge an objection against the decision of Respondent No. 1 and to initiate a re-examination. They had made use of this in the present case (see Exhibit GMW-eV11). Accordingly, Respondent No. 1 also complied with the remaining steps required by the highest court's jurisprudence (see BGH, Decision of July 29, 2021 – III ZR 179/20) during the subsequent proceedings. Thus, this too does not lead to arbitrary treatment of the Claimants seeking a preliminary injunction.

j)   Furthermore, the conduct of Respondent No. 1 which the Claimants object does not constitute discrimination within the meaning of antitrust law.

Admittedly, the Claimants argue that other providers of comparable tools, such as "Teamfluence," have not been blocked (see Exhibit GMW-eV1).

However, Respondent No. 1 has sufficiently substantiated that, within the framework of a consistent, globally applied enforcement program, it takes action against products that are in breach of contract in general, and precisely not exclusively against the "Teamfluence" software (see Exhibits AG10 to AG12). Corresponding measures included internal and external reports, investigations, as well as sending cease-and-desist declarations. Enforcement against all violations worldwide could not be carried out simultaneously. The basis for the actions of Respondent 1) is Section 8.2.2 of the User Agreement, which in particular satisfies the criterion of non-discrimination because it applies equally to all user groups and is based exclusively on an objective, substantively justified criterion, namely avoiding significant security, stability, and data protection risks from automated data extraction that would run counter to the trust and legitimate expectations of end users.

2.   For the reasons stated, there is also no claim for injunctive relief pursuant to Sections 823(1) and 1004 BGB by analogy in in conjunction with the right to an established and operating business.

The provision of Section 1004(1), Sentence 2 BGB is applicable by analogy in the present case (so-called quasi-negatory claim for injunctive relief). In principle, Section 1004 BGB, when applied directly, protects only ownership and certain rights in rem (see Raff, in: MüKoBGB, 9th Ed. 2023, Section 1004 margin no. 1).

- Page 34 -

Given the need to protect other absolute rights, all absolute rights are protected pursuant to Section 1004 BGB, including the right to a business that has been established and is being operated, in order to expand the punitive damages protection under Section 823(1) BGB to include a preventive injunction with future effect, which is covered by analogy under Section 1004(1), Sentence 2 BGB (see Spohnheimer, in: BeckOGK, as of November 01, 2025, Section 1004 BGB, margin no. 13 et seq.).

The right to an established and operating business is recognized as an "other right" within the meaning of Section 823(1) BGB (see BGH, Decision of December 09, 1958 – VI ZR 199/57). The corporate personality right protects the social standing of corporations as business enterprises guaranteed by Art. 2(1), in conjunction with Art. 19(3) of the German Basic Law (GG) and Article 8(1) of the European Convention on Human Rights (ECHR) (see BGH, Decision of April 10, 2018 – VI ZR 396/16; BGH, Decision of April 04, 2017 – VI ZR 123/16). The protection of Section 823(1) BGB is granted against any infringement of the right to a business that has been established and is being operated, provided that the interference constitutes a direct encroachment on the scope of commercial activities. The protection granted to the established and operating business is intended to safeguard the company in its economic activity and in its functioning against unlawful interference (see BGH, Decision of January 15, 2019 – VI ZR 506/17; BGH, Decision of May 15, 2012 - VI ZR 117/11; BGH, Decision of February 06, 2014 – I ZR 75/13; BVerfG, order of June 26, 2002 - 1 BvR 558/91). The infringing act must be specifically directed against the operation and its organization or against entrepreneurial freedom of decision and must go beyond mere nuisance or a socially customary interference (see BGH, Decision of January 14, 2020 – VI ZR 496/18; BGH, Decision of November 26, 2019 – VI ZR 12/19).

The right to an established and operating business is an open-ended legal element, the content and boundaries of which are determined only by balancing interests with the sphere of interests of others that collides in the specific case (see BGH, Decision of January 19, 2006 – I ZR 98/02). The unlawfulness of an interference is not presumed, rather, it must be examined in each individual case by taking into account all circumstances (see BGH, Decision of January 19, 2006 – I ZR 98/02).

In the present case, it can be left open whether the suspensions of the Claimants' user accounts at issue constitute a direct interference with the scope of commercial activities and are therefore directly related to the business. With regard to Claimant No. 2, the scope of protection under the provision is not triggered, as his user account is his private profile, even though he simultaneously uses it in his capacity as sole shareholder and managing director of Claimant No. 1.

- Page 35 -

In any case, however, any potential interference, as explained above, is justified due to violations of the user agreement and, in particular, also due to data protection concerns.

3.  Furthermore, no claim for injunctive relief arises from any right of access under Article 6(12) of the DMA with respect to the "LinkedIn" platform.

It may be left undecided whether Article 6(12) DMA - beyond the obligation to publish and apply fair, reasonable, and non-discriminatory general access conditions - conveys any subjective right at all for individual business users to access a core platform service. Even in terms of its wording, Article 6(12) DMA differs from other provisions of Article 6 DMA that expressly establish a right of access or use, in particular Article 6(11) DMA. According to its wording, however, Article 6(12) DMA primarily obligates the gatekeeper to draft and apply general terms and conditions in accordance with FRAND standards.

Irrespective of this, the terms of use applied by Respondent No. 1, particularly Section 8.2.2, meet the requirements for fairness, reasonableness, and non-discrimination. The provision prohibits all users equally, and thus without discrimination, from using automated means, such as crawlers or browser plugins, for the systematic extraction or copying of profile data and other content. It thereby relies on an objective, factually justified criterion, namely the avoidance of security, stability, and data protection risks as well as potential regulatory liability. As explained above, there is no apparent unequal treatment of certain user groups. The clause is worded with sufficient clarity and is readily understandable and enforceable for the average commercial user.

Against this background, the suspension of the Claimants' profiles challenged in the present case does not constitute a violation of an obligation of fair treatment arising from Article 6(12) DMA. In particular, the account suspension did not unlawfully deprive the Claimant of access, since, as explained above, there are objective grounds for the freeze, and based on these grounds, Respondent No. 1 has a legitimate interest in the restriction.

4. No other grounds for a claim are apparent in this case.

III.    Finally, with regard to the claim under item 1) c), there is no right to injunctive relief concerning conduct toward other members of the "LinkedIn" platform who use the "Teamfluence" software.

The question of whether the Claimants in the preliminary injunction proceedings have standing to sue may remain open, particularly with regard to a possible claim under Sections 823(1) and 1004 BGB, applied by analogy, in conjunction with the right to an established and operating business. In any event, the actions of Respondent No. 1 are justified.

Respondent No. 1 is authorized- not only on the basis of the platform "LinkedIn" user agreement, which users are required to accept, to take action against violations by individual users. As set forth above, the Respondents have sufficiently set out and substantiated that the use of the "Teamfluence" software violates both the user agreement and data protection regulations.

According to the Respondents statement, affected profiles that use relevant software - not exclusively the Claimant's - are automatically suspended, either temporarily or permanently, if the platform's multi-layered technical anti-abuse system detects automation or "scraping" behavior. These consequences are included in the Terms of Use; users are thus made sufficiently aware of prohibited conduct and the associated consequences. The Claimants have failed to demonstrate credibly that the measures in question are directed solely against the "Teamfluence" software; the defendants have, in this regard, credibly demonstrated that their systems did not identify "Teamfluence" per se, but only a specific type of user behavior.

IV. The Claimants' alternative motion was also denied.

With regard to the alternative claims set forth in subparagraphs (a) and (b), these, too, were to be dismissed as unfounded, since, in particular, they are not suitable for addressing the breaches of the User Agreement alleged by the Respondents. According to the Claimants' own statements, they do not use the accounts in question solely to promote "Teamfluence", but rather conduct their entire communication via "LinkedIn". The platform is therefore also used for communication regarding the conclusion and execution of contracts. The Claimants would therefore still have the option of contacting prospective customers or clients of the "Teamfluence" software. Therefore, banning advertising is not an effective means of preventing the Claimants' unlawful conduct on the accounts at issue. Therefore, Respondent 1 is entitled to keep the accounts blocked to safeguard its legitimate interests, even with such restricted use.

With regard to the unchanged request for relief set forth in subparagraph (c) concerning a prohibition on such conduct toward other members of the "LinkedIn" platform who use the

"Teamfluence" software, reference is made to the above remarks.

C.

The decision on costs is based on Section 91(1) ZPO. Section 100(4) ZPO is not applicable by analogy to the Claimants.

The decision on provisional enforceability is based on Sections 708 No. 6, 711 ZPO.

The calculation of the amount in dispute is based on Sections 3, 4, 5 ZPO. In this respect, the Court concurs with the Claimants' statements.

D.

Any new factual assertions submitted by the parties in the briefs filed on February 22, 2026, and February 27, 2026, respectively, which were not filed within the prescribed time limit, were time-barred in this case pursuant to Section 296a ZPO and were therefore rejected; legal arguments were taken into account.

**Notice of Right to Appeal:**

An appeal may be filed against the decision setting the amount in dispute if the value of the matter in dispute exceeds 300 euros or if the court has allowed the appeal.

The appeal must be filed within **six months** with the

> Munich I Regional Court
> Prielmayerstraße 7
> 80335 Munich

37 O 104/26                                    - Page 38 -

.

The time limit begins when the decision on the merits becomes final or when the proceedings are otherwise concluded. If the amount in dispute has been determined later than one month before the expiration of the six-month period, the appeal may still be filed within one month after service or informal notification of the order determining the amount in dispute. In the case of informal notification, the decision is deemed to have been made known on the fourth day after mailing.

The appeal must be filed in writing or by making a statement for the record at the office of the named court. It can also be declared for the record at the office of any local court; however, the deadline is met only if the record is received in time by the court named above. Legal representation is not required.

Legal remedies may also be filed as an **electronic document** . A simple email does not meet the legal requirements.

Appeals filed by an attorney, a government agency, or a legal entity under public law, including associations formed by such entities to fulfill their public duties, must be submitted as an **electronic document**, unless this is temporarily not possible for technical reasons. In this case, the submission remains permissible under the general provisions, provided that the temporary inability to submit the document is substantiated at the time of the substitute submission or immediately thereafter. The electronic document must be submitted subsequently upon request.

Electronic documents must
- bear a qualified electronic signature of the responsible person or
- be signed by the responsible person and submitted via a secure transmission channel.

An electronic document bearing a qualified electronic signature of the responsible person may be transmitted as follows:
- via a secure transmission path or
- to the Electronic Court and Administration Mailbox (EGVP) of the court, set up for receiving electronic documents.

With regard to secure transmission channels, reference is made to Section 130a(4) of the Code of Civil Procedure. For further requirements regarding electronic communication with the courts, please refer to the Regulation on the Technical Framework for Electronic Legal Transactions and on the Special Electronic Government Mailbox (Electronic Legal Transactions Regulation - ERVV), as amended, as well as the website www.justiz.de.

sgd.

| Dr. Althaus | Schmelcher | Reichert |
|---|---|---|
| Honorable Presiding Judge at the Regional Court | Honorable Judge at the Regional Court | Honorable Judge at the Regional Court |

**38**

37 O 104/26

Pronounced on March 11, 2026

sgd.

Taş, JAng

Clerk of the Court

[stamp:] BAVARIA          Certified to be a true copy

REGIONAL COURT          Munich, 03/11/2026


Taş, JAng

Clerk of the Court

Beglaubigte Abschrift

# Landgericht München I

Az.:    37 O 104/26

Eingegangen am:

11.03.2026



## IM NAMEN DES VOLKES

In dem Rechtsstreit

1) **Teamfluence OÜ**, vertreten durch den Geschäftsführer Jan-Jakob Liebling, ████████
████████████

    - Verfügungsklägerin -

2) **Liebling** Jan-Jakob, alias Steven Morell, ████████████
    - Verfügungskläger -

Prozessbevollmächtigte zu 1 und 2:
Rechtsanwälte **Glade Michel Wirtz**, Partnerschaft von Rechtsanwälten mbB, ████████
████████████ Gz.: 25-118

gegen

1) **LinkedIn Ireland Unlimited Company**, vertreten durch ihre Geschäftsführer Keith Dolliver, Benjamin Orndorff, James O'Connor, Henry Chi-Ning Fong sowie Sue Duke, Wilton Place, Dublin 2, Irland
    - Verfügungsbeklagte -

2) **LinkedIn Germany GmbH**, vertreten durch d. Geschäftsführer Keith Dolliver, Benjamin Orndorff, Steven Liang-Chun Chen sowie Henry Chi-Ning Fong, August-Everding-Str. 24, 81671 München
    - Verfügungsbeklagte -

Prozessbevollmächtigte zu 1 und 2:
Rechtsanwälte **Fieldfisher Partnerschaft von Rechtsanwälten mbB**, Amerigo-Vespucci-Platz 1, 20457 Hamburg, Gz.: SZI/SBK/DE01-052492-00036/136693963 v2

wegen einstweiliger Verfügung

erlässt das Landgericht München I - 37. Zivilkammer - durch die Vorsitzende Richterin am Landgericht Dr. Althaus, den Richter am Landgericht Schmelcher und den Richter am Landgericht Reichert aufgrund der mündlichen Verhandlung vom 18.02.2026 folgendes

**41**

37 O 104/26                              - Seite  2  -

# Endurteil

1.    Der Antrag auf Erlass einer einstweiligen Verfügung vom 22.01.2026 wird zurückgewiesen.

2.    Die Verfügungskläger haben die Kosten des Rechtsstreits zu jeweils 50 % zu tragen.

3.    Das Urteil ist vorläufig vollstreckbar. Die Verfügungskläger können die Vollstreckung der Verfügungsbeklagten durch Sicherheitsleistung in Höhe von 110 % des aufgrund des Urteils vollstreckbaren Betrags abwenden, wenn nicht die Verfügungsbeklagten vor der Vollstreckung Sicherheit in Höhe von 110 % des zu vollstreckenden Betrags leisten.

sowie folgenden

# Beschluss

Der Streitwert wird auf 25.000,00 € festgesetzt.

**42**

37 O 104/26                                          - Seite   3  -

# Tatbestand

Die Verfügungskläger wenden sich im Wege des einstweiligen Verfügungsverfahrens gegen eine ihrer Ansicht nach zu Unrecht erfolgte Einschränkung ihrer Nutzerprofile auf der Plattform „LinkedIn" sowie gegen Maßnahmen gegenüber anderen Mitgliedern der Plattform, die die von der Verfügungsklägerin zu 1) vertriebene Software nutzen.

Die Verfügungsklägerin zu 1) ist ein Unternehmen mit Sitz in Estland, das sich auf die Entwicklung und Bereitstellung von Softwarelösungen für Social-Media-Integrationen, insbesondere im Bereich von Browser-Plugins für die Plattform „LinkedIn", spezialisiert hat. Hierzu vertreibt sie insbesondere die Software „Teamfluence". Diese vertreibt die Verfügungsklägerin zu 1) international, jedoch mit einem Schwerpunkt von etwa 30 % an Kunden aus Deutschland.

Der Verfügungskläger zu 2) ist geschäftsführender Alleingesellschafter der Verfügungsklägerin zu 1). Er nutzt die Plattform „LinkedIn" selbst unter dem Künstlernamen „Steven Morell" (vgl. Anlage GMW-eV1).

