J.R. HOWELL (State Bar No. 268086)
jr@lojrh.com
LAW OFFICE OF J.R. HOWELL
2219 Main Street
Suite 436
Santa Monica, CA 90405
Tel: (323) 897-8656

ATTORNEY FOR PLAINTIFF,
JEFF GANAN AND THE PROPOSED CLASSES

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JEFF GANAN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>v.<br>LINKEDIN CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:26-cv-02968-VC<br><br>**PLAINTIFF JEFF GANAN'S REQUEST FOR JUDICIAL NOTICE** |

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................................1

II. LEGAL STANDARD ...........................................................................................................2

III. EACH CATEGORY OF EXHIBITS SHOWS THAT A PREMISE OF LINKEDIN'S
MOTION IS GENUINELY DISPUTED..................................................................................4

    A. The Browser Makers' Own Documentation and the Enumeration Literature Dispute
"Openly Provided" and "Publicly Available" (Howell Decl. Exhibits A–L) .........................4

    B. The Fingerprinting and Inference Literature Disputes "Standard," "Passively Exposed,"
and "Nothing Private" (Howell Decl. Exhibits M–Z)............................................................7

    C. The Re-Identification Literature Disputes "No Linkage" and "No Sharing" (Howell
Decl. Exhibits AA–FF)........................................................................................................10

    D. The FTC's Own Report Disputes "Routine" and "In No Way Private" (Howell Decl.
Exhibit GG) ..........................................................................................................................12

    E. The Disclosure-Comprehension Literature Disputes That the Quoted Policies Disclosed
This Conduct (Howell Decl. Exhibits HH–LL) ...................................................................13

IV. THESE MATERIALS DEFEAT THE FACTUAL ATTACK ...........................................15

V. CONCLUSION ...................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) ................................................12

*Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134 (9th Cir. 2024) ....................................1, 14, 15

*Brown v. Google LLC*, 525 F. Supp. 3d 1049 (N.D. Cal. 2021) ...................................................3, 4

*Calhoun v. Google LLC*, 526 F. Supp. 3d 605 (N.D. Cal. 2021) ...............................................3, 12

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ............................................3, 12

*Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971 (9th Cir. 1999).........................................3

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018)................................2, 3, 4, 16

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)..............................................................2

*Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014) ...................................................................1, 14

*Lolli v. County of Orange*, 351 F.3d 410 (9th Cir. 2003) ...............................................................3

*Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279 (9th Cir. 1986)...............................................12

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,

    181 F.3d 410 (3d Cir. 1999) ....................................................................................................3

*Safe Air for Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004).........................................1, 14, 15

*United States v. Gould*, 536 F.2d 216 (8th Cir. 1976) ....................................................................3

*Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954 (9th Cir. 2010) ...3, 5, 8, 13

**Rules**

Fed. R. Evid. 201 .......................................................................................................1, 2, 3, 9, 14

**PLAINTIFF JEFF GANAN'S**
**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF HIS OPPOSITION**
**TO DEFENDANT LINKEDIN CORPORATION'S MOTION TO DISMISS**

## I.    INTRODUCTION

Plaintiff Jeff Ganan asks the Court to take judicial notice of the existence and content of Exhibits A through LL to the accompanying Declaration of J.R. Howell ("Howell Decl.") — that each source exists, was published by the entity identified, and states what it states. Fed. R. Evid. 201(b)(2). The exhibits fall into five categories: (1) the browser makers' own developer documentation, web-standards guidance, and the peer-reviewed extension-enumeration literature (Howell Decl. Exhibits A–L), (2) the peer-reviewed security and privacy literature on device fingerprinting and trait inference (Howell Decl. Exhibits M–Z), (3) the re-identification studies (Howell Decl. Exhibits AA–FF), (4) a federal agency report (Howell Decl. Exhibit GG), and (5) the empirical disclosure-comprehension studies (Howell Decl. Exhibits HH–LL). Ganan does not ask the Court to accept any scientific conclusion as true.