Die Verfügungsbeklagte zu 1), eine in Irland ansässige, mittelbare Tochtergesellschaft der Microsoft Corporation, betreibt das unter der URL „www.linkedin.com" abrufbare Berufsnetzwerk „LinkedIn" in Europa (vgl. Anlage GMW-eV2). Das Angebot zielt darauf ab, Berufstätige miteinander zu verbinden und ihnen eine Plattform zur Veröffentlichung von berufsbezogenen Profilen und zum Austausch zu berufs- und karrierebezogenen Themen zu geben (vgl. Anlage AG1).

Die Verfügungsbeklagte zu 2) ist eine Tochtergesellschaft der Verfügungsbeklagten zu 1) mit Sitz in München. Sie erbringt gegenüber der Verfügungsbeklagten zu 1) administrative Aufgaben und Kundenservice im Zusammenhang mit der Plattform „LinkedIn". Hierzu gehören insbesondere die Beratung von Kunden und Nutzern sowie die Erbringung von Marketingleistungen vordergründig auf dem deutschen Markt. Darüber hinaus schließt die Verfügungsbeklagte zu 2) Verträge mit lokalen Dienstleistern ab (vgl. Anlagen AG2, GMW-eV3 und GMW-eV4).

Die Verfügungsklägerin zu 1) vertreibt seit etwa Juni 2023 die speziell für die Plattform „LinkedIn" entwickelte Software „Teamfluence" an gewerbliche Kunden. Seit Anfang des Jahres 2024 ist die Software als Browser-Plugin verfügbar, das über den App-Store des Browsers „Chrome" herun-

37 O 104/26                                                - Seite  4  -

tergeladen und dort installiert und genutzt werden kann.

Die Verfügungskläger unterhalten jeweils seit mehreren Jahren ein Profil auf der Plattform „LinkedIn". Die Nutzung der Plattform erfolgt dabei auf Grundlage der Nutzervereinbarung der Verfügungsbeklagten zu 1) (vgl. Anlage GMW-eV6).

Nach Klausel 8.2. der Nutzervereinbarung haben die Nutzer unter anderem Folgendes zu unterlassen:

„2. Software, Geräte, Skripts, Roboter oder sonstige Mittel oder Prozesse entwickeln, unterstützen oder nutzen (wie Crawler, Browser-Plug-ins und Add-ons oder andere Technologien), um die Services zu scrapen oder Profile und andere Daten von den Services zu kopieren";

„7. Gegen die geistigen Eigentumsrechte oder sonstige Rechte von LinkedIn verstoßen, einschließlich, aber nicht beschränkt auf (i) das Kopieren oder Verbreiten unserer Lernvideos oder anderer Materialien; (ii) das Kopieren oder Verbreiten unserer Technologie, es sei denn, sie wird unter Open-Source-Lizenzen bereitgestellt; oder (iii) die Verwendung des Wortes „LinkedIn" oder unserer Logos in Unternehmensnamen, E-Mail-Adressen oder URLs, außer wie in den Markenrichtlinien vorgesehen";

„10. Ohne unsere ausdrückliche Genehmigung den Eindruck erwecken, dass Sie mit LinkedIn verbunden sind oder von LinkedIn empfohlen werden (beispielsweise, indem Sie sich als Trainer:in von LinkedIn ausgeben)";

„11. Die Services oder zugehörige Daten vermieten, leasen, verleihen, mit ihnen handeln, sie verkaufen/weiterverkaufen oder sie auf andere Weise monetarisieren oder sich ohne Zustimmung von LinkedIn Zugang zu den Services oder damit verbundenen Daten verschaffen.";

„13. Bots oder andere nicht autorisierte automatisierte Methoden verwenden, um auf die Services zuzugreifen, Kontakte hinzufügen oder herunterzuladen, Nachrichten zu senden oder umzuleiten, Beiträge zu erstellen, zu kommentieren, zu liken, zu teilen oder erneut zu teilen oder auf andere Weise ein nicht authentisches Engagement zu generieren".

Nach Klausel 3.4 der Nutzungsvereinbarung ist die Verfügungsbeklagte zu 1) berechtigt, unter bestimmten Voraussetzungen die Nutzung der „Services" einzuschränken. Konkret heißt es hierzu:

37 O 104/26                                        - Seite  5  -

> „LinkedIn behält sich das Recht vor, Ihre Nutzung der Services, einschließlich der An-
> zahl der Kontakte und der Fähigkeit, mit anderen Mitgliedern Kontakt aufzunehmen, ein-
> zuschränken. LinkedIn behält sich das Recht vor, Ihr Konto einzuschränken, auszuset-
> zen oder zu schließen, wenn Sie gegen diesen Vertrag oder Gesetze verstoßen oder
> die Services missbrauchen (beispielsweise, indem Sie die Dos and Don'ts oder Com-
> munity-Richtlinien missachten).
>
> Wir können außerdem jegliche von Ihnen veröffentlichten Inhalte oder sonstigen Anga-
> ben entfernen, wenn wir der Meinung sind, dass sie gegen unsere Community-Richtli-
> nien, unsere Dos and Don'ts oder diesen Vertrag verstoßen. Erfahren Sie mehr dar-
> über, wie wir Inhalte moderieren.“

Mit E-Mail vom 10.12.2025 (vgl. Anlage GMW-eV7) wurden die Verfügungskläger von „LinkedIn Enforcement“ aufgefordert, unter anderem das Angebot ihres Browser-Plugins „Teamfluence“ zu unterlassen. Zur Begründung wurde angeführt, dass dieses ein sogenanntes „Scraping“ von „Lin-kedIn“-Daten und eine „Automation of LinkedIn services“ betreibe, und dies gegen die Nutzerver-einbarung verstoße.

Mit Schreiben vom 22.12.2025 (vgl. Anlage GMW-eV8) reagierten die Verfügungskläger und führ-ten an, dass die betreffende Klausel 8.2.2 der Nutzervereinbarung gegen die Verordnung (EU) 2022/1925 des Europäischen Parlaments und des Rates vom 14.09.2022 über bestreitbare und faire Märkte im digitalen Sektor und zur Änderung der Richtlinien (EU) 2019/1937 und (EU) 2020/1828 (Gesetz über digitale Märkte – DMA) verstoße und demnach keine Verletzung der Nut-zervereinbarung gegeben sei.

Mit Schreiben vom 05.01.2026 (vgl. Anlage GMW-eV9) teilte „LinkedIn Enforcement“ mit, dass für eine nähere Prüfung zusätzliche Informationen und Erläuterungen seitens der Verfügungskläger erforderlich seien. Eine Frist zur Übermittlung der Informationen enthielt das Schreiben nicht.

Am 15.01.2026 wurden sodann – ohne erneute vorherige Ankündigung oder Anhörung – die indivi-duellen und beruflichen Profile der beiden Verfügungskläger auf der Plattform „LinkedIn“ gesperrt. Hierüber wurden die Verfügungskläger mit E-Mail vom selben Tag (vgl. Anlage GMW-eV10) infor-miert. Begründet wurde die Sperrung damit, dass die Verfügungskläger nicht auf das Schreiben vom 05.01.2026 (vgl. Anlage GMW-eV9) reagiert hatten.

Mit Schreiben vom 15.01.2026 (vgl. Anlage GMW-eV11) legten die Verfügungskläger Widerspruch gegen die Sperrung ihrer Nutzerkonten ein und verlangten die sofortige Freigabe der Profile. Dem

wurde nicht nachgekommen.

Die Verfügungskläger tragen vor, die von der Verfügungsklägerin zu 1) vertriebene Software „Teamfluence" ermögliche Nutzern die Auswertung von Daten zu ihren eigenen Aktivitäten im Netzwerk. Die Software richte sich insbesondere an Sales-Teams und andere geschäftliche Nutzerkreise, denen es erlaubt, Interaktionen auf der Plattform „LinkedIn", wie beispielsweise Likes, Kommentare oder Profilbesuche, systematisch zu erfassen, zu analysieren und für unternehmensinterne Prozesse, etwa im Bereich des Kundenmanagements oder Vertriebs, einzusetzen. Hierzu erfolge eine Übermittlung der Daten an ein Cloud-Backend, wo die Daten strukturiert, zusammengeführt, ausgewertet und für die Weiterverarbeitung in unternehmenseigenen Systemen, wie CRM- oder Sales-Tools, aufbereitet würden. Die Übertragung betreffe dabei ausschließlich Daten, auf die der jeweilige Nutzer im Rahmen seines eigenen „LinkedIn"-Kontos Zugriff habe und die ihm im Browser angezeigt würden (vgl. Anlage GMW-eV1).

„Scarping" im Sinne der Nutzervereinbarung liege nicht vor. Es handle sich bei „Teamfluence" vielmehr um ein Tool, das ausschließlich solche Datenpunkte verarbeite, die „LinkedIn" dem jeweiligen Nutzer in dessen Browser ohnehin anzeige und im Cache speichere. Es würden somit lediglich dem Nutzer selbst bereitgestellte Daten, technisch unterstützt, erfasst; ein systematisches Auslesen fremder Daten oder eine Umgehung technischer Schutzmaßnahmen finde nicht statt.

Die Anwendung beeinträchtige daher weder die Funktionsfähigkeit von LinkedIn, noch liege ein Datenschutzverstoß vor. Zudem sei es nicht Sache der Verfügungsbeklagten, etwaige Verstöße gegen Datenschutzrecht außerhalb der Plattform zu ahnden. Die Verfügungsbeklagten hätten somit kein berechtigtes Interesse daran, zu kontrollieren, welche Software auf den Endgeräten ihrer Nutzer installiert und genutzt werde. Das Eigentum an und die Kontrolle über die genutzte Softwareumgebung lägen ausschließlich bei den Nutzern. Ein generelles Verbot, Browser-Plugins, wie das von den Verfügungsklägern bereitgestellte Tool „Teamfluence" zu verwenden, lasse sich nicht rechtfertigen.

Soweit die Verfügungsbeklagten sich auf eine etwaige markenrechtliche Beeinträchtigung berufen, sei darauf hinzuweisen, dass die Verwendung eines geschützten Markennamens zulässig sei, soweit dies zur Erläuterung von Nutzen und Funktionsweise einer Dienstleistung erforderlich sei. Dies sei bei einem speziell für die Plattform „LinkedIn" entwickelten Softwaretool zwangsläufig der Fall, sodass auch die Nutzung geschützter Bild- und Bildmarken vorliegend keinen Grund

37 O 104/26                                        - Seite  7  -

für eine Sperrung der klägerischen Nutzerkonten liefere.

Die Sperrung der Nutzerkonten der beiden Verfügungskläger sei zu Unrecht erfolgt. Ein Verstoß gegen die Nutzungsbedingungen liege nicht vor. Ohnehin sei zwischen dem Vertrieb der Software und der Nutzung der „LinkedIn"-Accounts zu unterscheiden. Außerdem verstoße die Regelung der Klausel 8.2.2 der Nutzervereinbarung gegen zwingende Regelungen des aufgrund der Torwächterstellung der Verfügungsbeklagten anwendbaren DMA. Aus Art. 6 Abs. 10 DMA und Art. 6 Abs. 12 DMA ergebe sich konkret ein Anspruch der Verfügungskläger auf (Echtzeit-)Zugang zu der von den Verfügungsbeklagten betriebenen Plattform, sodass die Sperrung allein aufgrund dessen rückgängig gemacht werden müsse. Die diesen Anspruch einschränkende Klausel der Nutzungsvereinbarung laufe dem zuwider, sei vor diesem Hintergrund nichtig und könne daher nicht als Begründung für eine Sperrung herangezogen werden.

Insbesondere stellten die Verfügungsbeklagten gewerblichen Nutzern und den von ihnen autorisierten Dritten bislang keine anderweitige alternative Zugangsmöglichkeit oder Schnittstelle zur Verfügung, welche die gesetzlichen Anforderungen an einen effektiven, hochwertigen und permanenten Echtzeitzugang zu den bei „LinkedIn" generierten Daten erfüllen. So sei insbesondere ein Zugang über die „Pages Data Portability API" nicht ausreichend. Diese unterlägen erheblichen Kapazitäts- und Geschwindigkeitsbeschränkungen, sodass kein Echtzeitdatenzugang gewährt werde, und seien für sogenannte „Business User" ohnehin praktisch nicht nutzbar. Jedenfalls habe die Verfügungsklägerin zu 1) einen entsprechenden Antrag bei den Verfügungsbeklagten gestellt, wobei der Zugang ohne Begründung abgelehnt worden (vgl. Anlagen GMW-eV25 und GMW-eV26) und unmittelbar hierauf die Sperrung der streitgegenständlichen Nutzerkonten erfolgt sei. Auch der „LinkedIn Sales Navigator" – der ohnehin kostenpflichtig sei und damit nicht die Anforderungen des Art. 6 Abs. 10 DMA erfülle – ermögliche einen in Art. 6 DMA geforderten Zugang nicht; vielmehr erlaube dieses Tool lediglich die erweiterte Suche nach Firmen und Personen sowie das Herausleiten dieser Daten an Salesforce.

Die Sperrung der klägerischen Nutzerkonten stelle eine gezielte Maßnahme gegen die Verfügungskläger dar. Hintergrund sei, dass die Verfügungsbeklagten mit ihrer eigenen Software „LinkedIn Sales Navigator" ein mit „Teamfluence" konkurrierendes Produkt anböten (vgl. Anlage GMW-eV27) und der Wettbewerb seitens der Verfügungsbeklagten entsprechend eingeschränkt werden solle. Dass die Verfügungsbeklagten gezielt gegen die Software „Teamfluence" vorgingen, ergebe sich schließlich daraus, dass weiterhin Profile zahlreicher Anbieter vergleichbarer Produkte auf der Plattform „LinkedIn" erreichbar seien (vgl. Anlage GMW-eV1). Hierin sei jedenfalls eine Diskriminierung im kartellrechtlichen Sinne zu sehen, neben einer unbilligen Behinde-

37 O 104/26                                    - Seite  8  -

rung durch Sperrung der Nutzerkonten ohne sachlichen Grund und substantiierte Begründung so-wie ohne faires, partizipatorisches Anhörungsverfahren. Die Verfügungsbeklagten verfügten über eine marktbeherrschende Stellung auf dem Markt für professionelle Social-Networking-Dienste bzw. digitale Plattformdienste zur Anbahnung und Pflege geschäftlicher Kontakte. Dies ergebe sich aus den Marktzahlen, wonach die Plattform im Jahr 2025 weltweit über 1,3 Milliarden registrierte Nutzer verfügte, davon Anfang Februar 2025 rund 304 Millionen im Europäischen Wirtschaftsraum. In Deutschland habe die Plattform „LinkedIn" im September 2025 7,4 Millionen aktive Nutzer pro Monat verzeichnet, über 70 Millionen Unternehmen seien registriert bzw. gelistet (vgl. Anlagen GMW-eV23 und GMW-eV24); die Plattform „XING" spiele im relevanten Markt hingegen faktisch keine Rolle mehr. Zudem sei die Plattform als „sehr große Online-Plattform" im Sinne der Verordnung (EU) 2022/2065 des Europäischen Parlaments und des Rates vom 19.10.2022 über einen Binnenmarkt für digitale Dienste und zur Änderung der Richtlinie 2000/31/EG (Digital Services Act – DSA) eingestuft worden.

Die streitgegenständlichen Kontosperrungen begründeten des Weiteren einen Eingriff in das Recht der Verfügungskläger am eingerichteten und ausgeübten Gewerbebetrieb, weshalb ein entsprechender Unterlassungsanspruch auch aus § 823 Abs. 1 BGB i. V. m. § 1004 BGB analog folge.