The request is relevant because LinkedIn Corporation elected a factual jurisdictional attack. LinkedIn announces that it "brings both attacks," facial and factual, Mot. at 7, supports the factual attack with the declaration of its Principal Trust and Safety Investigator ("Seymour Decl.") and an incomplete LinkedIn-HUMAN Data Processing Agreement ("DPA"), and tells the Court that "LinkedIn's evidence in support establishes the opposite" of injury. Mot. at 2–3. Once LinkedIn went beyond the pleadings, the record opened to both sides. A plaintiff answers a factual attack with competent proof of his own, the Court views contested evidence in the light most favorable to him, and factual disputes intertwined with the merits go to the trier of fact, not to a Rule 12 motion. *Leite v. Crane Co.*, 749 F.3d 1117, 1121–22 & n.3 (9th Cir. 2014); *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1144 (9th Cir. 2024); *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039–40 (9th Cir. 2004). The noticed exhibits are that proof.

The noticed content shows that six empirical premises of LinkedIn's motion are genuinely disputed. First, the motion asserts that the detected information is "openly provide[d]" to all websites and is "publicly available and in no way private." Mot. at 2. Second, LinkedIn's declarant asserts that its fingerprinting system collects only "standard" signals that the browser "passively exposes." Seymour Decl. ¶ 22. Third, the motion asserts that "knowing that a user does or does not have a particular extension installed fails to establish anything private about them." Mot. at 10 n.8. Fourth, the motion asserts that detection results are not linked to member identities. Mot. at 9. Fifth, the motion asserts that LinkedIn does not share detection results "with any third party." Mot. at 9. Sixth, the motion asserts that the conduct was "disclosed and agreed to by all its members." Mot. at 2. These propositions are all disputed. The Court need not accept any of Ganan's sources as true. It need only see that each premise is the subject of open disagreement among the browser makers themselves, the peer-reviewed research community, and a federal regulator. A fact that authoritative sources contest cannot be noticed for LinkedIn or resolved against the Complaint on a Rule 12 motion.[1]

## II.    LEGAL STANDARD

The Court may notice what these sources say, and may not notice a disputed fact for either side. Three propositions frame the request.

**First, courts notice the existence and content of public documents without adopting their truth.** A court may judicially notice a fact "not subject to reasonable dispute" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The doctrine reaches what an authoritative source says without adopting

---

[1] The significance of each dispute for the specific grounds of LinkedIn's motion is developed in Ganan's concurrently filed Opposition to the Motion to Dismiss. Ganan's concurrently filed Opposition to LinkedIn's Request for Incorporation by Reference and/or Judicial Notice addresses the mirror-image defect in LinkedIn's exhibits: they are offered for the truth of contested facts, the use *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99, 1002–03 (9th Cir. 2018), forbids.

any disputed matter asserted within it. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (notice taken "not for the truth of the facts recited therein, but for the existence of the [record], which is not subject to reasonable dispute over its authenticity") (quoting *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426–27 (3d Cir. 1999)). The Ninth Circuit applies that rule to publications directly: "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citation omitted); *accord Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (noticing "that the market was aware of the information contained in news articles"). This District applies it to the very genre of material at issue here. *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1061 (N.D. Cal. 2021) (noticing Google's own technical webpages, including "How private browsing works in Chrome," while reserving that "to the extent any facts . . . are subject to reasonable dispute, the Court will not take judicial notice of those facts"); *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 611–12 (N.D. Cal. 2021) (noticing Google webpages, Chrome policy documents, and Federal Trade Commission materials with the same caveat). Government publications stand on the same footing. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities").[2]

**Second, in the alternative, the published literature is legislative-fact material.** Rule 201 "governs judicial notice of an adjudicative fact only, not a legislative fact." Fed. R. Evid. 201(a); *see* Fed. R. Evid. 201 advisory committee's note (legislative facts are "those which have relevance to legal reasoning"). Courts consult published scientific literature on that footing. *United*

---

[2] The overuse concern *Khoja* identifies, 899 F.3d at 998, runs against truth-notice, not content-notice. Ganan's request asks for the latter only: notice of a document's existence and content is not notice of its truth, and no exhibit is offered to establish any disputed scientific fact.

*States v. Gould*, 536 F.2d 216, 219–21 (8th Cir. 1976) (treating a scientific proposition as a legislative fact outside Rule 201(b)); *Lolli v. County of Orange*, 351 F.3d 410, 419 (9th Cir. 2003) (consulting authoritative medical literature). Ganan invokes this route only to show that the motion's premises are contested, never to establish any scientific conclusion.