Der Verfügungskläger zu 2) nutze die Plattform „LinkedIn" als zentrales Instrument zur Verwaltung seines beruflichen Netzwerks sowie zur Abwicklung seiner gesamten geschäftlichen Kommunikation im Zusammenhang mit der Vermarktung der Software „Teamfluence" (vgl. Anlage GMW-eV1). Sein Nutzerkonto enthalte sämtliche Kontakte und wesentliche Inhalte aus knapp zwei Jahrzehnten Berufstätigkeit. Rund 80 % der geschäftlichen Kommunikation der Verfügungskläger mit Neu- und Bestandskunden sowie Geschäftspartnern erfolge über die Direktnachrichtenfunktion der Plattform „LinkedIn". Die Plattform stelle damit nicht nur den zentralen Kommunikationskanal, sondern zugleich das maßgebliche Adress- und Netzwerkverzeichnis der Verfügungskläger dar. Darüber hinaus sei die Plattform das einzig relevante Instrument zur Neukundenakquise.

Die Sperrung der Nutzerkonten gefährde die wirtschaftliche Existenz der Verfügungskläger. Sie seien von sämtlichen geschäftlichen Kontakten und ihrem gesamten beruflichen Netzwerk abgeschnitten; insbesondere sei eine Neukundenakquise nicht mehr möglich. Hinzu komme, dass die Verfügungskläger in vormals zwischen ihnen und ihren Kunden geführten Kommunikation nunmehr unter der Bezeichnung „LinkedIn Member" angezeigt würden, wodurch die Sperrung für Dritte offensichtlich werde und demnach ein – fälschlicher – Eindruck eines begangenen Versto-

37 O 104/26                                                    - Seite  9  -

ßes seitens der Verfügungskläger entstehe, was schließlich zu einem erheblichen Reputationsverlust führe (vgl. Anlagen GMW-eV1 und GMW-eV12). Bereits laufende Verhandlungen seien teils abgebrochen worden, neue Anfragen blieben aus.

Weiter hätten die Verfügungsbeklagten Kunden der Verfügungsklägerin zu 1) bzw. Nutzer der Software „Teamfluence" kontaktiert, nachdem sie infolge eines rechtswidrigen Ausspionierens der Browser-Einstellungen eine Nutzung der klägerischen Software festgestellt hätten. Unter Berufung auf Ziffer 8.2.2 der Nutzervereinbarung sei den Nutzern sodann mit Sanktionen gedroht worden, um eine Beendigung der Nutzung der Software „Teamfluence" zu erzwingen. Diese Maßnahmen beschleunigten den Vertrauensverlust und vertieften die Existenzgefährdung der Verfügungskläger (vgl. Anlagen GMW-eV1 und GMW-eV13). Erste Nutzer hätten bereits mitgeteilt, ihren Vertrag im Hinblick auf die Nutzung der Software „Teamfluence" aus Sorge vor Sanktionen von Seiten der Verfügungsbeklagten kündigen zu wollen (vgl. Anlagen GMW-eV1 und GMW-eV14). Auch diese rechtswidrigen Maßnahmen stellten sich letztlich als Eingriffe gegen die Verfügungskläger dar, weshalb auch insoweit Unterlassen begehrt wird.

Im Rahmen der mündlichen Verhandlung erweiterten die Verfügungskläger infolge eines Hinweises seitens der Kammer den ursprünglich gestellten Antrag um einen Hilfsantrag.

Die Verfügungskläger beantragen zuletzt:

Den Antragsgegnerinnen zu 1) und 2) wird, unter Androhung eines vom Gericht für jeden Fall der Zuwiderhandlung festzusetzenden Ordnungsgelds von bis zu EUR 250.000 – ersatzweise Ordnungshaft – oder der Ordnungshaft bis zu sechs Monaten, zu vollstrecken an ihrem gesetzlichen Vertreter, bis zu einer Entscheidung in der Hauptsache untersagt,

a) die am 15. Januar 2026 erfolgte Sperrung des Kontos der Antragstellerin zu 1) auf der Plattform LinkedIn, vormals erreichbar unter der URL https://linkedin.com/company/myteamfluence/ mit der Bezeichnung "My Teamfluence" aufrechtzuerhalten, sodass die Antragstellerin zu 1) ihr Konto, einschließlich ihrer Unternehmensseite, im Zustand zum Zeitpunkt der Sperrung einschließlich aller Funktionen der LinkedIn-Plattform wieder vollständig nutzen kann, und eine erneute Sperrung dieses Kontos vorzunehmen;

**49**

37 O 104/26                                - Seite 10 -

b) die am 15. Januar 2026 erfolgte Sperrung des Kontos des Antragstellers zu 2) auf der Plattform LinkedIn, vormals erreichbar unter der URL https://www.lin-kedin.com/in/stevenmorell/ mit der Bezeichnung "Steven Morell" aufrechtzuerhalten, sodass der Antragsteller zu 2) sein Konto, einschließlich seines Profils, im Zustand zum Zeitpunkt der Sperrung einschließlich aller Funktionen der LinkedIn-Plattform wieder vollständig nutzen kann, und eine erneute Sperrung dieses Kontos vorzunehmen;

c) LinkedIn-Mitglieder, die die Software Teamfluence nutzen, aufgrund dieser Nutzung zu verwarnen oder abzumahnen oder anderweitig mit dem Ziel der Beendigung der Nutzung von Teamfluence auf LinkedIn-Mitglieder einzuwirken, oder gegenüber LinkedIn-Mitgliedern nachteilige Maßnahmen für den Fall der weiteren Nutzung von Teamfluence anzukündigen oder durchzuführen, wie insbesondere vorübergehende oder dauerhafte Kontosperrungen.

Hilfsweise beantragen die Verfügungskläger:

Den Antragsgegnerinnen zu 1) und 2) wird, unter Androhung eines vom Gericht für jeden Fall der Zuwiderhandlung festzusetzenden Ordnungsgelds von bis zu EUR 250.000 – ersatzweise Ordnungshaft – oder der Ordnungshaft bis zu sechs Monaten, zu vollstrecken an ihrem gesetzlichen Vertreter, bis zu einer Entscheidung in der Hauptsache untersagt,

a) die am 15. Januar 2026 erfolgte Sperrung des Kontos der Antragstellerin zu 1) auf der Plattform LinkedIn, vormals erreichbar unter der URL https://lin-kedin.com/company/myteamfluence/ mit der Bezeichnung "My Teamfluence" aufrechtzuerhalten, sodass die Antragstellerin zu 1) ihr Konto, einschließlich ihrer Unternehmensseite, im Zustand zum Zeitpunkt der Sperrung einschließlich aller Funktionen der LinkedIn-Plattform wieder vollständig nutzen kann, und eine erneute Sperrung dieses Kontos vorzunehmen, mit der Maßgabe, dass die Antragstellerin zu 1) keine Werbung für das Produkt „Teamfluence" betreibt;

b) die am 15. Januar 2026 erfolgte Sperrung des Kontos des Antragstellers zu 2) auf der Plattform LinkedIn, vormals erreichbar unter der URL https://www.lin-kedin.com/in/stevenmorell/ mit der Bezeichnung "Steven Morell" aufrechtzuerhalten, sodass der Antragsteller zu 2) sein Konto, einschließlich seines Profils, im Zustand zum Zeitpunkt der Sperrung einschließlich aller Funktionen der LinkedIn-Plattform wieder vollständig nutzen kann, und eine erneute Sperrung dieses Kontos vorzunehmen, mit der Maßgabe, dass der Antragsteller zu 2) keine Inhalte zu „Teamfluence" veröffentlicht;

37 O 104/26                                    - Seite  11 -

c) LinkedIn-Mitglieder, die die Software Teamfluence nutzen, aufgrund dieser Nutzung zu verwarnen oder abzumahnen oder anderweitig mit dem Ziel der Beendigung der Nutzung von Teamfluence auf LinkedIn-Mitglieder einzuwirken, oder gegenüber LinkedIn-Mitgliedern nachteilige Maßnahmen für den Fall der weiteren Nutzung von Teamfluence anzukündigen oder durchzuführen, wie insbesondere vorübergehende oder dauerhafte Kontosperrungen.

Die Verfügungsbeklagten beantragen,

den Antrag auf Erlass einer einstweiligen Verfügung zurückzuweisen.

Schriftsätzlich hatten die Verfügungsbeklagten darüber hinaus angeregt, hilfsweise auszusprechen, dass die Verfügungsbeklagten die Vollstreckung einer einstweiligen Verfügung – unabhängig von einer Sicherheitsleistung durch die Verfügungskläger – durch Sicherheitsleistung in Höhe von 30.000,00 € abwenden können.

Die Verfügungsbeklagten sind der Auffassung, die Sperrung der Nutzerkonten der Verfügungskläger sei zu Recht erfolgt, weshalb ein Anspruch auf Unterlassen der Sperrung in Gestalt der Freigabe nicht bestehe.

Die Verfügungsbeklagten rügen zunächst die internationale und örtliche Zuständigkeit des angerufenen Gerichts. Das Landgericht München I sei lediglich für einen kleinen Teil der geltend gemachten Ansprüche zuständig, nämlich nur für die angeblichen Ansprüche des Verfügungsklägers zu 2) gegen die Verfügungsbeklagte zu 2), gemäß § 32 ZPO i. V. m. § 87 GWB, § 33 GZVJu. Im Hinblick auf sonstige Ansprüche sei das angerufene Gericht jedoch nicht zuständig. Die Verfügungsbeklagte zu 1) habe ihren Sitz in Dublin (Irische Republik). Eine Zuständigkeit des Landgerichts München I ergebe sich hinsichtlich der gegen die Verfügungsbeklagte zu 1) gerichteten Ansprüche insbesondere nicht aus Art. 7 Nr. 2 der Verordnung (EU) Nr. 1215/2012 des Europäischen Parlaments und des Rates vom 12.12.2012 über die gerichtliche Zuständigkeit und die Anerkennung und Vollstreckung von Entscheidungen in Zivil- und Handelssache (EuGVVO). Vielmehr gelte im Anwendungsbereich des Art. 7 EuGVVO weder die Norm des § 33 GZVJu noch die Vorschrift des § 87 GWB, da konkurrierende nationale örtliche Zuständigkeitsvorschriften ausgeschlossen seien. Zuständig sei daher das Landgericht Landshut. Die (internationale) Zuständigkeit des Landgerichts München I ergebe sich auch nicht aus Art. 8 Nr. 1 EuGVVO aufgrund des vermeintlichen Wohnsitzes des Verfügungsklägers zu 2) in Freising, der bereits nicht hinreichend

- Seite  12 -

glaubhaft gemacht sei. Die Voraussetzungen des sich aus dieser Vorschrift ergebenden Ankerge-
richtsstands seien vorliegend nicht erfüllt; es fehle insbesondere an einer engen Beziehung zwi-
schen den verbundenen Anträgen.

Die Verfügungsbeklagte zu 1) sei alleinige Betreiberin der Plattform „LinkedIn" im Europäischen
Wirtschaftsraum. Mit der Verfügungsbeklagten zu 2) habe weder die Verfügungsklägerin zu 1)
noch der Verfügungskläger zu 2) eine vertragliche Beziehung. Darüber hinaus habe die Verfü-
gungsbeklagte zu 2) kein Weisungsrecht gegenüber der Verfügungsbeklagten zu 1) oder anderen
Gesellschaften der Microsoft-Gruppe. Sie erbringe keine technischen Support-Leistungen und sei
nicht in die Durchsetzung der „LinkedIn"-Nutzervereinbarung oder Ahndung von Verstößen gegen
diese involviert. Auch hätten ihre Mitarbeiter keinen Zugriff auf die E-Mail-Adresse
„enforcement@linkedin.com" und seien weder befugt noch in der Lage, Nutzer abzumahnen oder
Nutzer bzw. deren Konten zu sperren; ebenso wenig könnten sie bereits vorgenommene Sper-
rungen aufheben oder bevorstehende Sperrungen verhindern (vgl. Anlage AG2). Die Verfügungs-
beklagte zu 2) sei demnach bereits nicht passivlegitimiert. Durch die parallele Geltendmachung
von nicht begründeten Ansprüchen auch gegen die Verfügungsbeklagte zu 2) versuchten die Ver-
fügungskläger, eine von Art. 8 Nr. 1 EuGVVO geforderte enge Beziehung vielmehr rechtsmiss-
bräuchlich zu konstruieren. Schließlich folge eine Zuständigkeit des angerufenen Gerichts auch
nicht aus der vermeintlichen Torwächterstellung, da dies keinen prozessual zuständigkeitsbe-
gründenden Zurechnungstatbestand darstelle.

Die Verfügungsbeklagten tragen vor, bei dem von den Verfügungsklägern vertriebenen und be-
worbenen Produkt „Teamfluence" handle es sich ausweislich öffentlich zugänglicher Quellen um
ein vertragsverletzendes Produkt. Das Tool überwache Besuche auf „LinkedIn"-Seiten der „Team-
fluence"-Kunden, deren Verbindungen, Posts, Likes und Kommentare und lese Daten automati-
siert aus. Es ermögliche sogar die Überwachung und „Scraping" von Mitgliederdaten aus Interak-
tionen von Mitgliedern mit Inhalten, die in keinem Zusammenhang mit „Teamfluence"-Kunden
stünden. Aus der Produktbeschreibung der Verfügungskläger ergebe sich zudem, dass von der
Plattform „LinkedIn" von der Software „Teamfluence" rechtswidrig ausgelesene Daten nicht nur
im Browser der Kunden verarbeitet würden, sondern vielmehr eine Übermittlung an Server der
Verfügungsklägerin zu 1) stattfinde, wo die Daten – einschließlich personenbezogener Daten, die
ohne Rechtsgrundlage verarbeitet würden –, von künstlicher Intelligenz analysiert und mit zusätz-
lichen personenbezogenen Daten, wie E-Mail-Adressen und Telefonnummern, aus angeblich
mehr als 20 Quellen angereichert und an Nutzer zurückgespielt würden. Zugleich würden urhe-
berrechtliche Schrankenregelungen, etwa § 44b UrhG, verletzt. Darüber hinaus werbe die Verfü-
gungsklägerin zu 1) damit, dass die rechtswidrig erlangten und durch weitere personenbezogene

Daten ergänzten Datensätze mit Marketingtools ihrer Kunden synchronisiert würden und Kunden auf Basis der von der Software „Teamfluence" rechtswidrig erlangten und ergänzten Datensätzen E-Mail-Werbe-Kampagnen oder Telefonmarketing betreiben könnten. Durch eine derartige unbe-rechtigte Ausleitung von Mitgliedsdaten könnten Mitglieder der Verfügungsbeklagten zu 1) die Kon-trolle über ihre personenbezogenen Daten verlieren. Entsprechende Browser-„Scraping"-Erweite-rungen, wie das Tool „Teamfluence", verletzten auch die Privatsphäre der „LinkedIn"-Mitglieder, da sie deren personenbezogene Daten ohne ausreichende Rechtsgrundlage gemäß der Verord-nung (EU) 2016/679 des Europäischen Parlaments und des Rates vom 27.04.2016 zum Schutz natürlicher Personen bei der Verarbeitung personenbezogener Daten, zum freien Datenverkehr und zur Aufhebung der Richtlinie 95/46/EG (Datenschutz-Grundverordnung – DS-GVO) verarbei-teten. Jedenfalls habe das klägerische Plugin-Tool „Teamfluence" die technischen Systeme der Verfügungsbeklagten zu 1) zur Missbrauchsbekämpfung, die untypische Muster in Anfragen an ih-re Server analysieren, ausgelöst.