**Third, the ceiling on judicial notice is the point of the request.** A court "cannot take judicial notice of disputed facts contained in such public records," and "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Ganan's request honors that limit. He does not ask the Court to find that fingerprinting identified him or that extension probing revealed anyone's religion. He asks the Court to see that LinkedIn's contrary premises are "subject to reasonable dispute," which forecloses noticing them for LinkedIn and forecloses resolving them against the Complaint.

## III. EACH CATEGORY OF EXHIBITS SHOWS THAT A PREMISE OF LINKEDIN'S MOTION IS GENUINELY DISPUTED

Each category of exhibits shows that identified factual assertions in LinkedIn's motion and declaration are genuinely disputed. For each category, Ganan states what the exhibits are, the basis for notice, and then, assertion by assertion, what LinkedIn asserts, what the noticed source states, and why the dispute is genuine.

### A. The Browser Makers' Own Documentation and the Enumeration Literature Dispute "Openly Provided" and "Publicly Available" (Howell Decl. Exhibits A–L)

The platform makers' own documentation and seven peer-reviewed studies genuinely dispute LinkedIn's account of extension detection as open, passive, and public. Exhibits A through C of the Howell Declaration are Google's official Chrome developer documentation. Exhibit D is Mozilla's official MDN documentation. Exhibit L is the World Wide Web Consortium's guidance, *Mitigating Browser Fingerprinting in Web Specifications*. Exhibits E through K are peer-reviewed extension-detection studies published at leading security venues (USENIX Security, NDSS,

WWW, CODASPY) between 2017 and 2022. Howell Decl. ¶¶ 3–4. All are noticeable for existence and content: this District has noticed Google's own technical webpages, *Brown*, 525 F. Supp. 3d at 1061, and the studies are publications noticeable to show what is in the public realm, *Von Saher*, 592 F.3d at 960.

LinkedIn asserts that it "detects information that browser extensions openly provide to all websites in order to interact with them" and that "[t]he information is publicly available and in no way private." Mot. at 2. But, Exhibit A, Google's documentation, states that a content script runs in "a private execution environment that isn't accessible to the page." Howell Decl. Ex. A at 3. Exhibit C states that absent a developer's externally_connectable declaration, "no web pages can connect." Howell Decl. Ex. C at 1. The maker of the browser describes isolation where LinkedIn describes open provision. The dispute is genuine.

LinkedIn asserts that "browser extension developers tell websites, like LinkedIn, which extensions are installed; LinkedIn merely looks at the extension's publicly accessible files designated as 'web_accessible_resources.'" Mot. at 8. Exhibit E is the peer-reviewed study that measured probe-based extension detection, reporting that its authors succeeded in "successfully identif[ying] over 50% of the top 1,000 free Chrome extensions." Howell Decl. Ex. E. Exhibit K states that "Chrome lacks any countermeasures for preventing WAR-based extension enumeration." Howell Decl. Ex. K. And LinkedIn's own declarant supplies the mechanics: "LinkedIn maintains a list of extension IDs" and "LinkedIn's JavaScript checks whether a web-accessible resource associated with any listed extension can be retrieved." Seymour Decl. ¶ 11. On LinkedIn's own declaration, the browser announces nothing. The probing website brings the list of candidate identifiers and runs the check against each visitor. Whether developers "tell" LinkedIn anything, or LinkedIn instead built targeting infrastructure to interrogate every visitor, is genuinely disputed.

LinkedIn's declarant asserts that extensions "are identified by a unique publicly registered extension ID—a 32-character string" that is "publicly listed on the Chrome Web Store." Seymour Decl. ¶ 6. By the declaration's own account, the public registry supplies the target list, and LinkedIn does the rest: it "maintains a list of extension IDs" and "checks whether a web-accessible resource associated with any listed extension can be retrieved" from each visitor's browser. Seymour Decl. ¶ 11. Public listing of an identifier is one fact. Public availability of a particular user's installation state, the fact LinkedIn extracts, is another. The declarant likewise concedes that a retrieved resource "is a signal—not a conclusion—that the browser environment may include a prohibited tool," and that the target list covers extensions "known or believed to operate on or interact with the LinkedIn website," Seymour Decl. ¶ 11, an interaction criterion, not an abuse criterion. Whether any of that makes installation status "publicly available" is genuinely disputed.