Dies stehe im offenen Bruch mit diversen Regelungen der „LinkedIn"-Nutzervereinbarung und stelle zudem einen Verstoß gegen Datenschutzbestimmungen dar (vgl. auch Anlagen AG5 bis AG8). Die Regelungen der Klauseln 8.2.2 und 8.2.13 der Nutzungsvereinbarungen, gegen welche ein Verstoß vorliege, dienten insbesondere dem Schutz der Daten und geschützten Inhalte der Mitglieder des „LinkedIn"-Netzwerks und seien diesbezüglich erforderlich, auch um automatisierte Aktivitäten zu verhindern, welche die Authentizität der Interaktionen zwischen Nutzern der Platt-form beeinträchtigten. Zugleich komme die Verfügungsbeklagte zu 1) mit Klausel 8.2.2 der Nut-zervereinbarung ihren Verpflichtungen nach dem DSA nach. Denn Anbieter würden hiernach un-ter anderem verpflichtet, präventiv und eigenständig Maßnahmen zur Vermeidung systemischer Risiken, zu dem insbesondere der Schutz personenbezogener Daten der Nutzer vor unbefugtem Zugriff (einschließlich des automatisierten Auslesens von Daten, beispielsweise durch „Scra-ping"), – etwa in Allgemeinen Geschäftsbedingungen – zu implementieren.

Tools wie „Teamfluence" führten zudem durch eine Automatisierung und dauerhafte Überwa-chung der Plattform „LinkedIn" zu einer deutlich erhöhten Anzahl von Serveranfragen und belaste-ten die Infrastruktur wesentlich stärker als menschliche Nutzer (vgl. Anlage AG4). Sogenannte „Scraper", wozu nach Auffassung der Verfügungsbeklagten auch die Software „Teamfluence" zähle, seien für einen erheblichen Teil des Datenverkehrs verantwortlich, der auf Server zugreife, die Mitgliederprofile und andere Daten bereitstellten. Trotz technischer Abwehrmaßnahmen führ-ten solche Aktivitäten zu signifikanten Beeinträchtigungen bis hin zu Ausfällen von Diensten und zwängen die Verfügungsbeklagten zu erheblichen Investitionen in zusätzliche Serverkapazitäten (vgl. Anlage AG4).

- Seite  14 -

Darüber hinaus hätten die Verfügungskläger gegen die Klauseln 8.2.7 und 8.2.10 der Nutzerver-einbarung verstoßen, indem sie die Unionsmarken Nr. 008411951 und Nr. 008411928 der Verfü-gungsbeklagten (vgl. Anlage AG13) ohne Zustimmung zur Bewerbung eigener Dienstleistungen genutzt hätten (vgl. Anlage AG14). Trotz Abmahnung (vgl. Anlage GMW-eV7) seien entsprechen-de Nutzungshandlungen fortgesetzt worden.

Nach Klausel 3.4 der Nutzungsvereinbarung sei „LinkedIn" berechtigt, bei Verstößen gegen Ver-trag, Gesetze oder Community-Richtlinien Inhalte zu entfernen und Konten vorübergehend oder dauerhaft einzuschränken oder zu schließen. Von diesen Rechten habe die Verfügungsbeklagte zu 1) aufgrund der genannten – insbesondere wiederholten und schwerwiegenden – Verstöße der Verfügungskläger Gebrauch gemacht. Die streitgegenständlichen Kontosperrungen seien nach einem ordnungsgemäßen und transparenten Enforcement-Verfahren erfolgt (vgl. Anlagen GMW-eV7 bis GMW-eV11 und AG16). Angesichts dessen könne nicht von einem Missbrauch ei-ner – aus Sicht der Verfügungsbeklagten ohnehin nicht bestehenden – Marktmacht durch die Ver-fügungsbeklagte zu 1) ausgegangen werden.

Die Verfügungsbeklagte zu 1) sei dabei auch nicht gezielt allein gegen die Verfügungskläger vor-gegangen. Vielmehr werde im Rahmen eines konsistenten, weltweit angewandten Enforce-ment-Programms insgesamt gegen vertragswidrige Produkte vorgegangen (vgl. Anlagen AG10 bis AG12). Vor diesem Hintergrund liege – entgegen der Behauptung der Verfügungskläger – ge-rade keine kartellrechtliche Diskriminierung vor.

Ebenso wenig finde ein gezieltes Vorgehen gegen bloße Nutzer der Software „Teamfluence" statt. Soweit Konten einzelner Nutzer eingeschränkt worden seien, beruhe dies auf durch An-ti-Missbrauchssysteme erkannten atypischen Anfragemustern, nicht auf einer Kenntnis installier-ter Plugins (vgl. Anlage AG4).

Darüber hinaus ergebe sich kein Anspruch auf Zugang zur Plattform „LinkedIn" aufgrund der Vor-schriften des DMA. Die Verfügungsbeklagte zu 1) setze ihre Verpflichtungen aus Art. 6 Abs. 10 DMA durch die Bereitstellung zweier kostenloser Schnittstellen um, namentlich der „Member Data Portability API" und der „Pages Data Portability API". Letztere diene der kontinuierlichen Datenpor-tabilität für Unternehmensseiten. Personenbezogene Daten von Mitgliedern würden standardmä-ßig ausgeschlossen, es sei denn, diese hätten ausdrücklich eingewilligt. Die genannten Schnitt-stellen seien öffentlich dokumentiert und zugänglich (vgl. Anlage GMW-eV17). Die Verfügungsbe-klagte zu 1) halte sämtliche Verpflichtungen aus Art. 6 Abs. 10 DMA ein, indem sie gewerblichen Nutzern auf Antrag einen Anspruch auf einen kostenlosen, effektiven, hochwertigen und perma-

37 O 104/26                                 - Seite  15 -

nenten Datenzugang in Echtzeit gewähre (vgl. Anlage GMW-eV17). Selbst wenn die bereitgestellte Leistung der Schnittstellen für die Zwecke einzelner Entwickler nicht ausreichen sollte, könne bei der Verfügungsbeklagten zu 1) eine Erweiterung der Kapazität beantragt werden. Somit verfange auch das klägerische Argument im Hinblick auf etwaige Defizite der Schnittstellen nicht. Letztlich hätten jedoch die Verfügungskläger die seitens der Verfügungsbeklagten zur Verfügung gestellten Schnittstellen vor Einleitung des Verfügungsverfahrens nicht ordnungsgemäß genutzt; insbesondere hätten sie den Antragsprozess nicht vollständig durchlaufen.

Auch verleihe Art. 6 Abs. 12 DMA kein Zugangsrecht zur Plattform „LinkedIn", sondern verpflichte den Netzwerkbetreiber lediglich dazu, dass sie allgemeine Zugangsbedingungen veröffentlicht und anwendet, die den sogenannten FRAND-Bedingungen entsprechen. Die Verfügungsbeklagte zu 1) sei ihrer entsprechenden Verpflichtung, den Zugang gewerblicher Nutzer nach fairen, zumutbaren und diskriminierungsfreien allgemeinen Bedingungen zu gewähren, vollumfänglich nachgekommen (vgl. Anlage GMW-eV17).

Ferner fehle es nach Auffassung der Verfügungsbeklagten an einem Verfügungsgrund. Den Verfügungsklägern sei es weiterhin möglich, ihre Leistungen über andere Kanäle – insbesondere über ihre eigene Webseite – zu bewerben und Umsätze zu erzielen. Zudem verfüge das Unternehmen Jaxx Technologies Inc., dem nach öffentlichen Angaben Rechte an der Software „Teamfluence" zustünden, weiterhin über ein uneingeschränktes „LinkedIn"-Profil. Eine existenzielle Gefährdung sei daher nicht glaubhaft gemacht.

Schließlich würde eine (Wieder-)Bereitstellung der streitgegenständlichen Nutzerkonten sowie die Untersagung der erneuten Löschung oder Sperrung zu einer unzulässigen Vorwegnahme der Hauptsache führen.


Die Kammer hat mit Beschluss vom 29.01.2026 die Durchführung der mündlichen Verhandlung angeordnet und in der öffentlichen Sitzung vom 18.02.2026 über den Antrag auf Erlass einer einstweiligen Verfügung verhandelt. Für den Inhalt der mündlichen Verhandlung wird auf die Niederschrift der öffentlichen Sitzung Bezug genommen. Im Übrigen wird zur Vervollständigung des Tatbestands auf die seitens der Parteien eingereichten Schriftsätze nebst Anlagen Bezug genommen.

37 O 104/26                              - Seite  16 -

# Entscheidungsgründe

Der zulässige Antrag auf Erlass einer einstweiligen Verfügung ist nicht begründet.

A.

Die Zulässigkeit des Antrags auf Erlass einer einstweiligen Verfügung ergibt sich insbesondere aufgrund der Zuständigkeit des angerufenen Gerichts sowie der Bestimmtheit und ausreichenden Konkretisierung der zu prüfenden Anträge.

Die Tatsachen, aus denen sich die örtliche wie die internationale Zuständigkeit ergibt, müssen zu irgendeinem Zeitpunkt zwischen Rechtshängigkeit und Schluss der mündlichen Verhandlung vorgelegen haben (vgl. BGH, Urteil vom 01.03.2011 − XI ZR 48/10; Roth, in: Stein, ZPO, 24. Aufl. 2024, vor § 12 Rn. 58). Der Grundsatz des *perpetuatio fori* (vgl. § 261 Abs. 3 Nr. 2 ZPO) gilt auch im Rahmen der internationalen Zuständigkeit.

I. Die internationale Zuständigkeit des Landgerichts München I ist auch für die Verfügungsbeklagte zu 1) gegeben.

Diese richtet sich im Hinblick auf die Verfügungsbeklagte zu 1) nach den Vorschriften der EuGVVO, da die Verfügungsbeklagte zu 1) eine Gesellschaft nach dem Recht der Irischen Republik ist, ihren Sitz in Dublin hat und somit ein zur Anwendung der EuGVVO erforderlicher Auslandsbezug vorliegt.

1.    Zwar besteht gemäß Art. 7 Nr. 1 EuGVVO kein Gerichtsstand für vertraglich geltend gemachte Ansprüche, da die insoweit maßgebliche vertragstypische Leistung in der Irischen Republik erbracht wird.

2.    Hinsichtlich der Verfügungskläger besteht jedoch jeweils ein Gerichtsstand gemäß Art. 7 Nr. 2 EuGVVO für die geltend gemachten deliktischen Ansprüche.

Dem steht nicht entgegen, dass zwischen dem Verfügungskläger zu 2) und der Verfügungsbeklagten zu 1) eine Vertragsbeziehung besteht.

Denn Art. 7 Nr. 2 EuGVVO ist dahin auszulegen, dass er für eine Klage gilt, die auf die Unterlassung bestimmter Verhaltensweisen auch im Rahmen einer Vertragsbeziehung zwi-

schen den Beteiligten gerichtet ist und die darauf gestützt wird, dass die Verfügungsbeklagte unter Verstoß gegen das Wettbewerbsrecht seine marktbeherrschende Stellung missbräuchlich ausnutzt, sofern es jedenfalls nicht unerlässlich ist, den Vertrag zwischen den Parteien auszulegen (vgl. EuGH, Urteil vom 24.11.2020 – C-59/19 2021). Gleiches hat zwangsläufig auch für das allgemeine Deliktsrecht sowie sonstige deliktische Ansprüche zu gelten (vgl. EuGH, Urteil vom 13.03.2014 – C-548/12; Stadler/Krüger, in: Musielak/Voit, ZPO, 22. Aufl. 2025, Art. 7 EuGVVO Rn. 3). Zwar knüpft der hier geltend gemachte Anspruch insofern an das Vertragsverhältnis zwischen dem Verfügungskläger zu 2) und der Verfügungsbeklagten zu 1) an, als dem Anspruch ein etwaiger kartellrechtlicher Unterlassungsanspruch wegen Einschränkung auf Grundlage eines mutmaßlichen Verstoßes gegen Bedingungen des abgeschlossenen Vertrags über das Nutzerkonto der Plattform „LinkedIn" zugrunde liegt. Maßgeblich ist jedoch, wie der Europäische Gerichtshof klargestellt hat (vgl. EuGH, Urteil vom 24.11.2020 – C-59/19 2021), dass sich der Verfügungskläger zu 2) in seiner Antragsschrift auf einen Verstoß gegen Wettbewerbsrecht berufen hat, welcher den Missbrauch einer beherrschenden Stellung unabhängig vom Bestehen eines Vertrags oder einer anderen freiwillig eingegangenen Verpflichtung allgemein verbietet. Der kartellrechtliche Missbrauchsanspruch kann sich aus dem Gesetz unabhängig davon ergeben, ob die Verfügungsbeklagte zu 1) sich mit der Einschränkung des Nutzerkontos im Rahmen ihrer vertraglichen Befugnisse gehalten hat. Eine Auslegung des Vertrags ist für die Beurteilung dieses Anspruchs daher nicht unerlässlich (ständige Rechtsprechung der Kammer, u. a. LG München l, Endurteil vom 03.09.2021 – 37 O 9343/21). Zwar erfordert die nach § 19 Abs. 1, Abs. 2 Nr. 2 GWB stets gebotene Interessenabwägung im Einzelfall bei einer Vertragsbeziehung der Parteien auch eine Betrachtung der vertragstypischen Rechte und Pflichten und der zwischen den Parteien getroffenen Regelungen. Für die Qualifikation des geltend gemachten Anspruchs als deliktischer Anspruch ist dies jedoch ohne Belang, zumal dabei Interessen nicht berücksichtigt werden dürfen, deren Durchsetzung insbesondere nach den kartellrechtlichen Wertungen rechtlich missbilligt werden (vgl. BGH, Urteil vom 10.02.2021 – KZR 66/17).

Als Erfolgsort bzw. Ort der Verwirklichung des Schadenserfolgs im Sinne des Art. 7 Nr. 2 EuGVVO ist nur der Ort anzusehen, an dem in das geschützte Rechtsgut eingegriffen wurde (vgl. BGH, Urteil vom 20.12.1963 – l b ZR 104/62; BGH, Urteil vom 24.09.1986 – Vlll ZR 320/85). Abzustellen ist auf den Ort, an dem der „Erstschaden" erlitten wurde (vgl. EuGH, Urteil vom 05.07.2018 − C-27/17). Der Europäische Gerichtshof hat dies dahin präzisiert, dass der durch eine Website Verletzte vor den Gerichten des Niederlassungs-

37 O 104/26                                     - Seite 18 -

staats des Urhebers der Inhalte oder vor den Gerichten des Staates, in dem der Verletzte den Mittelpunkt seiner Interessen hat, den gesamten erlittenen Schaden einklagen kann (vgl. EuGH, Urteil vom 25.10.2011 – C-509/09 und C-161/10). Auch eine juristische Person kann am Ort des Mittelpunkts ihrer Interessen klagen (vgl. EuGH, Urteil vom 17.10.2017 – C-194/16). Übe die juristische Person ihre Tätigkeit überwiegend nicht im Staat ihres satzungsmäßigen Sitzes aus, so könne sie am Ort der Verwirklichung des Schadenserfolges klagen (vgl. EuGH, Urteil vom 17.10.2017 – C-194/16). Auch eine englischsprachige Internetseite kann sich aber nach ihrem Inhalt gezielt an deutsche Nutzer richten (vgl. BGH, Urteil vom 12.12.2013 – I ZR 131/12).