LinkedIn asserts that "[t]he browser extension data is intentionally exposed to websites by the user's browser; it cannot reasonably be expected to remain private." Mot. at 8. But, Exhibit B, Google's reference page for the very manifest field LinkedIn invokes, warns that exposing extension resources "allows a malicious website to fingerprint extensions that a user has installed." Howell Decl. Ex. B at 1. Exhibit D states that Mozilla randomizes each installation's extension identifier because doing so "prevents websites from fingerprinting a browser by examining the extensions it has installed." Howell Decl. Ex. D at 2. Exhibit F states that browsers "implement defensive countermeasures that, in theory, protect extensions and their resources from third party access," and documents "attacks that bypass these control techniques in every major browser family, enabling enumeration attacks against the list of installed extensions." Howell Decl. Ex. F. Exhibit H designs a further countermeasure and observes that extension fingerprints "can be used

to infer sensitive information about users." Howell Decl. Ex. H.[3] Browser makers do not engineer countermeasures against disclosures they intend. The dispute is genuine.

LinkedIn asserts that "Chrome browser extensions typically include 'web_accessible_resources,'" Mot. at 4, and its declarant asserts that a developer who declares a resource "choose[s] to expose that resource to the web," Seymour Decl. ¶ 13, so that LinkedIn "is simply observing information that the extension developer has, by architectural choice, made publicly accessible to any website the member visits," *id.* ¶ 14.[4] Exhibit G reports that much of what makes an extension detectable is unintended "extension bloat" — "page modifications that are completely unnecessary for the extension's functionality" — rather than deliberate exposure. Howell Decl. Ex. G. And Exhibit F's name for "simply observing" is an enumeration attack that must "bypass" browser defenses. Howell Decl. Ex. F. Whether detection reflects developer choice or a documented vulnerability class is genuinely disputed. So is prevalence: Exhibit E reports a measured research finding, not an architecture-wide default. Howell Decl. Ex. E.

LinkedIn's declarant asserts that LinkedIn "also operates a passive DOM-based detection system called Spectroscopy," which "does not rely on extension IDs." Seymour Decl. ¶ 15. Exhibits I and J are peer-reviewed studies classifying precisely those techniques, detecting extensions through injected style sheets and through behavioral traces, as browser fingerprinting. Howell Decl. Exs. I, J. For extensions detected this way there is no web-accessible resource and

---

[3] The remaining enumeration studies confirm the same body of work. *See* Howell Decl. Ex. G (Starov et al., WWW 2019); Howell Decl. Ex. I (Laperdrix et al., *Fingerprinting in Style: Detecting Browser Extensions via Injected Style Sheets*, USENIX Security 2021); Howell Decl. Ex. J (Solomos et al., *The Dangers of Human Touch: Fingerprinting Browser Extensions Through User Actions*, USENIX Security 2022); Howell Decl. Ex. K (Karami et al., *Carnus*, NDSS 2020). A five-year, top-venue literature treating extension detection as a privacy threat is difficult to reconcile with the motion's charge of "manufacturing a fake privacy controversy." Mot. at 2.

[4] The motion's only cited support for "typically include" is LinkedIn's own Exhibit 1 — the BrowserGate capture the motion elsewhere calls "propaganda." Mot. at 4 n.7; Mot. at 3.

no developer declaration at all, so LinkedIn's exposure-by-choice account cannot reach LinkedIn's own second system. The dispute is genuine.

On the browser makers' own documentation, whether LinkedIn "merely look[ed]" at public files or deployed a recognized fingerprinting technique against the browser's isolation architecture cannot be resolved in LinkedIn's favor at this stage.

### B. The Fingerprinting and Inference Literature Disputes "Standard," "Passively Exposed," and "Nothing Private" (Howell Decl. Exhibits M–Z)

The fingerprinting and inference literature genuinely disputes Seymour's account of "standard," "passive," and "nothing private" signals. Exhibits M through U are peer-reviewed device-fingerprinting studies published between 2010 and 2020 at venues including IEEE S&P, ACM CCS, PETS, and WWW, and in ACM Transactions on the Web. Exhibits V through Z are peer-reviewed studies quantifying what installed-extension sets and other digital traces reveal about a person. Howell Decl. ¶ 4. All are noticeable as publications for existence and content, *Von Saher*, 592 F.3d at 960, and, in the alternative, as legislative-fact material, *supra* § II.