Hiernach ist vorliegend der Erfolgsort der geltend gemachten deliktischen Handlungen in Deutschland. Der Kundenschwerpunkt der Geschäftstätigkeit der Verfügungsklägerin zu 1) liegt nach ihrem unstreitig gebliebenen Vortrag in der Verhandlung in Deutschland.

Der Verfügungskläger zu 2), Geschäftsführer der Verfügungsklägerin zu 1), hat seinen tatsächlichen Wohnsitz in Freising, von welchem er auch die Geschäftstätigkeit seiner Gesellschaft lenkt. Dies wurde durch Vorlage des Personalausweises des Verfügungsklägers zu 2) glaubhaft gemacht und durch die persönliche Anhörung des Verfügungsklägers zu 2) bestätigt.

3.    Auf die Frage des Ankergerichtsstandes des Art. 8 Nr. 1 EuGVVO kommt es mithin nicht an.

II. Die örtliche Zuständigkeit folgt aus Art. 7 Nr. 2 EuGVVO, die sachliche Zuständigkeit aus §§ 87 Satz 1, 89 Abs. 1 Satz 1 GWB, 33 Abs. 1 Nr. 1 GZVJu.

Zwar verdrängt die EuGVVO grundsätzlich die nationalen Zuständigkeitsvorschriften; nur soweit die Verordnung die örtliche Zuständigkeit nicht mit regelt (deutlich wird die Unterscheidung in den Wendungen „Gerichte des Mitgliedstaates" einerseits bzw. „Gericht des Ortes" andererseits), kann auf die inländischen Vorschriften zur Bestimmung der örtlichen Zuständigkeit zurückgegriffen werden (vgl. Gebauer/Berner, in: Gebauer/Wiedmann, Europäisches Zivilrecht, 3. Aufl. 2021, Art. 4 Brüssel Ia-VO Rn. 6). Die kartellrechtliche Zuständigkeitskonzentration bedeutet jedoch keine Abweichung von der Regelung der EuGVVO, sondern regelt die Gerichtsstruktur in Bayern und definiert dadurch erst das „Gericht des Ortes" im Sinne des Art. 7 Nr. 2 EuGVVO. Bei der durch Rechtsverordnung begründeten Zuständigkeit handelt es sich um eine besondere Form der sachlichen Zuständigkeit. Das gilt allgemein für Vorschriften, welche die Zuständigkeit eines Gerichts für die Bezirke mehrerer Gerichte nach sachlich-funktionellen Kriterien bestimmen. Während die

37 O 104/26                                    - Seite  19 -

Regelungen der örtlichen Zuständigkeit an die lokalen Beziehungen der beteiligten Personen oder der Streitsache anknüpfen, beruht die durch § 89 GWB geschaffene Konzentrationsmöglichkeit auf der sachlichen Erwägung der „Sicherung einer einheitlichen Rechtsprechung" in Kartellsachen (vgl. Ollerdißen, in: Wiedemann, Handbuch des Kartellrechts, 5. Aufl. 2026, § 59 Rn. 45; OLG Koblenz, Beschluss vom 21.06.2007 – 4 SmA 29/07; Schmidt, in: Immenga/Mestmäcker, Wettbewerbsrecht, 7. Aufl. 2024, § 89 GWB Rn. 1).

III. Die Anträge der Verfügungskläger sind auch jeweils ausreichend bestimmt im Sinne des § 253 Abs. 2 Nr. 2 ZPO.

Nach ständiger Rechtsprechung des Bundesgerichtshofs darf ein Verbotsantrag nach § 253 Abs. 2 Nr. 2 ZPO nicht derart undeutlich gefasst sein, dass Gegenstand und Umfang der Entscheidungsbefugnis des Gerichts nach § 308 Abs. 1 ZPO nicht erkennbar abgegrenzt sind, sich die beklagte Partei deshalb nicht erschöpfend verteidigen kann und letztlich die Entscheidung darüber, was ihr verboten ist, dem Vollstreckungsgericht überlassen bliebe (vgl. BGH, Urteil vom 05.10.2010 – I ZR 46/09; BGH, Urteil vom 04.11.2010 – I ZR 118/09). Bei den Anforderungen an die Konkretisierung des Antrags sind die Besonderheiten des anzuwendenden materiellen Rechts und die Umstände des Einzelfalls zu berücksichtigen, wobei auch der Sachvortrag für die Auslegung heranzuziehen ist. In die Beurteilung einzubeziehen sind nicht nur die Interessen der beklagten Partei, sich gegen die Klage erschöpfend verteidigen zu können, sondern auch die Belange des (Verfügungs-)Klägers, dem ein wirksamer Rechtsschutz nicht verwehrt werden darf (vgl. BGH, Versäumnisurteil vom 28.11.2002 – I ZR 168/00). Hiernach sind die streitgegenständlichen Anträge hinreichend verständlich und bestimmt.

B.

Der Antrag auf Erlass einer einstweiligen ist jedoch unbegründet.

Die Verfügungskläger vermochten es nicht, einen Verfügungsanspruch hinreichend glaubhaft zu machen. Hinsichtlich der Verfügungsbeklagten zu 2) fehlt es bereits an der Passivlegitimation. Aber auch gegen die Verfügungsbeklagte zu 1) ist ein Anspruch nicht gegeben.

I. Ein Verfügungsanspruch gegen die Verfügungsbeklagte zu 2) ist nicht gegeben. Die Verfügungsbeklagte zu 2) ist nicht passivlegitimiert, da ihr die angegriffenen Handlungen nicht zuzurechnen sind.

37 O 104/26                                    - Seite  20 -

Die Verfügungsbeklagte zu 2) ist nicht Betreiberin der Plattform „LinkedIn". Ausweislich der klägerseits vorgelegten Nutzerbedingungen (vgl. Anlage GMW-eV6) ist Betreiberin der Plattform „LinkedIn" nicht die Verfügungsbeklagte zu 2), sondern vielmehr die in diesen Dokumenten ausdrücklich genannte Verfügungsbeklagte zu 1). Angesichts dessen wurde zwischen den Verfügungsklägern und der Verfügungsbeklagten zu 2) kein entsprechender Plattformnutzungsvertrag geschlossen, sodass vertragliche Ansprüche, die auf ein Unterlassen gerichtet sind, ausscheiden.

Dies gilt ebenso für entsprechende Ansprüche nach dem Deliktsrecht, da die Verfügungsbeklagte zu 2) nach eigener hinreichender Glaubhaftmachung selbst die Sperrung der klägerischen Accounts nicht vorgenommen hat (vgl. Anlage AG2).

Insbesondere erfolgt vorliegend auch keine Zurechnung etwaigen rechtswidrigen Verhaltens der Muttergesellschaft an die Verfügungsbeklagte zu 2) als deren Tochtergesellschaft. Eine zivilrechtliche Haftung einer Tochtergesellschaft für etwaige Ansprüche, sofern eine Zuwiderhandlung gegen Art. 101 Abs. 1 AEUV seitens deren Muttergesellschaft festgestellt worden ist, kommt nur dann in Betracht, wenn das mutmaßliche Opfer nachweist, dass zum einen im Hinblick auf die wirtschaftlichen, organisatorischen und rechtlichen Bindungen zwischen diesen beiden rechtlichen Einheiten und zum anderen im Hinblick auf das Bestehen eines konkreten Zusammenhangs zwischen der wirtschaftlichen Tätigkeit dieser Tochtergesellschaft und dem Gegenstand der Zuwiderhandlung, für die die Muttergesellschaft haftbar gemacht wurde, diese Tochtergesellschaft mit ihrer Muttergesellschaft eine wirtschaftliche Einheit bildete (vgl. EuGH, Urteil vom 06.10.2021 – C-882/19). Zwar sind die Verfügungsbeklagten hier entsprechend verbunden (vgl. Anlagen GMW-eV 3, GMW-eV4 und AG2). Doch vermochten die Verfügungskläger einen konkreten Zusammenhang zwischen der wirtschaftlichen Tätigkeit der Verfügungsbeklagten zu 2) als Tochtergesellschaft der Verfügungsbeklagten zu 1) und dem Gegenstand der Zuwiderhandlung nicht hinreichend darzulegen. Vielmehr machten die Verfügungsbeklagten glaubhaft, dass die Verfügungsbeklagte zu 2) nicht in Sperrungsvorgänge der Verfügungsbeklagten zu 1) involviert sei (vgl. Anlage AG2). So bestehe seitens der Verfügungsbeklagten zu 2) kein Weisungsrecht gegenüber der Verfügungsbeklagten zu 1) oder anderen Gesellschaften der Microsoft-Gruppe. Sie erbringe auch keine technischen Support-Leistungen und sei nicht in die Durchsetzung der „LinkedIn"-Nutzervereinbarung oder Ahndung von Verstößen gegen diese involviert. Ferner hätten ihre Mitarbeiter keinen Zugriff auf die E-Mail-Adresse „enforcement@linkedin.com" und seien weder befugt noch in der Lage, Nutzer abzumahnen oder Nutzer bzw. deren Konten zu sperren; ebenso wenig könnten sie bereits vorgenommene Sperrungen aufheben oder bevorstehende Sperrungen verhindern.

Die Passivlegitimation der Verfügungsbeklagten zu 2) folgt – entgegen den Ausführungen der Ver-

60

- Seite 21 -

fügungskläger – auch nicht aus der Torwächterbenennung des Microsoft-Konzerns (vgl. Anlage GMW-eV5). Vorliegend ist die Verfügungsbeklagte zu 2) als verklagte Rechtseinheit nicht unmittelbarer Adressat des DMA-Benennungsbeschlusses, sondern lediglich eine nationale Konzerntochtergesellschaft. Auch im Zusammenhang des DMA entspricht der in Art. 2 Nr. 27 DMA legaldefinierte Begriff des Unternehmens der vom Europäischen Gerichtshof in ständiger Rechtsprechung entwickelten Definition zum Unternehmensbegriff in Art. 101 bzw. 102 AEUV (vgl. Lahme/Ruster, in: Podszun, Digital Markets Act, 1. Aufl. 2023, Art. 39 Rn. 45). Demnach wäre, wie oben dargelegt, der Nachweis im Hinblick auf die wirtschaftlichen, organisatorischen und rechtlichen Bindungen zwischen den beiden Verfügungsbeklagten einerseits und zum anderen im Hinblick auf das Bestehen eines konkreten Zusammenhangs zwischen der wirtschaftlichen Tätigkeit dieser Tochtergesellschaft und dem Gegenstand der Zuwiderhandlung, für die die Muttergesellschaft haftbar gemacht wurde, diese Tochtergesellschaft mit ihrer Muttergesellschaft eine wirtschaftliche Einheit bildete (vgl. EuGH, Urteil vom 06.10.2021 – C-882/19; EuGH, Urteil vom 14.03.2019 – C-724/17), erforderlich. Dem kamen die Verfügungskläger, wie oben ausgeführt, nicht nach.

II. Auch Ansprüche gegen die Verfügungsbeklagte zu 1) bestehen nicht.

1.   Ein Verfügungsanspruch in Bezug auf die Anträge unter Ziffern 1) a) und 1) b) ergibt sich nicht aus § 33 Abs. 1 GWB i. V. m Art. 102 AEUV, § 19 GWB.

   a)   Auf den kartellrechtlichen Unterlassungsanspruch findet nach Art. 6 Abs. 3 Buchst. a) der Verordnung (EG) Nr. 864/2007 des Europäischen Parlaments und des Rates vom 11.07.2007 über das auf außervertragliche Schuldverhältnisse anzuwendende Recht (Rom-II-Verordnung) deutsches Recht Anwendung. Da sich das Nutzerkonto der Verfügungsklägerin zu 1) überwiegend an den deutschen Markt richtet und auch der Verfügungskläger zu 2) seinen Wohnsitz in Deutschland hat, ist auf Grundlage des klägerischen Vortrags eine Beeinträchtigung des deutschen Markts wahrscheinlich. Die gegenteilige Vereinbarung in Klausel 6 der Nutzungsbedingungen der Plattform „LinkedIn" ist nach Art. 6 Abs. 4 Rom-II-Verordnung unwirksam.

   b)   Die Frage des Vorliegens einer marktbeherrschenden Stellung der Verfügungsbeklagten zu 1) kann hier dahinstehen, da ohnehin bereits kein Missbrauch von Marktmacht im Sinne des § 19 Abs. 1, Abs. 2 GWB bzw. Art. 102 AEUV gegeben ist. So sind die klägerseits angegriffenen Sperrungen ihrer Nutzerkonten auf der Plattform

37 O 104/26                                   - Seite 22 -

„LinkedIn" weder als unbillige Behinderung noch als Diskriminierung im Sinne des § 19 Abs. 2 Nr. 1 GWB zu werten.

Die Feststellung der Unbilligkeit der Behinderung setzt eine umfassende Abwägung der beiderseitigen Individualinteressen unter Berücksichtigung der auf die Freiheit des Wettbewerbs gerichteten Zielsetzung des GWB voraus (vgl. BGH, Beschluss vom 22.09.1981 – KVR 8/80). Ein marktbeherrschendes Unternehmen ist in seiner Entscheidung über Aufnahme und Beendigung von Geschäftsbeziehungen auf ein diskriminierungsfreies und von sachlichen Erwägungen getragenes Verhalten beschränkt. Im konkreten Fall stellt sich die Sperrung der fraglichen Nutzerkonten unter Berücksichtigung aller Umstände nicht als unbillige Behinderung oder Diskriminierung dar. Insbesondere haben die Verfügungsbeklagten glaubhaft gemacht, dass das Softwaretool „Teamfluence" durch seine Funktionsweise die Interessen der Verfügungsbeklagten objektiv in einer Weise beeinträchtigt, die diese nicht hinnehmen müssen.

c)    Die Verfügungsbeklagte zu 1) hat glaubhaft gemacht, dass die Software „Teamfluence" zu einer Überlastung ihrer Systeme führen kann.

aa)    Die Verfügungsbeklagte zu 1) trägt vor, dass es sich bei der Software „Teamfluence" um ein technisches Mittel handelt, das Besuche auf „LinkedIn"-Seiten der „Teamfluence"-Kunden, deren Verbindungen, Posts, Likes und Kommentare und weitere Daten automatisiert ausliest.