LinkedIn's declarant asserts that the AFPC system "collects standard browser and device signals that any website may collect and that the browser passively exposes as part of normal operation," listing "graphics processing unit (GPU) characteristics derived from canvas and WebGL rendering," CPU cores, device memory, screen resolution, "time zone and language settings," fonts, network and IP information, and "behavioral signals." Seymour Decl. ¶ 22. Exhibit Q states that canvas fingerprinting requires the collecting script to "render text and WebGL scenes to a <canvas> element, then examine the pixels produced." Howell Decl. Ex. Q. Exhibit S details the same mechanism: "the script first draws text," then "calls Canvas API's ToDataURL method to get the canvas pixel data," then "takes the hash." Howell Decl. Ex. S. Exhibit R explains that the technique "does not require a tracker to set any state in the user's browser" — the collecting

code, not the browser, generates the data. Howell Decl. Ex. R.[5] And Exhibit L, the standards body's guidance, warns that "[e]xposure of settings and characteristics of browsers can harm user privacy by allowing for browser fingerprinting." Howell Decl. Ex. L at 1. The signal inventory Seymour recites is the same inventory this literature studies as fingerprinting vectors. Whether those signals are "passively expose[d]" or actively manufactured and extracted by LinkedIn's code is genuinely disputed.

LinkedIn asserts that the fingerprinting fields Ganan pleads are "routine browser information" outside any reasonable expectation of privacy. Mot. at 8–9. But, Exhibit M reports that "83.6% of browsers . . . exhibited instantaneously unique fingerprints." Howell Decl. Ex. M. Exhibit O, the field's survey, describes a fingerprint as "akin to a cookie that cannot be deleted," collected where "the user has no control over the collection process." Ex. O.[6] Ganan also submits the leading study on the other side of the question: Exhibit P finds that at large scale "only 33.6% of fingerprints are unique by opposition to over 80% in previous studies." Howell Decl. Ex. P. Ganan attaches Exhibit P because a live, peer-reviewed disagreement over identifiability is exactly what Rule 201 calls a fact "subject to reasonable dispute," one the Court can notice for neither side, Fed. R. Evid. 201(b). The dispute is genuine by the literature's own terms.

LinkedIn asserts that "knowing that a user does or does not have a particular extension installed fails to establish anything private about them." Mot. at 10 n.8. Exhibit K catalogs that "147, 116, and 387 extensions expose the user's medical/health conditions, religion and political inclinations, respectively." Howell Decl. Ex. K. Exhibit V finds that installed-extension sets can reveal a user's "income-level" and "even their political inclinations." Howell Decl. Ex. V. Exhibit

---

[5] *Accord* Howell Decl. Ex. T (Acar et al., *FPDetective*, ACM CCS 2013); Howell Decl. Ex. U (Nikiforakis et al., *Cookieless Monster*, IEEE S&P 2013) (explaining that such identification "can be used to track users between sites, without their knowledge and without a simple way of opting-out").

[6] *Accord* Howell Decl. Ex. N (Laperdrix et al., *Beauty and the Beast*, IEEE S&P 2016) (confirming Exhibit M's uniqueness result on a larger dataset).

X reports that innocuous digital records "can be used to automatically and accurately predict . . . sexual orientation, ethnicity, religious and political views," classifying "Christians and Muslims . . . correctly . . . in 82% of cases." Howell Decl. Ex. X.[7] If the Court credits LinkedIn's own Exhibits 7 and 8 at all—Ganan objects to them in his concurrently filed Opposition to LinkedIn's request—they prove the point against their proponent. Its Exhibit 8 is an extension that, in the motion's words, "[s]hows warnings about woke companies," Mot. at 10 n.8, and its Exhibit 7 is the PordaAI extension, described on its own page as a "Haram Remover Islamic Ai filter for Muslims." A political tagger and a religious content filter sit on LinkedIn's own target list. The dispute is genuine on LinkedIn's own exhibits as much as Ganan's.

LinkedIn asserts that neither Plaintiff explains "how there could be any economic value to whatever data is allegedly used by third parties." Mot. at 10. Exhibit Z reports that footprint-derived psychological profiles are deployed at scale to influence consumer behavior. Howell Decl. Ex. Z. Whether such data carries commercial value is a studied, contested question, not a pleading defect. The dispute is genuine.

Because the declarant's own signal list matches the literature's fingerprinting canon, Seymour's characterizations of that list cannot be credited over the Complaint at this stage.