Die Verfügungsbeklagten nehmen insoweit auf die in der Eigenwerbung von Teamfluence enthaltene Darstellung Bezug. Danach ist „Teamfluence" ein Browser-Plugin, das die automatisierte Überwachung von Bewegungen auf einem bestimmten Nutzeraccount vornimmt, um dann bestimmte Daten, beispielsweise von Besuchern, zu speichern und weiterzuverarbeiten. Dies geht aus den vorgelegten Werbeanzeigen (vgl. S. 25 des Schriftsatzes vom 09.02.2026) hervor und wird seitens der Verfügungskläger auch nicht in Abrede gestellt.

bb)    Die Verfügungsbeklagten haben vorgetragen und glaubhaft gemacht, dass durch solche automatisierten Zugriffe ihr eigener Server weit mehr belastet würde, als dies durch Zugriffe durch natürliche Personen der Fall sei. Es sei deshalb auch bereits zu Systemausfällen gekommen und die Verfügungsbe-

37 O 104/26                                    - Seite  23 -

klagte zu 1) habe ihre Serverkapazitäten auf eigene Kosten erweitern müssen. Die Systeme von „LinkedIn" hätten die Software „Teamfluence" aufgrund des Nutzungsverhaltens erkannt. Dies haben die Verfügungsbeklagten auch durch eidesstattliche Versicherung vom 06.02.2026 (vgl. Anlage AG4) glaubhaft gemacht. Die Verfügungskläger haben diese Glaubhaftmachung nicht erschüttern können. Ihr diesbezüglicher Vortrag, die Zugriffe glichen nach Qualität und Quantität den Zugriffen natürlicher Personen, ist ohne Substanz und widerspricht der Lebenserfahrung. Konkreter Vortrag zu Abrufintervallen und durch „Teamfluence" abgerufenen Datenvolumina fehlt gänzlich. Dass eine ähnliche Belastung durch natürliche Personen herbeigeführt werden könnte, wenn diese nur oft genug auf „LinkedIn" zugriffen, ist nicht geeignet, den Vortrag der besonderen Belastung durch automatisierte Zugriffe zu widerlegen.

cc)     Unerheblich ist in diesem Zusammenhang, ob der eigentliche Zugriff auf die Daten auf dem Server der Verfügungsbeklagten oder der Nutzer der Software „Teamfluence" stattfindet. Bereits der massenhafte automatisierte Abruf von Daten ist geeignet, die Interessen der Verfügungsbeklagten zu 1) zu verletzten. Diese hat insoweit durch die vorgelegte eidesstattliche Versicherung glaubhaft gemacht, dass sie durch entsprechende Plugins bereits Seviceeinschränkungen und sogar Ausfälle hat hinnehmen müssen.

dd)     Zur Durchsetzung dieser berechtigten Interessen hat die Verfügungsbeklagte zu 1) in Klausel 8.2.2 der Nutzervereinbarung der Plattform „LinkedIn" festgelegt, dass Nutzer es zu unterlassen haben, Software, Geräte, Skripte, Roboter oder sonstige Mittel oder Prozesse (wie Crawler, Browser-Plugins, Add-ons oder andere Technologien) zu entwickeln, zu unterstützen oder zu nutzen, um die Services zu „scrapen" oder um Profile und andere Daten von den Services zu kopieren (vgl. Anlage GMW-eV6). Hiergegen verstößt die Software „Teamfluence".

Diese Klausel verstößt auch nicht gegen Art. 6 DMA. Nach Art. 6 Abs. 10 DMA gewährt der Torwächter gewerblichen Nutzern und von einem gewerblichen Nutzer zugelassenen Dritten auf ihren Antrag hin kostenlos einen effektiven, hochwertigen und permanenten Echtzeitzugang zu aggregierten und nichtaggregierten Daten, einschließlich personenbezogener Daten, die im

37 O 104/26                                    - Seite  24 -

Zusammenhang mit der Nutzung der betreffenden zentralen Plattformdienste oder von Diensten, die zusammen mit den betreffenden zentralen Plattform-diensten oder zu deren Unterstützung erbracht werden, durch diese gewerb-lichen Nutzer und die Endnutzer, die die Produkte oder Dienstleistungen die-ser gewerblichen Nutzer in Anspruch nehmen, bereitgestellt oder generiert werden, und ermöglicht die Nutzung solcher Daten. Die Vorschrift verpflichtet Torwächter demnach zur Bereitstellung bestimmter Daten über einen gere-gelten Antrags- und Bereitstellungsmechanismus in einem effektiven und hochwertigen Echtzeitformat. Die Norm begründet hingegen keinen An-spruch Dritter auf eigenmächtigen Zugriff außerhalb des gesetzlich vorgese-henen Zugangswegs. Das in Klausel 8.2.2 der Nutzervereinbarung normierte Verbot unautorisierter Zugriffsmethoden untergräbt den gesetzlichen Zu-gangsanspruch nicht, da der vorgesehene Antrags- und Bereitstellungspfad unberührt bleibt. Die Verfügungsbeklagte zu 1) stellt vorliegend zwei Schnitt-stellen bereit, über die dem Anspruch aus Art. 6 DMA nachgekommen wird. Die Schnittstelle „Pages Data Portability API" diene dabei der Erfüllung des Zugangsanspruchs aus Art. 6 Abs. 10 DMA, wobei der Zugang nach hinrei-chender Glaubhaftmachung durch die Verfügungsbeklagte zu 1) den gesetz-lichen Voraussetzungen entspreche. Dass sie einen kostenlosen, effektiven und dauerhaften Zugang im Rahmen ihrer Schnittstellen gewährt, wird von den Verfügungsklägern nicht substantiiert widerlegt, zumal diese die Schnitt-stellen mangels vollständigen Durchlaufens des Antragsprozesses nicht selbst nutzten und somit keine konkrete Aussage, insbesondere im Hinblick auf eine etwaige Kapazitätsbeschränkung, treffen können.

Selbst wenn die angebotene Schnittstelle den Anforderungen nicht genügte, würde dies für etwaige Anwender kein Selbsthilferecht begründen. Die Verfü-gungsbeklagte zu 1) ist auch nach Art. 10 DMA nicht verpflichtet, derartige Daten über einen Zugang zur Verfügung zu stellen, der hierfür nicht vorgese-hen ist. Das gilt insbesondere dann, wenn die unkontrollierte Nutzung über einen solchen nicht vorgesehenen Zugang, wie hier, geeignet ist, die stö-rungsfreie Funktion der Plattform zu beeinträchtigen.

Die Klausel begegnet aus den genannten Gründen auch keinen kartellrechtli-chen Bedenken. Sie ist daher auch nicht unwirksam bzw. nichtig i. S. v. § 134 BGB.

37 O 104/26                                    - Seite  25 -

d)    Die von der Software „Teamfluence" vorgenommene Datenverarbeitung verstößt darüber hinaus gegen geltendes Datenschutzrecht. Eine solche rechtswidrige Verarbeitung von auf ihrer Plattform generierten Daten muss die Verfügungsbeklagte zu 1) nicht hinnehmen.

aa)    Die Verfügungsbeklagten haben unter Berufung auf die Eigenwerbung von „Teamfluence" vorgetragen, dass dieses Browser-Plugin die Überwachung, Speicherung und Verarbeitung von Mitgliederdaten ermöglicht. Aus der Produktbeschreibung der Verfügungskläger ergibt sich zudem, dass von der Plattform „LinkedIn" von der Software „Teamfluence" rechtswidrig ausgelesene Daten nicht nur im Browser der „Teamfluence"-Kunden verarbeitet werden, sondern vielmehr eine Übermittlung an Server der Verfügungsklägerin zu 1) stattfindet, wo die Daten – einschließlich personenbezogener Daten, die ohne Rechtsgrundlage verarbeitet werden –, von künstlicher Intelligenz analysiert und mit zusätzlichen personenbezogenen Daten wie E-Mail-Adressen und Telefonnummern aus angeblich mehr als 20 Quellen angereichert und an Nutzer zurückgespielt werden.

Darüber hinaus wirbt „Teamfluence" damit, dass die erlangten und durch weitere personenbezogene Daten ergänzten Datensätze mit Marketingtools ihrer Kunden synchronisiert werden und Kunden auf Basis der von der Software „Teamfluence" erlangten und ergänzten Datensätzen E-Mail-Werbe-Kampagnen oder Telefonmarketing betreiben können.

Nach dem unbestrittenen Vortrag der Verfügungsbeklagten liest die Software darüber hinaus Daten von Personen aus, die die Kunden von „Teamflunce" selbst nicht besucht haben, etwa indem Profile markiert werden.

bb)    Diese Datenspeicherung und Datenverarbeitung unterliegt den Anforderungen der DS-GVO; insbesondere gilt diese auch im Anwendungsbereich des DMA.

cc)    Personenbezogene Daten in sozialen Netzwerken sind dabei grundsätzlich öffentlich zugängliche Daten im Sinne der DS-GVO, soweit die entsprechenden Daten für jedermann einsichtig sind. Das ist nach dem unstreitigen Vortrag hier zumindest für einen Teil der betroffenen Nutzerdaten der Fall. Das Erfordernis einer Anmeldung hindert die Einordnung als öffentlich zugängli-

**65**

37 O 104/26                                    - Seite  26 -

che Daten nicht, da diese „Hürde" von jedermann überwunden werden kann.

Die Zulässigkeit der Verarbeitung richtet sich insoweit grundsätzlich nach Art. 6 Abs. 1 Buchst. f) DS-GVO. Hiernach ist eine Abwägung zwischen den Interessen des Datenverarbeitenden und denen der betroffenen Personen erforderlich.

Dabei sind neben der Tatsache, dass es sich um öffentlich zugängliche Daten handelt, die Interessen an der Datenverarbeitung, aber auch die Erwartungshaltung der vernünftig denkenden Person zu berücksichtigen (vgl. Albers/Veit, in: BeckOK-DatenschutzR, 54. Edition (Stand: 01.08.2025), Art. 6 DS-GVO Rn. 72). Insbesondere bei Veröffentlichungen auf Plattformen wird der Teilnehmer dabei nicht ohne weiteres davon ausgehen, dass die fraglichen Informationen auch außerhalb der Plattform von weiteren Personen für plattformfremde Zwecke verwendet werden wird. Auf der anderen Seite ist gerade bei der Verfügungsbeklagten zu 1) in Rechnung zu stellen, dass es sich um Informationen aus dem geschäftlichen bzw. beruflichen Lebensbereich handelt, die grundsätzlich weniger sensibel sind als private Informationen. Zudem kann im beruflichen Kontext davon ausgegangen werden, dass die Betroffenen grundsätzlich eher mit der Verarbeitung von Daten rechnen und insoweit einen anderen Erwartungshorizont als Privatleute haben (vgl. Dallmann/Busse, ZD 2019, 394, 396).

Im Rahmen der Abwägung im konkret vorliegenden Fall ist noch zu sehen, dass „LinkedIn" selbst den Nutzern Einstellungsmöglichkeiten für den Export von Daten für Dritte zur Verfügung stellt, und zwar in der Form, dass dies ausdrücklich erlaubt werden muss (vgl. S. 5 des Schriftsatzes vom 14.02.2026). Außerdem werden Einstellungen für die Sichtbarkeit außerhalb der Plattform zur Verfügung gestellt.

Daraus folgt, dass die Nutzung von Daten von Nutzern, die den Export ausdrücklich erlaubt haben, auch für die Software „Teamfluence" ohne weiteres zulässig ist.

Umgekehrt werden Nutzer, die diese Möglichkeit nicht freigeschaltet haben, die berechtigte Erwartung haben, dass ihre Einstellungen respektiert werden. Im Rahmen des Art. 6 Abs. 1 Buchst. f) DS-GVO folgt hieraus, dass eine den

37 O 104/26                                  - Seite  27 -

Einstellungen widersprechende Datenverarbeitung unzulässig ist.

Denn solche Nutzer, die den Export von Informationen nicht erlaubt haben, dürfen damit rechnen, dass auf diese Informationen nicht exportiert werden. Die Rechte Dritter an der Datenverarbeitung können nicht überwiegen.

Zwar weist „LinkedIn" darauf hin, dass Profilinformationen sichtbar bleiben und unter Umständen auch außerhalb der Plattform verwaltet werden können. In der Zusammenschau der hier erteilten Informationen kann der Nutzer aber davon ausgehen, dass seine Aktivitäten nicht außerhalb von „LinkedIn" erfasst und verarbeitet werden können. Insbesondere ist für den Nutzer nicht erkennbar, dass Informationen über den Besuch einzelner Seiten gespeichert und verarbeitet werden könnten. Zwar stimmt der „LinkedIn"-Nutzer unter Umständen zu, dass seine Kontaktaufnahmen von einem Mitglied gesehen werden können. Dass dieses Mitglied diese Informationen dauerhaft speichert, verarbeitet, mit weiteren Informationen ergänzt und in andere Datenverarbeitungssysteme einspeist, ist für ihn jedoch nicht ersichtlich.

Dabei ist unerheblich, ob die fraglichen Informationen im Cache des Nutzers auf dessen Browser regelmäßig zwischengespeichert werden. Denn die Zustimmung zu einer dauerhaften Speicherung und Datenverarbeitung ist hiermit nicht verbunden. Der technisch nicht gebildete Nutzer wird auch regelmäßig nicht zwischen einem echten Export und einem Zugriff auf den Cache des Empfängers differenzieren, zumal er selbst regelmäßig seinen Cache nicht wird auslesen können. Er wird daher nach der Gestaltung der Einstellungsmöglichkeiten davon ausgehen, dass zumindest seine Aktivitäten nicht außerhalb der Plattform gespeichert und verarbeitet werden. Daher ist diese Form der Datenverarbeitung auch für diese Nutzer rechtswidrig nach der DS-GVO.

dd)    Die Verfügungskläger haben darüber hinaus nicht zu Umständen vorgetragen, die den Verdacht einer gegen weitere Normen der DS-GVO (insbesondere Art. 32 oder 25 Abs. 1) verstoßenden Funktionsweise der Software „Teamfluence" hätten entkräften können. Der Hinweis der Verfügungskläger, die Kunden von „Teamfluence" wahrten die datenschutzrechtlichen Bestimmungen in eigener Verantwortung, lässt vielmehr erkennen, dass die Einhal-

**67**

37 O 104/26                                        - Seite  28 -

tung von Datenschutzbestimmungen vollständig von unbekannten Dritten, die sich überall auf der Welt befinden können, abhängt, ohne dass die Betroffenen die Möglichkeit hätten, die einzelnen Schritte der Datenverarbeitung nachzuvollziehen.

ee)    Einen derartigen Datenschutzverstoß durch ihre „Nutzer" muss die Verfügungsbeklagte nicht hinnehmen. Es kann dahingestellt bleiben, ob sie, etwa nach Art. 32 DSA, zu einer entsprechenden Überwachung verpflichtet ist. Jedenfalls ist sie hierzu berechtigt. Es liegt auf der Hand, dass die Duldung von Datenschutzverstößen durch andere Nutzer unter Verwendung von Softwaretools wie dem Vorliegenden geeignet ist, den Ruf der Plattform der Verfügungsbeklagten zu schädigen und Mitglieder von einer weiteren Nutzung der Plattform abhalten könnte. Dass die Software „Teamfluence" bezogen auf bestimmte Nutzer möglicherweise in zulässiger Weise Daten erhebt, ist in diesem Zusammenhang ohne Belang. Die Verfügungskläger behaupten selbst nicht, dass „Teamfluence" in der Lage wäre, unterschiedliche Voreinstellungen der Nutzer zu erkennen und zu berücksichtigen.

Die hier genannten Gesichtspunkte greifen im Übrigen auch unabhängig von einem Verstoß gegen die DS-GVO. In jedem Fall muss die Verfügungsbeklagte zu 1) zur Sicherung ihrer eigenen vertraglichen Pflichten das Recht haben, Handlungen zu unterbinden, die ihren eigenen datenschutzrechtlichen Richtlinien und den entsprechenden angebotenen Einstellungsmöglichkeiten zuwiderlaufen.