### C. The Re-Identification Literature Disputes "No Linkage" and "No Sharing" (Howell Decl. Exhibits AA–FF)

The re-identification literature genuinely disputes LinkedIn's assertions that the collected and transmitted data identify no one. Exhibits AA through FF are published re-identification and de-anonymization studies and foundational technical reports appearing between 2000 and 2017, including work by Sweeney, Narayanan and Shmatikov, and de Montjoye. Howell Decl. ¶ 4. They are noticeable on the same publication and legislative-fact grounds. *Supra* § II.

---

[7] *See also* Howell Decl. Ex. Y (Hinds & Joinson, PLOS ONE 2018) (systematic review of 327 studies finding that demographic inference extends to "non-visible" traces including browsing and clickstreams).

LinkedIn asserts that it does not "link those data to member identities, except in furtherance of servicing the member's account or securing the platform," Mot. at 9, and its declarant attests that "LinkedIn has not, and does not, link browser extension detection results to member identities in order to use that information for any revenue-generating, marketing, or advertising purpose," Seymour Decl. ¶ 17. Both denials are purpose-qualified, and the declaration separately attests that "[b]rowser tracking events are stored for up to two years" and that "a customer support representative may seek to determine whether the member has browser extensions installed that could degrade webpage performance." *Id.* ¶ 19. Exhibit O supplies the frame for that concession: a fingerprint is "akin to a cookie that cannot be deleted," collected where "the user has no control over the collection process," Howell Decl. Ex. O — and the declaration describes a two-year, server-side store, Seymour Decl. ¶ 19, of the very kind Exhibit O describes as beyond user control. The noticed literature then reports that linkage-capable data identifies individuals regardless of the collector's purpose: Exhibit AA calculates that "87% . . . of the population in the United States" are unique on "{5-digit ZIP, gender, date of birth}," Howell Decl. Ex. AA, and Exhibit BB finds that sparse "anonymized" data re-identifies "99% of records" from eight data points, Howell Decl. Ex. BB.[8] Whether the retained, queryable data is linked to identifiable members is genuinely disputed.

LinkedIn asserts that "the transmitted data does not include browser extension detection results, but only record information about web traffic," Mot. at 9, and that "[t]here can be no harm caused by sharing basic data with a vendor who uses it solely in furtherance of purposes to which Plaintiffs expressly agreed," Mot. at 9–10.[9] Exhibit DD finds that "for a majority of users (69%),

---

[8] *Accord* Howell Decl. Ex. CC (de Montjoye et al., Scientific Reports 2013) (finding that "four spatio-temporal points are enough to uniquely identify 95% of the individuals").

[9] The qualifiers "solely" and "expressly agreed" are contradicted on LinkedIn's own proffer: the DPA LinkedIn filed with the Seymour Declaration permits HUMAN Security's "internal use to improve the quality of the services provided by Supplier" notwithstanding its purpose limitation. DPA § 4.1 (the internal-use carve-out in the same provision Seymour quotes, Seymour Decl. ¶

the browsing history is unique." Howell Decl. Ex. DD. Exhibit EE finds that "de-identified web browsing histories can be linked to social media profiles using only publicly available data." Howell Decl. Ex. EE. Exhibit FF explains that identifying information travels inside the URL itself and passes to third parties through the referer header. Howell Decl. Ex. FF. On this literature, "only . . . web traffic" describes one of the most identifying data classes known, and whether the shared data is "basic" is genuinely disputed.

LinkedIn asserts that it "does not share browser extension detection results with any third party." Mot. at 9. Exhibit W reports that "54.86% of users that have installed at least one detectable extension are unique," installed-extension sets are themselves fingerprint components. Howell Decl. Ex. W. And Exhibits I and J show that extensions are detectable from the very stylistic and behavioral traces fingerprinting systems collect. Howell Decl. Exs. I, J. The asserted partition between "extension detection results" and the "device fingerprinting signals" LinkedIn admits transmitting to HUMAN Security, Seymour Decl. ¶¶ 20, 23, is a technical claim the field disputes. The dispute is genuine.

Because identification is precisely what this literature studies and confirms as contested, LinkedIn's no-linkage and no-sharing characterizations cannot be accepted as jurisdictional fact.