Dies gilt jedenfalls für Richtlinien und Einstellungsmöglichkeiten, die, wie hier, angemessen sind und zu erwartenden Bedenken der betroffenen Nutzer Rechnung tragen. Es kann bei der konkreten Ausgestaltung gerade nicht davon ausgegangen werden, dass die fraglichen Regeln und Einstellungsmöglichkeiten allein dazu dienen, unliebsame Wettbewerber einzuschränken.

ff)    Auch aus Art. 6 Abs. 10 DMA ergibt sich nichts anderes. Die Norm begründet keinen Anspruch Dritter auf eigenmächtigen Zugriff außerhalb des gesetzlich vorgesehenen Zugangswegs. Sie verdrängt die Anforderungen nach der DS-GVO nicht, rechtfertigt nicht per se jegliche beliebige Form der Datenverarbeitung und hindert die Torwächter nicht, angemessene Formen des Da-

37 O 104/26                                    - Seite  29 -

tenschutzes auf seiner Plattform zu etablieren.

Selbst wenn die angebotene Schnittstelle den Anforderungen nicht genügte, würde dies für etwaige Anwender kein Selbsthilferecht begründen. Die Verfügungsbeklagten haben unwidersprochen vorgetragen, dass bei Nutzung der zur Verfügung gestellten Schnittstelle die Einstellungen der Nutzer betreffend ihrer Privatsphäre eingehalten werden könnten. Allein hieraus ergibt sich bereits, dass die Verfügungsbeklagte zu 1) ein berechtigtes Interesse daran hat, dass Datenzugriffe dritter Unternehmen allein über die vorgesehene Schnittstelle erfolgen und nicht heimlich über hierfür nicht vorgesehene Zugangswege.

e)     Darüber hinaus ermöglicht die Software „Teamfluence" automatisierte Prozesse zur Kontaktaufnahme, Nachrichtenübermittlung oder zur Generierung von Interaktionen sowohl außerhalb der „LinkedIn"-Kommunikation als auch auf der Plattform selbst. Der diesbezügliche Vortrag der Verfügungsbeklagten stützt sich wiederum auf die Eigendarstellung von „Teamfluence" und ist auch seitens der Verfügungskläger nicht bestritten.

aa)    Hierin liegt ein Verstoß gegen Klausel 8.2.13 der Nutzervereinbarung. Danach ist es untersagt, Bots oder andere nicht autorisierte automatisierte Methoden zu verwenden, um auf die Services zuzugreifen, Kontakte hinzuzufügen oder herunterzuladen, Nachrichten zu senden oder umzuleiten, Beiträge zu erstellen, zu kommentieren, zu liken, zu teilen oder erneut zu teilen oder auf andere Weise ein nicht authentisches Engagement zu generieren (vgl. Anlage GMW-eV6).

bb)    Diese Einschränkung begegnet keinen rechtlichen Bedenken. Die Verfügungsbeklagte zu 1) hat an einer derartigen Einschränkung der Plattformnutzung ein berechtigtes Interesse.

Soweit die automatisierten Nachrichten innerhalb der Plattform versendet werden, liegt dies auf der Hand. Entscheidend ist, dass die Plattforminteraktionen nicht mehr ausschließlich auf individuelle, authentische Nutzerhandlungen zurückzuführen sind, sondern technisch gesteuert und in ihrer Frequenz sowie Systematik automatisiert erfolgen. Dagegen erwarten die Nutzer in der Regel einen persönlichen Austausch. Im Übrigen sind automatisch

37 O 104/26                                    - Seite  30 -

generierte Mitteilungen weit weniger aufwendig als persönlich verfasste Mitteilungen und haben daher eher belästigenden Charakter. Dieser Rechtsgedanke ist auch in § 7 Abs. 2 UWG ausdrücklich verankert.

Aus diesen Gründen muss die Verfügungsbeklagte zu 1) aber auch nicht dulden, dass bei ihr generierte Daten für automatisch generierte Mitteilungen außerhalb der Plattform, etwa über E-Mail, verwendet werden. Abgesehen davon, dass derartige E-Mails nach deutschem Recht unter den Voraussetzungen des § 7 Abs. 2 und 3 UWG untersagt sind, hat die Verfügungsbeklagte zu 1) ein berechtigtes Interesse daran, dass Nutzer vor derartigen Belästigungen geschützt werden. Eine solche Verwendung der auf der Plattform verfügbaren Daten wäre auch grundsätzlich geeignet, den Ruf der Plattform zu schädigen und potentielle Nutzer von der Nutzung der Plattform abzuhalten.

f)    Angesichts des festgestellten Verstoßes kann vorliegend dahinstehen, ob die Verfügungskläger zudem gegen weitere Regelungen der Nutzervereinbarung der Plattform „LinkedIn", beispielsweise infolge von Markenrechtsverletzungen (vgl. Klauseln 8.2.7 und 8.2.10) oder der Verwendung eines Pseudonyms (vgl. Klausel 2.1) in Bezug auf den Verfügungskläger zu 2), verstoßen haben.

g)    Vor dem Hintergrund dieser Verletzungen ihrer Interessen durch den Einsatz der Software „Teamfluence" war die Verfügungsbeklagte zu 1) auch berechtigt, die Nutzerkonten der Verfügungskläger zu 1) und 2) zu sperren. Mit der Behauptung, es sei zwischen der Verwendung der Nutzerkonten und der Nutzung von „Teamfluence" zu unterscheiden, können die Verfügungskläger nicht gehört werden.

Die Verfügungsklägerin zu 1) vermarktet „Teamfluence" und ist als verantwortliche Gesellschaft ohne weiteres Adressatin jedweder Maßnahmen zur Unterbindung des Vertriebs und der Nutzung der Software. Der Verfügungskläger zu 2) ist als geschäftsführender Alleingesellschafter die hinter „Teamfluence" stehende natürliche Person.

Nach dem Vortrag der Verfügungskläger wickeln diese ihr gesamtes „Teamfluence" betreffendes Geschäft über die Plattform „LinkedIn" ab. Durch die Sperrung sei ihnen eine Kommunikation mit ihren Kunden nicht mehr möglich (vgl. Rn. 45 der Antragsschrift vom 22.01.2026). Über die Konten würde die gesamte unternehmeri-

37 O 104/26                                    - Seite  31 -

sche Tätigkeit abgewickelt, „insbesondere Kundenaquise, Geschäftsanbahnung und laufende Kommunikation" (vgl. Rn. 103 der Antragsschrift vom 22.01.2026). Die Neukundengewinnung laufe praktisch ausschließlich über „LinkedIn" (vgl. Rn. 132 der Antragsschrift vom 22.01.2026).

Damit besteht ein rechtlicher Bezug zwischen dem Betrieb von „Teamfluence" und den Verfügungsklägern sowie ein funktionaler Zusammenhang zwischen den Accounts und dem regelwidrigen Geschäftsmodell. Die Pflichtverletzung liegt nicht isoliert außerhalb der Plattform, sondern manifestiert sich in der Nutzung von „LinkedIn" als Distributions- und Vermarktungskanal für ein nach den Nutzungsbedingungen unzulässiges Produkt. Die Sperrung der fraglichen Konten stellt sich damit als geeignete Maßnahme zur Unterbindung der rechtswidrigen, jedenfalls gegen die Interessen der Verfügungsbeklagten zu 1) verstoßenden Verbreitung und Nutzung der Software „Teamfluence" dar.

Entsprechend liegt in dem Vertrieb bzw. dem Bewerben des Tools ein nach der Nutzervereinbarung verbotenes Unterstützen entsprechender Software. Damit haben sowohl die Verfügungsklägerin zu 1) als auch der Verfügungskläger zu 2) gegen die Nutzungsvereinbarungen der Verfügungsbeklagten zu 1) verstoßen, indem sie die Software „Teamfluence" vertrieben bzw. beworben und so zumindest unterstützt haben.

h)    Vor dem Hintergrund des oben dargelegten Verhaltens der Verfügungskläger, welches zugleich einen Verstoß gegen die Nutzervereinbarung der Plattform „LinkedIn" darstellt, war die Verfügungsbeklagte zu 1) zur Vornahme der streitgegenständlichen Maßnahmen berechtigt. Das Verhalten der Verfügungsbeklagten zu 1), die Nutzerkonten der Verfügungskläger infolgedessen zu sperren, ist insgesamt sachlich gerechtfertigt und nicht willkürlich.

Die fragliche Sperrung ist auch nach Klausel 3.4 der Nutzungsvereinbarung vorgesehen und zwischen den Parteien vereinbart. Danach ist die Verfügungsbeklagte zu 1) berechtigt, die Nutzung der Services, einschließlich der Anzahl der Kontakte und der Fähigkeit, mit anderen Mitgliedern Kontakt aufzunehmen, einzuschränken, alternativ das Konto einzuschränken, auszusetzen oder zu schließen, wenn gegen die Nutzervereinbarung oder Gesetze verstoßen oder die Services missbraucht wird (vgl. Anlage GMW-eV6). Bezug wird dabei genommen auf die sogenannten

**71**

37 O 104/26                                    - Seite 32 -

„Dos and Don'ts" (vgl. Klausel 8 der Nutzervereinbarung) sowie die Community-Richtlinien.

i)      Auch bedurfte es vorliegend keiner – erneuten – vorherigen Anhörung der Verfügungskläger. Zwar wird im Falle einer beabsichtigten Sperrung eines Nutzerkontos nach der höchstrichterlichen Rechtsprechung eine vorherige Information bzw. Anhörung gefordert (vgl. BGH, Urteil vom 29.07.2021 – III ZR 179/20). Doch ist diese – entgegen der Ansicht der Verfügungskläger – erfolgt. Vorliegend wurden die Verfügungskläger bereits mit E-Mail vom 10.12.2025 (vgl. Anlage GMW-eV7) von „LinkedIn Enforcement" unter Anführung einer konkreten Begründung aufgefordert, unter anderem das Angebot ihres Browser-Plugins „Teamfluence" und somit den Verstoß gegen die Nutzervereinbarung zu unterlassen. Gleichzeitig wurde angekündigt, dass die Verfügungsbeklagte zu 1) im Falle der Nichtbeachtung ihrer Anweisungen weitere Maßnahmen zum Schutz der Mitglieder und der Website ergreifen werde. Mit Schreiben vom 22.12.2025 (vgl. Anlage GMW-eV8) reagierten die Verfügungskläger und führten an, dass die betreffende Klausel 8.2.2 der Nutzervereinbarung gegen den DMA verstoße und demnach keine Verletzung der Nutzervereinbarung gegeben sei. Mit Schreiben vom 05.01.2026 (vgl. Anlage GMW-eV9) teilte „LinkedIn Enforcement" mit, dass für eine nähere Prüfung zusätzliche Informationen und Erläuterungen seitens der Verfügungskläger erforderlich seien. Nachdem die Verfügungskläger hierauf zunächst reagiert hatten, wurden sodann am 15.01.2026 – ohne erneute vorherige Ankündigung oder Anhörung – die individuellen und beruflichen Profile der beiden Verfügungskläger auf der Plattform „LinkedIn" gesperrt. Hierüber wurden die Verfügungskläger mit E-Mail vom selben Tag (vgl. Anlage GMW-eV10) informiert. Begründet wurde die Sperrung damit, dass die Verfügungskläger nicht auf das Schreiben vom 05.01.2026 (vgl. Anlage GMW-eV9) reagiert hatten.

Angesichts der zwischen den Parteien im Vorfeld der erfolgten Sperrungen geführten Kommunikation war den Verfügungsklägern einerseits die konkrete Art des Vorwurfs über einen Monat vor Vollzug der Maßnahme bekannt. Andererseits musste ihnen aufgrund der Androhung von Maßnahmen in der E-Mail vom 10.12.2025 (vgl. Anlage GMW-eV7) bewusst sein, welche Konsequenzen bei Beibehaltung des Status quo drohten. Mögliche Folgemaßnahmen ergeben sich schließlich unmittelbar aus der von den Verfügungsklägern akzeptierten Nutzervereinbarung. Von einem willkürlichen Verhalten der Verfügungsbeklagten zu 1) kann demnach nicht die Rede sein.

**72**

- Seite 33 -

Zudem hatten die Verfügungskläger die Möglichkeit, infolge der einschränkenden Maßnahmen Einspruch gegen die Entscheidung der Verfügungsbeklagten zu 1) einzulegen und eine erneute Überprüfung zu veranlassen. Hiervon hatten sie vorliegend Gebrauch gemacht (vgl. Anlage GMW-eV11). Demnach wurden von Seiten der Verfügungsbeklagten zu 1) auch die übrigen, von der höchstrichterlichen Rechtsprechung (vgl. BGH, Urteil vom 29.07.2021 – Ⅲ ZR 179/20) geforderten Schritte im weiteren Verfahren eingehalten. Auch dies führt somit nicht zu einer willkürlichen Behandlung der Verfügungskläger.

j)    Darüber hinaus ist in dem klägerseits angegriffenen Verhalten der Verfügungsbeklagten zu 1) keine Diskriminierung im kartellrechtlichen Sinne zu erkennen.

Zwar führen die Verfügungskläger an, dass andere Anbieter von vergleichbaren Tools wie „Teamfluence" nicht gesperrt worden seien (vgl. Anlage GMW-eV1).

Jedoch hat die Verfügungsbeklagte zu 1) hinreichend glaubhaft gemacht, dass sie im Rahmen eines konsistenten, weltweit angewandten Enforcement-Programms insgesamt gegen vertragswidrige Produkte vorgeht, und gerade nicht ausschließlich gegen die Software „Teamfluence" (vgl. Anlagen AG10 bis AG12). Entsprechende Maßnahmen umfassten interne und externe Meldungen, Untersuchungen sowie das Versenden von Unterlassungserklärungen. Die Durchsetzung gegen alle Verstöße weltweit könne dabei nicht gleichzeitig durchgeführt werden. Grundlage des Handelns der Verfügungsbeklagten zu 1) sei Klausel 8.2.2 der Nutzervereinbarung, welche insbesondere das Kriterium der Nichtdiskriminierung erfülle, weil sie für sämtliche Nutzergruppen gleichermaßen gelte und ausschließlich an ein objektives, sachlich gerechtfertigtes Kriterium anknüpfe, nämlich Vermeidung erheblicher Sicherheits-, Stabilitäts- und Datenschutzrisiken durch automatisierte Datenextraktion, die Vertrauen und berechtigten Erwartungen der Endnutzer zuwiderlaufen würde.

2.    Aus den genannten Gründen besteht auch kein Unterlassungsanspruch nach §§ 823 Abs. 1, 1004 BGB analog i. V. m. dem Recht am eingerichteten und ausgeübten Gewerbebetrieb.

Die Vorschrift des § 1004 Abs. 1 Satz 2 BGB ist im vorliegenden Fall analog anwendbar (sogenannter quasinegatorischer Unterlassungsanspruch). Grundsätzlich schützt § 1004 BGB in unmittelbarer Anwendung nur das Eigentum und bestimmte dingliche Rechte (vgl.

- Seite  34 -

Raff, in: MüKoBGB, 9. Aufl. 2023, § 1004 Rn. 1). Aufgrund der Schutzbedürftigkeit anderer absoluter Rechte werden entsprechend § 1004 BGB alle absoluten Rechte geschützt, demnach auch das Recht am eingerichteten und ausgeübten Gewerbebetrieb, um den repressiven Schadensersatzschutz des § 823 Abs. 1 BGB um einen von § 1004 Abs. 1 Satz 2 BGB analog umfassten präventiv in die Zukunft wirkenden Unterlassungsschutz zu erweitern (vgl. Spohnheimer, in: BeckOGK, Stand: 01.11.2025, § 1004 BGB Rn. 13 ff.).