### D. The FTC's Own Report Disputes "Routine" and "In No Way Private" (Howell Decl. Exhibit GG)

A federal regulator's published report genuinely disputes LinkedIn's portrait of the practice as routine and harmless. Exhibit GG is the Federal Trade Commission's *Cross-Device Tracking: An FTC Staff Report* (Jan. 2017), published on the agency's official website. Howell Decl. ¶ 4. Agency publications are squarely noticeable. *Daniels-Hall*, 629 F.3d at 998; *Calhoun*, 526 F. Supp. 3d at 611–12 (noticing FTC materials); *see also Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279,

---

24). Ganan cites the document as LinkedIn's admission, not for notice of its truth. The contradiction is developed in Ganan's Opposition to the Motion to Dismiss.

1282 (9th Cir. 1986) (records and reports of administrative bodies), *abrogated on other grounds by Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991).

LinkedIn asserts that the detected information is "publicly available and in no way private," Mot. at 2, and that the pleaded fields are "routine browser information," Mot. at 8–9. Exhibit GG recognizes that probabilistic device tracking links consumers' devices "without" the consumer's "log[in]," in a manner "less apparent to consumers." Howell Decl. Ex. GG at 3, 6. A practice the federal consumer-protection agency has studied and flagged is not "routine" as a matter of common knowledge. The dispute is genuine and the government, not only Ganan, stands on the other side of it.

**E. The Disclosure-Comprehension Literature Disputes That the Quoted Policies Disclosed This Conduct (Howell Decl. Exhibits HH–LL)**

The empirical disclosure literature genuinely disputes LinkedIn's premise that its posted policies disclosed the challenged conduct to a reasonable user. Exhibits HH through LL are published empirical and scholarly studies of whether online disclosures produce actual reading, understanding, or agreement, appearing in peer-reviewed journals and leading law reviews. Howell Decl. ¶ 4. They are noticeable as publications, *Von Saher*, 592 F.3d at 960, and as legislative-fact material bearing on how consent doctrine should treat boilerplate disclosures, *supra* § II. Consent, moreover, is LinkedIn's burden to prove.

LinkedIn asserts that its "right to detect this information is disclosed and agreed to by all its members." Mot. at 2. Exhibit HH calculates that reading the privacy policies an ordinary user encounters would consume "about 54 billion hours" nationally each year. Howell Decl. Ex. HH. Exhibit II finds, in a controlled study, that large majorities skipped the policies entirely and "agreed" to gotcha clauses providing for data sharing "with the NSA and employers" and "a first-born child as payment." Ex. II. Universal agreement-in-fact is empirically contested. The dispute is genuine.

LinkedIn asserts that "[w]hen any web user (visitor or signed-in member) uses LinkedIn, they agree to LinkedIn's User Agreement." Mot. at 4. Exhibit LL observes that "[m]ost people do not read privacy notices on a regular basis," Howell Decl. Ex. LL, and Exhibit JJ documents interface designs that "coerc[e], steer[], or deceiv[e] users into making unintended . . . decisions," Howell Decl. Ex. JJ. Whether use equals informed agreement is a studied question with a hostile empirical record. The dispute is genuine.

LinkedIn asserts that its Privacy Policy "expressly discloses" access to "information about your network and device (e.g., IP address, proxy server, operating system, web browser and add-ons, device identifier and features, cookie IDs and/or ISP, or your mobile carrier)." Mot. at 5. Exhibit KK finds "very important discrepancies in the interpretation of privacy policy language, particularly with respect to data sharing." Howell Decl. Ex. KK. And the quoted policy language describes receipt of information, while the noticed technical sources describe elicitation by the collecting script. Exs. Q, S, E. The same disclosure, moreover, states that LinkedIn accesses "device information and internet protocol ('IP') addresses to identify you and log your use." Mot. at 5. LinkedIn's own quoted policy ties device data to identity — further disputing the no-linkage premise addressed in Section III.C. Whether that text disclosed the challenged conduct to a reasonable user is genuinely disputed.

The noticed studies bear on the question the motion assumes away: whether a reasonable user would have understood the quoted policy text to disclose covert extension probing and canvas fingerprinting — the disputed premise of the motion's "expressly discloses" assertions. Whether the quoted disclosures disclosed this conduct to a reasonable user is genuinely disputed, and consent is LinkedIn's burden to prove. The motion's consent recitals cannot be credited as jurisdictional fact.