Das Recht am eingerichteten und ausgeübten Gewerbebetrieb ist als sonstiges Recht im Sinne des § 823 Abs. 1 BGB anerkannt (vgl. BGH, Urteil vom 09.12.1958 – VI ZR 199/57). Das Unternehmenspersönlichkeitsrecht schützt den durch Art. 2 Abs. 1 i. V. m. Art. 19 Abs. 3 GG, Art. 8 Abs. 1 EMRK gewährleisteten sozialen Geltungsanspruch von Kapitalgesellschaften als Wirtschaftsunternehmen (vgl. BGH, Urteil vom 10.04.2018 – VI ZR 396/16; BGH, Urteil vom 04.04.2017 – VI ZR 123/16). Der Schutz des § 823 Abs. 1 BGB wird gegen jede Beeinträchtigung des Rechts am eingerichteten und ausgeübten Gewerbebetrieb gewährt, wenn die Störung einen unmittelbaren Eingriff in den gewerblichen Tätigkeitskreis darstellt. Durch den dem eingerichteten und ausgeübten Gewerbebetrieb gewährten Schutz soll das Unternehmen in seiner wirtschaftlichen Tätigkeit und in seinem Funktionieren vor widerrechtlichen Eingriffen bewahrt bleiben (vgl. BGH, Urteil vom 15.01.2019 – VI ZR 506/17; BGH, Urteil vom 15.05.2012 − VI ZR 117/11; BGH, Urteil vom 06.02.2014 – I ZR 75/13; BVerfG, Beschluss vom 26.06.2002 − 1 BvR 558/91). Die Verletzungshandlung muss sich gerade gegen den Betrieb und seine Organisation oder gegen die unternehmerische Entscheidungsfreiheit richten und über eine bloße Belästigung oder eine sozial übliche Behinderung hinausgehen (vgl. BGH, Urteil vom 14.01.2020 – VI ZR 496/18; BGH, Urteil vom 26.11.2019 – VI ZR 12/19).

Das Recht am eingerichteten und ausgeübten Gewerbebetrieb ist ein offener Tatbestand, dessen Inhalt und Grenzen sich erst aus einer Interessen- und Güterabwägung mit der im Einzelfall konkret kollidierenden Interessensphäre anderer ergeben (vgl. BGH, Urteil vom 19.01.2006 – I ZR 98/02). Die Rechtswidrigkeit eines Eingriffs wird nicht indiziert, sondern ist in jedem Einzelfall unter Heranziehung aller Umstände zu prüfen (vgl. BGH, Urteil vom 19.01.2006 – I ZR 98/02).

Vorliegend kann offenbleiben, ob die streitgegenständlichen Sperrungen der klägerischen Nutzerkonten einen unmittelbaren Eingriff in den gewerblichen Tätigkeitskreis darstellt, somit unmittelbar betriebsbezogen sind. Denn im Hinblick auf den Verfügungskläger zu 2) ist bereits der Schutzbereich der Norm nicht eröffnet, da es sich bei seinem Nutzerkonto um

- Seite  35 -

sein privates Profil handelt, auch wenn er dieses zugleich als Alleingesellschafter und Geschäftsführer der Verfügungsklägerin zu 1) nutzt. Jedenfalls aber ist ein etwaiger Eingriff, wie oben ausgeführt, aufgrund der Verstöße gegen die Nutzervereinbarung und insbesondere auch gegen datenschutzrechtliche Belange gerechtfertigt.

3.    Ein Unterlassungsanspruch ergibt sich ferner nicht aus einem etwaigen Zugangsanspruch gemäß Art. 6 Abs. 12 DMA in Bezug auf die Plattform „LinkedIn".

Dabei kann dahinstehen, ob Art. 6 Abs. 12 DMA – über die Verpflichtung zur Veröffentlichung und Anwendung fairer, angemessener und diskriminierungsfreier allgemeiner Zugangsbedingungen hinaus – überhaupt ein subjektives Recht einzelner gewerblicher Nutzer auf Zugang zu einem zentralen Plattformdienst vermittelt. Bereits nach seinem Wortlaut unterscheidet sich Art. 6 Abs. 12 DMA von anderen Vorschriften des Art. 6 DMA, die ausdrücklich einen Anspruch auf Zugang oder Nutzung statuieren, insbesondere Art. 6 Abs. 11 DMA. Dem Wortlaut nach verpflichtet Art. 6 Abs. 12 DMA den Torwächter demgegenüber in erster Linie zur Ausgestaltung und Anwendung allgemeiner Geschäftsbedingungen nach FRAND-Maßstäben.

Unabhängig davon genügen die von der Verfügungsbeklagten zu 1) angewandten Nutzungsbedingungen, insbesondere Klausel 8.2.2, den Anforderungen an Fairness, Zumutbarkeit und Nichtdiskriminierung. Die Regelung untersagt sämtlichen Nutzern gleichermaßen, somit diskriminierungsfrei, die Nutzung automatisierter Mittel – etwa Crawler oder Browser-Plugins – zum systematischen Auslesen oder Kopieren von Profildaten und sonstigen Inhalten. Sie knüpft damit an ein objektives, sachlich gerechtfertigtes Kriterium an, nämlich die Vermeidung von Sicherheits-, Stabilitäts- und Datenschutzrisiken sowie potenzieller regulatorischer Haftung. Eine Ungleichbehandlung bestimmter Nutzergruppen ist, wie oben ausgeführt, nicht ersichtlich. Die Klausel ist hinreichend transparent formuliert und für einen durchschnittlichen gewerblichen Nutzer ohne Weiteres verständlich und beachtbar.

Vor diesem Hintergrund stellt sich die vorliegend angegriffene Sperrung der klägerischen Profile nicht als Verstoß gegen eine aus Art. 6 Abs. 12 DMA folgende Pflicht zur fairen Behandlung dar. Insbesondere wurde der Zugang durch die Kontosperrung nicht rechtswidrig entzogen, da, wie oben dargelegt, sachliche Gründe vorliegen, und hierauf basierend auf Seiten der Verfügungsbeklagten zu 1) ein berechtigtes Interesse an der Einschränkung besteht.

37 O 104/26                                        - Seite  36  -

4.      Weitere Anspruchsgrundlagen sind vorliegend nicht ersichtlich.

III. Schließlich besteht hinsichtlich des Antrags unter Ziffer 1) c) kein Anspruch auf Unterlassung im Hinblick auf das Verhalten gegenüber weiteren Mitgliedern der Plattform „LinkedIn", welche die Software „Teamfluence" nutzen.

Offenbleiben kann dabei die Frage, ob die Verfügungskläger überhaupt aktivlegitimiert sind, insbesondere auch im Hinblick auf einen etwaigen Anspruch nach §§ 823 Abs. 1, 1004 BGB analog i. V. m. dem Recht am eingerichteten und ausgeübten Gewerbebetrieb. Das Vorgehen der Verfügungsbeklagten zu 1) ist jedenfalls gerechtfertigt.

Die Verfügungsbeklagte zu 1) ist – nicht nur aufgrund der von den jeweiligen Nutzern zwingend zu akzeptierenden Nutzervereinbarung der Plattform „LinkedIn" – berechtigt, gegen Verstöße einzelner Nutzer vorzugehen. Wie oben dargelegt, haben die Verfügungsbeklagten hinreichend dargelegt und glaubhaft gemacht, dass die Nutzung der Software „Teamfluence" sowohl gegen die Nutzervereinbarung als auch gegen datenschutzrechtliche Bestimmungen verstößt.

Nach dem Vortrag der Verfügungsbeklagten werden betroffene Profile, die eine entsprechende – nicht ausschließlich die klägerische – Software nutzen, im Falle der Erkennung von Automatisierungs- und „Scraping"-Verhalten durch das mehrschichtige technische Anti-Missbrauchssystem der Plattform automatisch vorübergehend oder dauerhaft gesperrt. Diese Folgen sind in den Nutzungsbedingungen aufgenommen; den Nutzern ist damit in hinreichender Form untersagtes Verhalten und die damit verbunden Konsequenzen vor Augen geführt. Dass die fraglichen Maßnahmen sich einseitig gegen die Software „Teamfluence" richten, haben die Verfügungskläger nicht glaubhaft machen können; die Verfügungsbeklagten haben insoweit glaubhaft gemacht, dass die Systeme der Verfügungsbeklagten nicht „Teamfluence" an sich, sondern nur ein bestimmtes Nutzerverhalten identifiziert haben.

IV. Auch der Hilfsantrag der Verfügungskläger hat keinen Erfolg.

Hinsichtlich der Hilfsanträge unter Buchstaben a) und b) waren auch diese als unbegründet zurückzuweisen, da sie insbesondere nicht geeignet sind, den seitens der Verfügungsbeklagten vorgetragenen Verstößen gegen die Nutzervereinbarung zu begegnen. Nach dem eigenen Vortrag der Verfügungskläger verwenden diese die fraglichen Accounts nicht allein, um „Teamfluence" zu bewerben, sondern wickeln vielmehr die gesamte Kommunikation über „LinkedIn" ab. Die Plattform wird daher auch für Kommunikation über Abschluss und Durchführung der Verträge genützt. Den Verfügungsklägern bliebe daher auch weiterhin die Möglichkeit der Kontaktaufnahme

37 O 104/26                                    - Seite  37 -

mit Interessenten bzw. Kunden der Software „Teamfluence". Daher ist der Ausschluss von Werbung nicht geeignet, das rechtswidrige Nutzerverhalten der Verfügungskläger auf den streitgegenständlichen Konten zu unterbinden. Die Verfügungsbeklagte zu 1) ist daher berechtigt, die Konten auch bei so eingeschränkter Nutzung zur Wahrung ihrer berechtigten Interessen gesperrt zu halten.

Im Hinblick auf den unverändert gestellten Hilfsantrag unter Buchstabe c) betreffend eine Untersagung des Verhaltens gegenüber weiteren Mitgliedern der Plattform „LinkedIn", welche die Software „Teamfluence" nutzen, kann auf die obigen Ausführungen verwiesen werden.

C.

Die Kostenentscheidung folgt aus § 91 Abs. 1 ZPO. § 100 Abs. 4 ZPO ist nicht analog für die Klägerseite anwendbar.

Die Entscheidung über die vorläufige Vollstreckbarkeit beruht auf §§ 708 Nr. 6, 711 ZPO.

Die Berechnung des Streitwerts beruht auf §§ 3, 4, 5 ZPO. Die Kammer folgt insoweit den Angaben der Verfügungskläger.

D.

Etwaiger neuer Tatsachenvortrag der Parteien in den nicht nachgelassenen Schriftsätzen vom 22.02.2026 bzw. 27.02.2026 war vorliegend nach § 296a ZPO verspätet und daher zurückzuweisen; rechtliche Ausführungen wurden berücksichtigt.

**Rechtsbehelfsbelehrung:**

Gegen die Entscheidung, mit der der Streitwert festgesetzt worden ist, kann Beschwerde eingelegt werden, wenn der Wert des Beschwerdegegenstands 300 Euro übersteigt oder das Gericht die Beschwerde zugelassen hat.

Die Beschwerde ist binnen **sechs Monaten** bei dem

        Landgericht München I
        Prielmayerstraße 7
        80335 München

37 O 104/26                                        - Seite  38 -

einzulegen.

Die Frist beginnt mit Eintreten der Rechtskraft der Entscheidung in der Hauptsache oder der anderweitigen Erledigung des Verfahrens. Ist der Streitwert später als einen Monat vor Ablauf der sechsmonatigen Frist festgesetzt worden, kann die Beschwerde noch innerhalb eines Monats nach Zustellung oder formloser Mitteilung des Festsetzungsbeschlusses eingelegt werden. Im Fall der formlosen Mitteilung gilt der Beschluss mit dem vierten Tage nach Aufgabe zur Post als bekannt gemacht.

Die Beschwerde ist schriftlich einzulegen oder durch Erklärung zu Protokoll der Geschäftsstelle des genannten Gerichts. Sie kann auch vor der Geschäftsstelle jedes Amtsgerichts zu Protokoll erklärt werden; die Frist ist jedoch nur gewahrt, wenn das Protokoll rechtzeitig bei dem oben genannten Gericht eingeht. Eine anwaltliche Mitwirkung ist nicht vorgeschrieben.

Rechtsbehelfe können auch als **elektronisches Dokument** eingereicht werden. Eine einfache E-Mail genügt den gesetzlichen Anforderungen nicht.

Rechtsbehelfe, die durch eine Rechtsanwältin, einen Rechtsanwalt, durch eine Behörde oder durch eine juristische Person des öffentlichen Rechts einschließlich der von ihr zur Erfüllung ihrer öffentlichen Aufgaben gebildeten Zusammenschlüsse eingereicht werden, sind **als elektronisches Dokument** einzureichen, es sei denn, dass dies aus technischen Gründen vorübergehend nicht möglich ist. In diesem Fall bleibt die Übermittlung nach den allgemeinen Vorschriften zulässig, wobei die vorübergehende Unmöglichkeit bei der Ersatzeinreichung oder unverzüglich danach glaubhaft zu machen ist. Auf Anforderung ist das elektronische Dokument nachzureichen.

Elektronische Dokumente müssen
- mit einer qualifizierten elektronischen Signatur der verantwortenden Person versehen sein oder
- von der verantwortenden Person signiert und auf einem sicheren Übermittlungsweg eingereicht werden.

Ein elektronisches Dokument, das mit einer qualifizierten elektronischen Signatur der verantwortenden Person versehen ist, darf wie folgt übermittelt werden:
- auf einem sicheren Übermittlungsweg oder
- an das für den Empfang elektronischer Dokumente eingerichtete Elektronische Gerichts- und Verwaltungspostfach (EGVP) des Gerichts.

Wegen der sicheren Übermittlungswege wird auf § 130a Absatz 4 der Zivilprozessordnung verwiesen. Hinsichtlich der weiteren Voraussetzungen zur elektronischen Kommunikation mit den Gerichten wird auf die Verordnung über die technischen Rahmenbedingungen des elektronischen Rechtsverkehrs und über das besondere elektronische Behördenpostfach (Elektronischer-Rechtsverkehr-Verordnung - ERVV) in der jeweils geltenden Fassung sowie auf die Internetseite www.justiz.de verwiesen.

gez.

|                        |                |                |
|------------------------|----------------|----------------|
| Dr. Althaus            | Schmelcher     | Reichert       |
| Vorsitzende Richterin  | Richter        | Richter        |
| am Landgericht         | am Landgericht | am Landgericht |

37 O 104/26

Verkündet am 11.03.2026

gez.
Taş, JAng
Urkundsbeamtin der Geschäftsstelle



Für die Richtigkeit der Abschrift
München, 11.03.2026

Taş, JAng
Urkundsbeamtin der Geschäftsstelle



I, Elisabeth G. Moser hereby certify that I am competent to translate from German to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the following document from German to English.

"March 11, 2026 Judgment of the Regional Court of Munich I (37 O 104/26) in the proceedings between Teamfluence OU and Liebling (Plaintiffs) and LinkedIn Ireland Unlimited Company and LinkedIn Germany GmbH (Respondents)."

I declare under penalty of perjury that the foregoing is true and correct.

Elisabeth G. Moser

Sworn to before me this   29 of June, 2026
[DATE]

Signature, Notary Public   Exp. 6/2/29

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 7TH FLOOR, NEW YORK, NY 10001 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 92 CITIES WORLDWIDE