## IV.   THESE MATERIALS DEFEAT THE FACTUAL ATTACK

Because LinkedIn elected a factual attack, the noticed materials are competent proof that defeats it. Three steps compel that conclusion.

First, LinkedIn's choice of a factual attack set the evidentiary rules. A factual attack "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction," *Safe Air*, 373 F.3d at 1039, and the plaintiff responds with "competent proof" "under the same evidentiary standard that governs in the summary judgment context," *Leite*, 749 F.3d at 1121. Judicially noticed publications, agency reports, and browser-maker documentation, offered for existence and content, are exactly such proof, and the mechanism is twofold. Their existence and content impeach Seymour's characterizations of the very signals and mechanisms his declaration describes, and they establish that each jurisdictional premise is itself "subject to reasonable dispute," Fed. R. Evid. 201(b), so no premise can be noticed for LinkedIn or found as jurisdictional fact without the weighing *Bowen* forbids.

Second, the Court views Ganan's evidence in his favor and may not weigh it away. In *Bowen*, the Ninth Circuit reversed a factual-attack dismissal because the district court impermissibly weighed evidence "that implicates both jurisdictional and merits issues," holding that "[c]ontested evidence is viewed in the light most favorable to the nonmoving party." 118 F.4th at 1143–46. The plaintiff there did what Ganan does here: submitted evidence "that raises further disputes of material fact." *Id.* at 1147-48. Seymour's characterizations, "passively exposes," "simply observing," "does not share," and the motion's "in no way private" cannot be weighed against the browser makers' documentation, the peer-reviewed literature, and the FTC on a Rule 12 record.

Third, the disputes are intertwined with the merits, so their resolution belongs to the trier of fact. Jurisdiction and merits are intertwined "where a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief." *Safe*

Pl. Ganan's RJN | 3:26-cv-02968-VC                15

*Air*, 373 F.3d at 1039. Here the contested facts, what LinkedIn's code did, what the signals reveal, whether the data identifies members, what the disclosures disclosed, are simultaneously the standing inquiry and the elements of Ganan's CIPA, ECPA, CDAFA, and privacy claims. On a factual attack the court "must leave the resolution of material factual disputes to the trier of fact when the issue of [standing] is intertwined with an element of the merits of the plaintiff's claim." *Bowen*, 118 F.4th at 1141.

The attack fails if any one intertwined dispute survives. To negate the privacy injury, LinkedIn must carry the public-availability, passivity, no-sensitivity, and consent premises, the first, second, third, and sixth identified above. To negate the economic injury, it must carry the no-linkage and no-sharing premises, the fourth and fifth, together with its assertion that the data lacks economic value, Mot. at 10. A genuine dispute on any premise within a theory keeps that injury and jurisdiction alive. Each of the five categories of exhibits above supplies at least one.

Even if the Court declines to notice some or all of Ganan's exhibits, LinkedIn's motion to dismiss fares no better. *Khoja* independently bars noticing LinkedIn's contrary premises for their truth, 899 F.3d at 999, so the remedy for a genuine dispute is to withhold notice from both sides and deny the factual attack, not to resolve the dispute for the movant. At minimum, the documented disagreement among Google, Mozilla, the W3C, a dozen top-venue research teams, and the FTC establishes that each premise is "subject to reasonable dispute" under Rule 201(b), which is all Ganan needs. And the request's own posture confirms its limit: Ganan attaches a study cutting against his position on fingerprint uniqueness, Howell Decl. Ex. P, because his request documents a dispute where LinkedIn's companion request asks the Court to resolve one. The factual attack cannot be sustained on this record.

## V.  CONCLUSION

The Court should take judicial notice of the existence and content of Exhibits A through LL to the Howell Declaration, and should decline to resolve any of the disputed factual premises identified above in LinkedIn's favor on its Rule 12 motion.

Respectfully submitted,

J.R. HOWELL,
LAW OFFICE OF J.R. HOWELL

Date:  July 14, 2026

By:  _/s/ J.R. Howell_
J.R. Howell (State Bar No. 268086)
*Attorney for Plaintiff, Jeff Ganan and*
*the Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on July 14, 2026. I further certify that Counsel for Defendant, LinkedIn Corporation, are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on July 14, 2026.

/s/ J.R. Howell
J.R. Howell (Cal. Bar No. 268086)